FILED
August 25, 2024
KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| IN THE MATTER OF<br>THE EXTRADITION OF<br>HUZEFA HAFIZ ISMAIL | Case No. 4:24-MJ-656 |

## COMPLAINT
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1. In this matter, I represent the United States in fulfilling its treaty obligations to France.

2. There is an extradition treaty in force between the United States and France. *See* Extradition Treaty Between the United States of America and France, U.S.-Fr., Apr. 23, 1996, S. TREATY DOC. NO. 105-13 (1997), *and* the Instrument as contemplated by Article 3, paragraph 2, of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the United States of America and France signed 23 April 1996, U.S.-Fr., Sept. 30, 2004, S. TREATY DOC. NO. 109-14 (2006) (together, the "Treaty").

3. The Treaty provides, in Article 13, for the provisional arrest and detention of alleged fugitives pending the submission of a formal request for extradition and supporting documents.

4. In accordance with Article 13 of the Treaty, France has asked the United States for the provisional arrest of **Huzefa Hafiz Ismail** (**Ismail** or the "fugitive"), with a view toward his extradition.

5. According to the information France has provided, **Ismail** is wanted by France so that he may be prosecuted for (1) money laundering, in violation of Article 222-38 of the French Criminal Code; (2) serious money laundering, in violation of Article 324-2 of the French Criminal Code; and (3) participation in a criminal conspiracy with the view to the preparation of a crime, participation in a criminal conspiracy with the view to the preparation of an offense sanctioned by 10 years' imprisonment, and participation in a criminal conspiracy with the view to the preparation of an offense sanctioned by at least 5 years' imprisonment, in violation of Article 450-1 of the French Criminal Code.[1]

6. France has jurisdiction over these offenses. On July 30, 2024, Julien Gau, Vice-President in charge of the investigation, of the Paris Tribunal Judiciaire, a judicial officer authorized by French law to issue warrants of arrest, issued a warrant in France for **Ismail**'s arrest for these offenses. The warrant remains valid and enforceable.

7. France's request presents the following information as the basis for the complaint and arrest warrant:

   a. On or about March 9, 2021, French authorities, in collaboration with other

---

[1] The United States is seeking a warrant for **Ismail's** provisional arrest based only on these charges. France requested **Ismail's** provisional arrest on additional charges, and the United States's decision to proceed in urgent circumstances on these select charges is without prejudice

countries, dismantled the encrypted messaging application SkyECC based on SkyECC being used exclusively to facilitate activities related to organized crime.

b. Upon analysis of intercepted encrypted text messages sent over SkyECC, French authorities identified a communication between SkyECC users "3DOR3D" and "E░░░░" that appeared to relate to a pickup of "900K" in Paris. Investigation revealed exchanges between these users on SkyECC related to the collection of funds that were the proceeds of drug trafficking. Further analysis of the SkyECC communications of user 3DOR3D, who used the SkyECC name "CEO-DARKBANK," revealed that CEO-DARKBANK acted as a broker or a financial intermediary to launder the proceeds of drug trafficking or other unlawful operations. Specifically, CEO-DARKBANK would collect the illicit funds and transmit them to third parties. The third parties, after taking a commission of the funds, would then credit the funds in cryptocurrency to various cryptocurrency wallets used by CEO-DARKBANK.

c. French authorities' analysis of the SkyECC communications of CEO-DARKBANK revealed the following communications, among others:

   i. Communications between CEO-DARKBANK and SkyECC users

---

to proceeding on additional charges when France's formal request for extradition is submitted to the United States, or thereafter.

D▓▓▓▓ (who used the name "T▓▓") and V▓▓▓▓ (who used the name "▓▓▓▓"), in which they discussed "stuff" in Costa Rica and Panama and exchanged a photograph of a slab of cocaine. In particular, among other things:

1. Communications on or about October 16, 2020, revealed that CEO-DARKBANK participated as an intermediary in the acquisition of 500 kilograms of cocaine stored in Costa Rica, as well as the financing for these narcotics in Sao Paolo, Brazil, on behalf of L▓▓▓▓. That day, L▓▓▓▓ wrote to CEO-DARKBANK, "is any stuff in costa rica?" That same day, T▓▓ wrote to CEO-DARKBANK, asking CEO-DARKBANK to give him a token and a telephone number for the "stuff" in Costa Rica and to send him money. L▓▓▓▓ then asked CEO-DARKBANK to send him the logo and a photo of the product. T▓▓ sent CEO-DARKBANK a photograph of a loaf of cocaine with the logo "R=67." CEO-DARKBANK sent this photograph to L▓▓▓▓ and told him to take a look. Then, L▓▓▓▓ explained to CEO-DARKBANK that he had a man who would "go empty" because the amount of cash was equivalent to two bags, and that another individual would drop off the first individual near the address because he did not want

to communicate too close to the house. CEO-DARKBANK and L▮▮▮ then communicated regarding currency conversions, and L▮▮▮ informed CEO-DARKBANK that "all 500" had the same logo. L▮▮▮ also instructed CEO-DARKBANK to pay the amount owed in Brazil.

ii. Communications on or about July 22, 2020, between CEO-DARKBANK and SkyECC user F▮▮▮ (who used the name "P▮▮▮"), in which P▮▮▮ wrote that the Colombian group he was dealing with did not like circulating photographs of their product, that he needed 28 million pesos from Medellin and Cucuta, and that CEO-DARKBANK should tell his network that a sample could be taken and that the merchandise had been sold quickly by another network. The next day, P▮▮▮ wrote to CEO-DARKBANK that the merchandise had been sold because "they" had liked the sample, and that there would be "500 more" that week.

iii. Communications on or about September 3, 2020, between CEO-DARKBANK and T▮▮▮, in which T▮▮▮ sent CEO-DARKBANK a photograph of a slab of drugs with a logo "Z20" and offered that CEO-DARKBANK's "mates" could take the merchandise.

iv. Communications on or about September 8, 2020, between CEO-DARKBANK and P▮▮▮, in which P▮▮▮ informed CEO-

5

DARKBANK of the arrival of "700 bits" in Costa Rica. P▓ also sent CEO-DARKBANK a photograph of a slab of drugs with a logo "3R" and wrote that he was waiting for the price.

v. Communications between CEO-DARKBANK and SkyECC user J▓, who was identified by Belgian police as J▓ B▓, a drug trafficker. In the correspondence, B▓ transferred contact information to CEO-DARKBANK, and B▓ and CEO-DARKBANK appeared to be close acquaintances.

vi. A communication on or about June 22, 2020, between CEO-DARKBANK and SkyECC user 4▓, in which 4▓ organized the transmission of drug trafficking proceeds to an individual or individuals named "R▓" and asked CEO-DARKBANK to collect the funds related to this transaction. CEO-DARKBANK and 4▓ also exchanged photographs showing the series numbers of bank notes to confirm that the funds were received, and they communicated regarding cash collection in the U.K.

vii. A communication on or about July 25, 2020, between CEO-DARKBANK and SkyECC user E▓ (who used the name "B▓"), in which they organized a cash delivery in the amount of hundreds of thousands of euros.

  viii. Communications between on or about November 26, 2020, and November 27, 2020, between CEO-DARKBANK and SkyECC user 7▮▮▮ (who used the name "C▮▮▮"), in which they arranged a collection of funds in Paris in the amount of approximately 800,000 euros. CEO-DARKBANK informed C▮▮▮ that he could offer C▮▮▮ a rate of 6%. They exchanged numbers for the issuance of the funds. Subsequently, CEO-DARKBANK informed C▮▮▮ that the operation had been carried out.

  ix. Communications, including between CEO-DARKBANK and SkyECC users A▮▮▮ and 5▮▮▮, regarding collection activity in Dubai totaling approximately several million euros.

  x. Communications between CEO-DARKBANK and SkyECC user B▮▮▮ (who used the name "t▮▮▮" or "Q▮▮▮"), in which CEO-DARKBANK issued instructions for cash payments or payments to cryptocurrency wallets used by CEO-DARKBANK, and the users exchanged screen shots depicting cryptocurrency tokens and deposit addresses.

d. Based on their analysis of CEO-DARKBANK's SkyECC communications, French authorities identified cryptocurrency wallets used by CEO-DARKBANK. Among other things, investigators found that, between on or about June 20, 2020, and April 5, 2021, CEO-DARKBANK used one of the

    wallets to send or receive approximately USD 284 million. Further, analysis of the transactions revealed that the wallet was used as a transaction hub, facilitating financial transactions between payors of Russian, Ukrainian, and Turkish nationalities and beneficiaries of Colombian nationality, through intermediaries residing in the United Arab Emirates. CEO-DARKBANK shared the private key for this wallet in a SkyECC messaging group and organized the shared management of the wallet by various SkyECC users, including Q███████████.

  e. The French investigation further established that **Ismail** was the user of the CEO-DARKBANK SkyECC account, including through analysis of information sent by the account depicting **Ismail**'s ex-partner, residence, and flights and the birth of his child.

8. Article 2 of the Treaty covers the offenses of which **Ismail** is accused.

9. **Ismail** may be found within the jurisdiction of this Court. Specifically, the government has received information that **Ismail** is scheduled to fly out of DFW Airport on August 26, 2024.

10. France has represented that it will submit a formal request for extradition within the time the Treaty requires.

11. **Ismail** would be likely to flee if he learned of the existence of a warrant for his arrest.

  WHEREFORE, the undersigned requests that a warrant for **Ismail**'s arrest be

issued in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and France, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered, and that this complaint and the warrant be placed under the seal of the Court, except as disclosure is needed for its execution, until such time as the warrant is executed.

_____
MATTHEW WEYBRECHT
Assistant United States Attorney

Sworn to me, over the telephone or other electronic means, and signed by me pursuant to Fed.R.Crim.P.4.1 on this 25th day of August 2024 at __5:14__ p.m., in Fort Worth, Texas.

_____
Hal R. Ray, Jr.
United States Magistrate Judge