# EXHIBIT 1

## Extradition Package

## DECLARATION OF STACY HAUF

I, Stacy Hauf, declare and say as follows:

1. I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Huzefa Hafiz Ismail. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and France are found in the Extradition Treaty Between the United States of America and France, with Agreed Minute, signed on 23 April 1996, (the "1996 Treaty"), and the Instrument as contemplated by Article 3, paragraph 2, of the Agreement on Extradition between the United States of America and the European Union signed on 25 June 2003, as to the application of the Extradition Treaty between the United States of America and France signed 23 April 1996, signed 30 September 2004 (the "Instrument"). Copies of the 1996 Treaty and Instrument are attached to this declaration.

3. In accordance with the provisions of the 1996 Treaty and Instrument, the Embassy of France has submitted Diplomatic Note No. 2024-0434671, dated October 21, 2024, formally requesting the extradition of Huzefa Hafiz Ismail. A copy of the diplomatic note is attached to this declaration.

4. In accordance with Article 22 of the 1996 Treaty, the United States provides legal representation in the U.S. courts for France in its extradition requests, and France provides legal representation in its courts for extradition requests made by the United States.

5. The offenses relating to money laundering and criminal conspiracy for which extradition is sought are covered under Article 2 of the 1996 Treaty. The other charges presented in the request have not currently been referred to the court for consideration, although the United States' decision to proceed on these select charges is without prejudice to proceeding on additional charges.

SENSITIVE BUT UNCLASSIFIED

-2-

6. Under Article 11 of the 1996 Treaty, as amended by Item II of the Instrument, documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition proceedings without further certification, authentication, or other legalization. Therefore, such documents satisfy the authentication requirements without the need for certification by the U.S. Embassy in Paris. France, in submitting documents in the instant case that bear the certificate or seal of the Ministry of European and Foreign Affairs, has complied with Treaty and Instrument with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on December 2, 2024.

Stacy Hauf

Attachments:

    1. Copy of Note

    2. Copies of Treaty and Instrument

SENSITIVE BUT UNCLASSIFIED

*Ambassade de France*
*aux Etats-Unis*

**UNOFFICIAL TRANSLATION**

L/LEI

2024 OCT 22  A 4: 20

DEPARTMENT OF STATE

**Re: Request for extradition of Mr. HUZEFA HAFIZ ISMAIL**

The Embassy of France presents its compliments to the Department of State and has the honor to transmit, together with court documents and their translation (all in duplicate), a request to the American government for the extradition of Mr. HUZEFA HAFIZ ISMAIL born on ▮▮▮▮▮▮▮ 1983 (place of birth unknown), an American citizen.

On July 30th, 2024, he was issued an arrest warrant by Mr. Julien GAU, vice-president in charge of the Pre-trial investigation at the Court of Paris (France) for:

MONEY LAUNDERING: AIDING THE DECEPTIVE JUSTIFICATION OF THE ORIGIN OF GOODS AND INCOME OF THE PERPETRATOR OR UNAUTHORIZED IMPORTATION OF NARCOTICS IN AN ORGANIZED GANG - MONEY LAUNDERING: AIDING THE FALSE JUSTIFICATIO0N OF THE ORIGIN OF THE ASSETS AND INCOME OF THE PERPETRATOR OF A DRUG TRAFFICKING OFFENSE – AGRRAVATED MONEY LAUNDERING : PARTICIPATION IN AN ORGANIZED GROUP IN AN OPERATION TO INVEST, CONCEAL OR CONVERT THE PROCEED AF A CRIME – ORGANIZED EXTORSION – FRAUDULENT ACCES TO AN AUTOMATED DATA PROCESSING SYSTEM - FRAUDULENT OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM – HINEDRING THE OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM – FRAUDULENT INTRODUCTION OF DATA INTO AN AUTOMATED DATA PROCESSING SYSTEM – FRAUDULENT EXTRACTION OF DATA FROM AN AUTOMATED DATA PROCESSING SYSTEM – PARTICIPATION IN A CRIMNAL CONSPIRACY TO PEPARE A CRIME – PARTICIPATION IN A CRIMNAL CONSPIRACY TO PREPARE AN OFFENSE PUNISHABLE BY 10 YEARS IMPRISONMENT - PARTICIPATION IN A CRIMNAL CONSPIRACY TO PREPARE AN OFFENSE PUNISHABLE BY AT LEAST 5 YEARS IMPRISONMENT.

This request, accompanied by an English translation, is transmitted pursuant to:

- The Extradition Treaty of April 23rd, 1996, between France and the United States of America;

- The Extradition Agreement of July 19th, 2003 between the European Union and the United States of America.

The Embassy of France would be very grateful to the Department of State for referring this request to the American judicial authorities and for notifying it of their subsequent actions in this regard.

.../...
SENSITIVE BUT UNCLASSIFIED

- 2 / 2 -

The Embassy of France would be most obliged to the Department of State for asking the American judicial authorities to specify, at the time of the person's release, the length of detention he served for extradition purposes alone.

The Embassy of France avails itself of this opportunity to renew to the Department of State the expression of its highest consideration./.

Washington, DC, October 21th, 2024

Agnès Von Der Mühll
Ministre Conseillière

**Department of State**
**Supervisory Paralegal Specialist**
**Office of The Legal Advisor – Law Enforcement & Intelligence**

**Department of Justice**
**Mr. Thomas BURROWS**
**Office of International Affairs**

SENSITIVE BUT UNCLASSIFIED

*Ambassade de France*
*aux Etats-Unis*

<u>Réf</u> : Demande d'extradition de Huzefa Hafiz ISMAIL
<u>N°</u> : 2024-0434671

L'Ambassade de France présente ses compliments au Département d'Etat et a l'honneur de lui adresser, par la présente note diplomatique, une demande d'extradition originale, accompagnée de sa traduction en langue anglaise, formée auprès du Gouvernement américain contre le nommé Huzefa Hafiz ISMAIL, né le ▮▮▮▮ 1983 (lieu inconnu), de nationalité américaine, en vertu :

- du Traité d'extradition du 23 avril 1996, entre la France et les Etats-Unis d'Amérique signé à Paris le 23 avril 1996
- de l'Accord entre l'Union européenne et les Etats-Unis d'Amérique en matière d'extradition signé le 25 juillet 2003 in Washington, D.C.

Huzefa Hafiz ISMAIL fait l'objet d'un mandat d'arrêt délivré le 30 juillet 2024 par M. Julien GAU, vice-président chargé de l'instruction au tribunal judiciaire de Paris pour des faits de : BLANCHIMENT : AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'IMPORTATION NON AUTORISEE DE STUPEFIANTS EN BANDE ORGANISEE - BLANCHIMENT : AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'UN DELIT DE TRAFIC DE STUPEFIANTS – BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVESRION DU PRODUIT D'UN DELIT – EXTORSION EN BANDE ORGANISEE - ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES - MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES – ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES – INTRODUCTION FRAUDULEUSE DE DONNEES DANS SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES – EXTRACTION FRAUDULEUSE DE DONNEES D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES - PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME - PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI DE 10 ANS D'EMPRISONNEMENT - PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI D'AU MOINS 5 ANS D'EMPRISONNEMENT.

L'Ambassade de France remercie le Département d'Etat de bien vouloir lui faire connaître la suite réservée à cette demande.

L'Ambassade de France prie, en outre, le Département d'Etat, de bien vouloir inviter les autorités judiciaires américaines à préciser au moment

SENSITIVE BUT UNCLASSIFIED

de la remise de l'intéressé la durée de la détention subie au seul titre extraditionnel dans leur pays par le susnommé.

L'Ambassade de France saisit cette occasion pour renouveler au Département d'Etat les assurances de sa très haute considération./.

Agnès Von Der Mühll
Ministre Conseillère

Washington, le 21 octobre 2024

**Département d'Etat**
**Office of The Legal Advisor**
**Law Enforcement & Intelligence**

**Département de la Justice**
**Bureau des Affaires Internationales**
**M. Thomas Burrows**

SENSITIVE BUT UNCLASSIFIED

| 105TH CONGRESS<br>*1st Session* | SENATE | TREATY DOC.<br>105–13 |
| --- | --- | --- |

## EXTRADITION TREATY WITH FRANCE

———

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

EXTRADITION TREATY BETWEEN THE UNITED STATES OF
AMERICA AND FRANCE, SIGNED AT PARIS ON APRIL 23, 1996



JULY 9, 1997.—Treaty was read the first time and, together with the
accompanying papers, referred to the Committee on Foreign Relations
and ordered to be printed for the use of the Senate

———

U.S. GOVERNMENT PRINTING OFFICE

39–118                                  WASHINGTON : 1997

SENSITIVE BUT UNCLASSIFIED

# LETTER OF TRANSMITTAL

———————

THE WHITE HOUSE, *July 9, 1997.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Extradition Treaty between the United States of America and France, signed at Paris on April 23, 1996.

In addition, I transmit, for the information of the Senate, the report of the Department of State with respect to the Treaty. As the report explains, the Treaty will not require implementing legislation.

This Treaty will, upon entry into force, enhance cooperation between the law enforcement communities of both countries. It will thereby make a significant contribution to international law enforcement efforts.

The provisions in this Treaty, which includes an Agreed Minute, follow generally the form and content of extradition treaties recently concluded by the United States.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

WILLIAM J. CLINTON.

(III)

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

## LETTER OF SUBMITTAL

———————

DEPARTMENT OF STATE,
*Washington, June 13, 1997.*

THE PRESIDENT: I have the honor to submit to you the Extradition Treaty between the United States of America and France ("the Treaty"), signed at Paris on April 23, 1996. I recommend that the treaty, which includes an Agreed Minute, be transmitted to the Senate for its advice and consent to ratification.

In many respects, the Treaty follows closely the form and content of extradition treaties recently concluded by the United States. Some of the Treaty's provisions, however, differ from those found in most of our other modern extradition treaties for reasons discussed in the Technical Analysis produced by the United States negotiating delegation. The treaty represents part of a concerted effort by the Department of State and the Department of Justice to develop modern extradition relationships to enhance the United States ability to prosecute serious offenders including, especially, narcotics traffickers and terrorists.

The Treaty marks a significant step in bilateral cooperation between the United States and France. Upon entry into force, it will replace the Treaty of Extradition between the United States of America and the Republic of France signed at Paris on January 6, 1909, and entered into force on July 27, 1911, and the Supplementary Extradition Convention signed at Paris on February 12, 1970, with exchanges of letters of June 2 and 11, 1970, and entered into force on April 3, 1971. That treaty has become outmoded, and the new Treaty will provide significant improvements. The Treaty can be implemented without legislation.

Article 1 obligates each Contracting State to extradite to the other, pursuant to the provisions of the Treaty, any person whom the competent authorities in the Requesting State have charged with or convicted of an extraditable offense.

Article 2(1) defines extraditable offenses as acts punished under the laws of both States by deprivation of liberty for a maximum of at least one year, or by a more severe penalty. Use of such a "dual criminality" clause rather than a list of offenses covered by the Treaty obviates the need to renegotiate or supplement the Treaty as additional offenses become punishable under the laws of both Contracting States.

Article 2(2) defines an extraditable offense to include also an attempt or a conspiracy to commit, or participation in the commission of, an extraditable offense.

Additional flexibility is provided by Article 2(3), which provides that an offense shall be considered an extraditable offense: (1) whether or not the laws in the Contracting States place the offense

(V)

SENSITIVE BUT UNCLASSIFIED

VI

within the same category of offenses or describe the offense by the same terminology; or (2) whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

With regard to an offense committed outside the territory of the Requesting State, Article 2(4) provides that extradition shall be granted when the laws of the Requested State authorize the prosecution or provide for the punishment of that offense in similar circumstances. The United States recognizes the extraterritorial application of many of its criminal statutes and frequently makes requests for fugitives whose criminal activity occurred in foreign countries with the intent, actual or implied, of affecting the United States.

If an extradition request concerns distinct acts, each punishable by deprivation of liberty in both States but not all of which meet the requirements of Article 2(1) and 2(2), Article 2(5) nevertheless requires extradition for all of the acts.

Article 2(6) provides that extradition shall be granted pursuant to the terms of Article 2(1) and 2(2) in matters concerning tax, customs duty, and foreign exchange offenses.

Article 3(1) declares that neither State has an obligation to extradite its own nationals, but the executive authority of the United States shall have the discretion to do so. The nationality of the person sought shall be the nationality of the person at the time the offense was committed.

Article 3(2) requires a State that refuses an extradition request solely on the basis of the nationality of the person sought to submit the case to its authorities for prosecution, if so requested by the Requesting State.

As is customary in extradition treaties, Article 4 incorporates a political offense exception to the obligation to extradite. Article 4(1) states that France shall not grant extradition for an offense considered by France to be a political offense, an offense connected with a political offense, or an offense inspired by political motives. Article 4(1) also states that the United States shall not grant extradition for an offense considered by the United States to be a political offense.

Article 4(2) specifies six categories of offenses that shall not be considered to be political offenses:

(a) a murder or other willful crime against the person of a Head of State of one of the Contracting States, or of a member of the Head of State's family, or any attempt or conspiracy to commit, or participation in, any of the foregoing offenses;

(b) an offense for which both Contracting Parties are obliged pursuant to a multilateral agreement to extradite the requested person or to submit the case to their competent authorities for decision as to prosecution;

(c) a serious offense involving an attack against the life, physical integrity or liberty of internationally protected persons, including diplomatic agents;

SENSITIVE BUT UNCLASSIFIED

VII

(d) an offense involving kidnapping, the taking of a hostage or any other form of unlawful detention;

(e) an offense involving the use of a bomb, grenade, rocket, automatic firearm or letter or parcel bomb if this use endangers persons; or

(f) an attempt or conspiracy to commit, or participation in, any of the offenses listed in paragraphs 2(b), 2(c), 2(d) or 2(e) above.

Article 4(3) creates a regime similar to that of the European Convention on Terrorism, in that the Requested State may deny extradition for any of the offenses mentioned in paragraphs 2(b)-2(f) above, in accordance with the provisions of Article 4(1). However, in evaluating the character of an offense, the Requested State is required to consider its particularly serious nature, if applicable, including that it created a collective danger to life, physical integrity or liberty of persons, that it affected persons not connected to the motives behind it, or that cruel or treacherous means were used in the commission of the offense.

Article 4(4) provides that extradition shall not be granted if the executive authority in the case of the United States or the competent authorities in the case of France have substantial grounds for believing that the request was for the purpose of prosecuting or punishing a person on account of that person's race, religion, nationality or political opinions.

Article 5 permits the parties to deny extradition for an offense that is exclusively a military offense (for example, desertion).

Article 6 permits denial of an extradition request when surrender of the person might entail exceptionally serious consequences related to age or health.

Article 7(1) permits denial of an extradition request for an offense punishable by death in the Requesting State but not in the Requested State, unless the Requesting State provides the assurance that the death penalty will not be imposed or, if imposed, will not be carried out. Article 7(2) declares that the death penalty, if imposed by the courts of the Requesting State, shall not be carried out in instances when a Requesting State has provided an assurance in accordance with Article 7(1).

Article 8 bars extradition when the person sought has been convicted or acquitted in the Requested State for the same offense, but does not bar extradition if the competent authorities in the Requested State have declined to prosecute or have decided to discontinue criminal proceedings against the person sought.

Article 9 states that extradition shall be denied if prosecution or execution of the penalty would be barred by the lapse of time under the laws of the Requested State, but requires that acts in the Requesting State that would interrupt or suspend the prescriptive period are to be taken into account by the Requested State to the extent possible under its laws.

Article 10 establishes the procedures and describes the documents that are required to support an extradition request. The Article requires that all requests for extradition be submitted through the diplomatic channel. Article 10(3)(c) provides that a request for the extradition of a person sought for prosecution be supported by a duly authenticated copy of the warrant or order of arrest and, for

SENSITIVE BUT UNCLASSIFIED

VIII

requests by the United States, the charging document, or for requests by France, the original or a duly authenticated copy of the warrant or order of arrest and such information as would justify the committal for trial of the person if the offense had been committed in the United States.

Article 11 establishes the procedures under which documents submitted pursuant to the provisions of this Treaty shall be received and admitted into evidence in each State.

Article 12 requires all documents submitted by the Requesting State to be translated into the language of the Requested State.

Article 13 sets forth procedures for the provisional arrest and detention of a person sought pending presentation of the formal request for extradition. A request for provisional arrest may be submitted directly between the U.S. Department of Justice and the Ministry of Justice of the French Republic by means of the facilities of the International Criminal Police Organization (INTERPOL) or through the diplomatic channel. Article 13(4) provides that if the Requested State's executive authority has not received the request for extradition and supporting documentation within sixty days after the provisional arrest, the person may be discharged from custody. Article 13(5) provides explicitly that discharge from custody pursuant to Article 13(4) does not prejudice subsequent re-arrest and extradition upon later delivery of the extradition request and supporting documents.

Article 14 sets forth procedures by which the Requested State may seek additional information in support of an extradition request to fulfill the requirements of the Treaty and provides for release from custody of a person under arrest for purposes of extradition if the additional information is not sufficient or not received within the time specified.

Article 15 specifies the procedures governing surrender and return of persons sought. It requires the Requested State to provide prompt notice to the Requesting State through the diplomatic channel regarding its extradition decision. If the request is denied in whole or in part, Article 15(2) requires the Requesting State to provide information regarding the reasons therefor. If extradition is granted, the authorities of the Contracting States shall agree on the date and place for surrender of the person sought. If the person is not removed from the territory of the United States within the time prescribed by its law or within 30 days from the surrender date set in accordance with Article 15(3) in the case of France, that person may be discharged from custody and the Requested State may subsequently refuse extradition for the same offense.

Article 16 concerns temporary and deferred surrender. If a person whose extradition is sought is being prosecuted or is serving a sentence in the Requested State, that State may temporarily surrender the person to the Requesting State solely for the purpose of prosecution. Alternatively, the Requested State may postpone the extradition proceedings until its prosecution has been concluded and the sentence has been served.

Article 17 sets forth a non-exclusive list of factors to be considered by the Requested State in determining to which State to surrender a person sought by more than one State.

SENSITIVE BUT UNCLASSIFIED

IX

Article 18 provides for the seizure and surrender to the Requesting State of property connected with the offense for which extradition is granted, to the extent permitted under the law of the Requested State. Such property may be surrendered even when extradition cannot be effected due to the death, disappearance, or escape of the person sought. Surrender of property may be deferred if it is needed as evidence in the Requested State and may be conditioned upon satisfactory assurances that it will be returned to the Requested State as soon as practicable. Article 18(3) imposes an obligation to respect the rights of third parties in affected property.

Article 19 sets forth the rule of speciality. It provides, subject to specific exceptions, that a person extradited under the Treaty may not be detained, tried, convicted, punished, or subjected to any restriction of his freedom for an offense other than that for which extradition has been granted, unless the Requested State has given it consent or the extradited person leaves the Requesting State after extradition and voluntarily returns to it or fails to leave the Requesting State within thirty days of being free to do so. Article 19(2) addresses situations where the denomination of an offense for which a person has been extradited is altered during the proceedings in the Requested State.

Article 20 provides that the Requesting State may not extradite a person to a third State for an offense committed prior to the original surrender unless the Requested State consents or the person did not leave the territory of the Requesting State within thirty days when given an opportunity to do so, or returned after having left it.

Article 21 governs the transit through the territory of one Contracting State of a person being surrendered to the other State by a third State.

Article 22 contains provisions on representation and expenses. The Requested State is required to advise and assist the Requesting State in accordance with the Agreed Minute on Representation that forms an integral part of the Treaty and is discussed in detail in the Technical Analysis.

Under Article 22(2), the Requesting State is required to bear the expenses related to the translation of documents and the transportation of the person surrendered. Article 22(3) clarifies that neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons sought under the Treaty.

Article 23 states that the United States Department of Justice and the Ministry of Justice of the French Republic may consult with each other directly or through the facilities of INTERPOL in connection with the processing of individual cases and in furtherance of maintaining and improving Treaty implementation procedures.

Article 24(1), like the parallel provision in almost all recent United States extradition treaties, states that the Treaty shall apply to offenses committed before as well as after the date the Treaty enters into force. Upon entry into force of the Treaty, Article 24(2) provides that the current Treaty of Extradition between the United States and France signed January 6, 1909 and the Supplementary Convention signed February 12, 1970, with exchanges of letters

SENSITIVE BUT UNCLASSIFIED

x

signed June 2 and 11, 1970, shall cease to have effect, except for any proceedings in which extradition documents have already been submitted to the courts of the Requested State at the time the Treaty enters into force.

Article 25 provides that each Contracting State shall notify the other of the completion of the constitutional procedures required for ratification of the Treaty, and the Treaty shall enter into force on the first day of the second month following the date of receipt of the last notification.

Under Article 26, either Contracting State may terminate the Treaty at any time upon written notice to the other Contracting State, with termination effective six months after the date of receipt of such notice.

As noted above, a Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation and will be submitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Treaty, including the Agreed Minute, by the Senate at an early date.

Respectfully submitted,

MADELEINE ALBRIGHT.

SENSITIVE BUT UNCLASSIFIED



EXTRADITION TREATY

BETWEEN

THE UNITED STATES OF AMERICA

AND

FRANCE

(1)

SENSITIVE BUT UNCLASSIFIED

2

The President of the United States of America and the President of the French Republic,

Recalling the Extradition Treaty and accompanying Protocol between the United States of America and the Republic of France signed at Paris January 6, 1909 and the Supplementary Convention signed at Paris February 12, 1970 with Exchanges of Letters of June 2 and 11, 1970;

Noting that these treaties continue in force between the Government of the United States of America and the Government of the French Republic until entry into force of this Treaty; and

Desiring to provide for more effective cooperation between the two States in the suppression of crime and to facilitate relations between the two States in the area of extradition by concluding a treaty for the extradition of offenders;

Have decided to conclude a new extradition treaty and have appointed as their plenipotentiaries for this purpose:

The President of the United States of America:

The Honorable, Janet Reno, Attorney General of the United States of America;

The President of the French Republic:

The Honorable, Jacques Toubon, Minister of Justice;

Who, having communicated to each other their respective full powers, which were found in good and due form, have agreed as follows:

SENSITIVE BUT UNCLASSIFIED

3

-2-

### Article 1

#### Obligation to Extradite

The Contracting States agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the competent authorities in the Requesting State have charged with or found guilty of an extraditable offense.

### Article 2

#### Extraditable Offenses

1.  Acts shall be extraditable if they are punished under the laws in both States by deprivation of liberty for a maximum of at least one year or by a more severe penalty. If extradition is requested for purposes of enforcing a judgment, the time remaining to be served must be at least six months.

2.  An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, or participation in the commission of, an offense described in paragraph 1.

3.  For the purposes of this Article, an offense shall be an extraditable offense:

> (a)  whether or not the laws in the Contracting States place the offense within the same category of offenses or describe the offense by the same terminology; or

SENSITIVE BUT UNCLASSIFIED

4

-3-

(b)    whether or not the offense is one for which
United States federal law requires proof or an
element of proof, such as passage from one
state to another, the use of the mails, wire,
and other facilities of interstate or foreign
commerce, or the effects upon such commerce,
since such an element is required for the sole
purpose of establishing the jurisdiction of
United States federal courts.

4.    Extradition shall be granted for an extraditable
offense committed outside the territory of the Requesting
State, when the laws of the Requested State authorize the
prosecution or provide for the punishment of that offense in
similar circumstances.

5.    If the extradition request concerns distinct acts,
each punishable under the laws of the two States by the
deprivation of liberty, and if some of the acts do not fulfill
the conditions set forth in Paragraphs 1 and 2 of this Article,
the Requested State shall nonetheless grant extradition based
upon such acts.

6.    In matters concerning tax, customs duty, and
foreign exchange offenses, extradition shall be granted
pursuant to the terms set forth in paragraphs 1 and 2 of this
Article.

SENSITIVE BUT UNCLASSIFIED

5

-4-

### Article 3
### Nationality

1.    There is no obligation upon the Requested State to grant the extradition of a person who is a national of the Requested State, but the executive authority of the United States shall have the power to surrender a national of the United States if, in its discretion, it deems it proper to do so.  The nationality of the person sought shall be the nationality of that person at the time the offense was committed.

2.    If extradition is refused solely on the basis of the nationality of the person sought, the Requested State shall, at the request of the Requesting State, submit the case to its authorities for prosecution.

### Article 4
### Political Offenses

1.    Extradition shall not be granted by France when the offense for which extradition is requested is considered by France as a political offense or as an offense connected with a political offense or as an offense inspired by political motives.  Extradition shall not be granted by the United States when the offense for which extradition is requested is considered by the United States to be a political offense.

SENSITIVE BUT UNCLASSIFIED

EX-ISMAIL-000021

6

-5-

2.    For the purposes of this Treaty, and in accordance with paragraph 1 of this Article, the following offenses shall not be considered to be political offenses:

(a)    a murder or a willful crime against the person of a Head of State of one of the Contracting States, or a member of his or her family, or any attempt or conspiracy to commit, or participation in, any of the foregoing offenses;

(b)    an offense for which both Contracting States are obliged pursuant to a multilateral agreement to extradite the requested person or to submit the case to the competent authorities for decision as to prosecution;

(c)    a serious offense involving an attack against the life, physical integrity or liberty of internationally protected persons, including diplomatic agents;

(d)    an offense involving kidnapping, the taking of a hostage or any other form of unlawful detention;

(e)    an offense involving the use of a bomb, grenade, rocket, automatic firearm or letter or parcel bomb if this use endangers persons; or

SENSITIVE BUT UNCLASSIFIED

7

---

-6-

(f) an attempt or conspiracy to commit, or
participation in, any of the offenses listed
in paragraphs 2(b), 2(c), 2(d) or 2(e) of this
Article.

3.    The Requested State may deny extradition of persons
who committed any of the offenses mentioned in paragraphs 2(b),
2(c), 2(d), 2(e), and 2(f) of this Article pursuant to the
provisions of paragraph 1 of this Article.

In evaluating the character of the offense, the
Requested State shall take into consideration the particularly
serious nature of the offense, including:

(a) that it created a collective danger to the
life, physical integrity or liberty of persons;

(b) that it affected persons foreign to the
motives behind it; or

(c) that cruel or treacherous means have been used
in the commission of the offense.

4.    Extradition shall not be granted if the executive
authority in the case of the United States or the competent
authorities in the case of France have substantial grounds for
believing that the request was for the purpose of prosecuting
or punishing a person on account of that person's race,
religion, nationality or political opinions.

---

SENSITIVE BUT UNCLASSIFIED

EX-ISMAIL-000023

8

-7-

### Article 5
### Military Offenses

Extradition shall not be granted if the offense in respect of which it is requested is exclusively a military offense.

### Article 6
### Humanitarian Considerations

This Treaty does not prevent the executive authority in the case of the United States or the competent authorities in the case of France from denying extradition when surrender of the person might entail exceptionally serious consequences related to age or health.

### Article 7
### Capital Punishment

1.  When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the Requested State may refuse extradition unless the Requesting State provides the assurance that the death penalty will not be imposed or, if imposed, will not be carried out.

SENSITIVE BUT UNCLASSIFIED

9

-8-

2.   In instances in which a Requesting State provides the assurance in accordance with this Article, the death penalty, if imposed by the courts of the Requesting State, shall not be carried out.

## Article 8
## Prior Prosecution

1.   Extradition shall not be granted when the person sought has been finally convicted or acquitted in the Requested State for the offense for which extradition is requested.

2.   Extradition shall not be refused on the grounds that the authorities in the Requested State have decided not to prosecute the person sought for the acts for which extradition is requested, or to discontinue any criminal proceedings which have been instituted against the person sought for those acts.

## Article 9
## Lapse of Time

1.   Extradition shall be denied if prosecution of the offense or execution of the penalty has been barred by lapse of time under the laws of the Requested State.

2.   Acts in the Requesting State that would interrupt or suspend the prescriptive period are to be taken into account by the Requested State to the extent possible under its laws.

SENSITIVE BUT UNCLASSIFIED

EX-ISMAIL-000025

10

-9-

### Article 10

#### Extradition Procedures and Required Documents.

1.  All requests for extradition shall be submitted through the diplomatic channel.

2.  All requests shall be supported by:

   (a) documents, statements, or other types of information which state the nationality, probable location, and also describe the identity of the person sought in order to establish that the person is the subject of the prosecution or conviction;

   (b) information describing the facts of the offense and the procedural history of the case;

   (c) the text of the provisions describing the offense for which extradition is requested; and

   (d) the text of the law prescribing the punishment for the offense.

3.  A request for extradition of a person who is sought for prosecution shall also be supported by:

   (a) in the case of a request submitted by the United States, a duly authenticated copy of the warrant or order of arrest and the charging document; or

SENSITIVE BUT UNCLASSIFIED

11

-10-

    (b)  in the case of a request submitted by France, an original or a duly authenticated copy of the warrant or order of arrest and such information as would justify the committal for trial of the person if the offense had been committed in the United States.

4.   A request for extradition relating to a person who has been found guilty or convicted of the offense for which extradition is sought shall also be supported by:

    (a)  in the case of a request by the United States, if the person has been convicted, the original or a duly authenticated copy of the final judgment of conviction, or, if the person has been found guilty but has not yet been sentenced, a statement by a judicial authority that the person has been found guilty, and a duly authenticated copy of the warrant of arrest;

    (b)  in the case of a request by France, the original or a duly authenticated copy of the final judgment of conviction;

    (c)  in all cases where a sentence has been imposed, a statement of the remainder of the sentence to be served; and

    (d)  in the case of a person who has been found guilty in absentia, the documents required by paragraph 3.

SENSITIVE BUT UNCLASSIFIED

EX-ISMAIL-000027

12

-11-

Article 11

Admissibility of Documents

The documents which accompany an extradition request shall be received and admitted as evidence in extradition proceedings if:

(a)  in the case of a request from the United States, they are transmitted through the diplomatic channel;

(b)  in the case of a request from France, they are certified by the principal diplomatic or principal consular officer of the United States resident in France, as provided by the extradition laws of the United States, or they are certified or authenticated in any other manner accepted by the laws of the United States.

Article 12

Translation

All documents submitted by the Requesting State shall be translated into the language of the Requested State.

SENSITIVE BUT UNCLASSIFIED

13

-12-

### Article 13
### Provisional Arrest

1.  In case of urgency, a Contracting State may request the provisional arrest of the person sought pending presentation of the request for extradition.  A request for provisional arrest may be transmitted directly between the United States Department of Justice and the Ministry of Justice of the French Republic, by means of the facilities of the International Criminal Police Organization (INTERPOL), or through the diplomatic channel.

2.  The application for provisional arrest shall contain:

      (a)  a description of the person sought and information concerning the person's nationality;

      (b)  the location of the person sought, if known;

      (c)  a brief statement of the facts of the case, including the location and approximate date of the offense;

      (d)  a description of the laws violated;

      (e)  a statement of the existence of a warrant of arrest or a finding of guilt or judgment of conviction against the person sought; and

      (f)  a statement that a request for extradition for the person sought will follow.

SENSITIVE BUT UNCLASSIFIED

14

-13-

3.    The Requesting State shall be notified without delay of the disposition of its application and the reasons for any denial.

4.    A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the Requested State has not received the formal request for extradition and the supporting documents required by Article 10.

5.    The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent rearrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

Article 14

Additional Information

1.    If the Requested State considers that the information furnished in support of a request for extradition is not sufficient to fulfill the requirements of this Treaty, that State may request that additional information be furnished within such reasonable length of time as it specifies.  Such additional information may be requested and furnished directly between the United States Department of Justice and the Ministry of Justice of France or through the diplomatic channel.

SENSITIVE BUT UNCLASSIFIED

15

-14-

2.    If the person sought is under arrest for purposes of extradition and the additional information furnished is not sufficient or is not received within the time specified, the person may be released from custody.  Such release shall not preclude the Requesting State from making another request in respect of the same or any other offense.

3.    When the person is released from custody in accordance with paragraph 2, the Requested State shall notify the Requesting State as soon as practicable.


Article 15

Decision and Surrender


1.    The Requested State shall notify as soon as possible the Requesting State of its decision on the request for extradition.

2.    If the request is denied in whole or in part, the Requested State shall provide an explanation of the reasons for the denial.  The Requested State shall provide copies of pertinent judicial decisions upon request.

3.    If the request for extradition is granted, the authorities of the Contracting States shall agree on the date and place for the surrender of the person sought.  The Requested State shall also notify the Requesting State of the length of time the person has spent in detention for purposes of extradition.

SENSITIVE BUT UNCLASSIFIED

16

-15-

4.   If the person sought is not removed from the
territory of the Requested State within the time prescribed by
its law in the case of the United States, or in the case of
France within 30 days from the date set for the surrender in
accordance with paragraph 3 of this Article, that person may be
discharged from custody, and the Requested State may
subsequently refuse extradition for the same offense.

5.   In the event circumstances beyond the control of
either Contracting State prevent the surrender or reception of
the person sought, the Contracting States shall agree on a new
date for the surrender, and the provisions of paragraph 4 of
this Article shall apply.

Article 16

Temporary and Deferred Surrender

1.   If the extradition request is granted in the case
of a person who is being prosecuted or is serving a sentence in
the Requested State, the Requested State may temporarily
surrender the person sought to the Requesting State for the
purpose of prosecution.  The person so surrendered shall be
kept in custody in the Requesting State and shall be returned
to the Requested State after the conclusion of the proceedings
against that person, in accordance with conditions to be
determined by mutual agreement of the Contracting States.

SENSITIVE BUT UNCLASSIFIED

17

-16-

2.   The Requested State may postpone the extradition
proceedings against a person who is being prosecuted or who is
serving a sentence in that State.  The postponement may
continue until the prosecution of the person sought has been
concluded and any sentence has been served.

Article 17

Requests for Extradition Made by Several States

If the Requested State receives requests from the other
Contracting State and from any other State or States for the
extradition of the same person, either for the same offense or
for different offenses, the executive authority in the case of
the United States and the competent authorities in the case of
France shall determine to which State the person will be
surrendered.  In making its decision, the Requested State shall
consider all relevant factors, including but not limited to:
whether the requests were made pursuant to treaty; the place
where each offense was committed; the respective interests of
the requesting States;  the gravity of the offenses; the
nationality of the person sought and the victim; the
possibility of further extradition between the requesting
States; and the chronological order in which the requests were
received from the requesting States.

SENSITIVE BUT UNCLASSIFIED

18

-17-

Article 18

Seizure and Surrender of Property

1.    To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all articles, documents, and evidence connected with the offense in respect of which extradition is granted.  The articles, documents, and evidence mentioned in this Article may be surrendered even when the extradition cannot be effected because of the death, disappearance, or escape of the person sought.

2.    The Requested State may condition the surrender of the property upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable.  The Requested State may also defer the surrender of such property if it is needed as evidence in the Requested State.

3.    The rights of third parties in such property shall be duly respected.

Article 19

Rule of Speciality

1.    A person extradited under this Treaty shall not be detained, tried, convicted, punished, or subjected to any restriction of his freedom in the territory of the Requesting

SENSITIVE BUT UNCLASSIFIED

19

-18-

State for any act prior to the person's surrender, other than the offense for which extradition has been granted, except in the following cases:

    (a)  when the Requested State has given its consent. A request for such purpose may be submitted, together with the documents listed in Article 10, and any statements made by the person extradited concerning the offense for which the consent of the Requested State is requested; or

    (b)  when, having had the opportunity to do so, the person extradited did not leave the territory of the Requesting State within 30 days of his final release, or returned to the territory of the Requesting State after having left it.

2.  If the denomination of the offense for which a person has been extradited is altered during the proceedings under the laws of the Requesting State or such a person is charged with a differently denominated offense, the person shall be prosecuted or sentenced provided the offense under its new legal description is:

    (a)  based on the same set of facts contained in the extradition request and its supporting documents; and

    (b)  punishable by the same maximum penalty as, or a lesser maximum penalty than, the offense for which he was extradited.

SENSITIVE BUT UNCLASSIFIED

20

-19-

### Article 20

### Reextradition to a Third State

1.  When a person has been surrendered by the Requested State to the Requesting State, the Requesting State shall not surrender the person extradited to a third State for an offense prior to the person's surrender, unless:

        (a)   the Requested State consents to such surrender; or

        (b)   the person extradited, having had the opportunity to do so, did not leave the territory of the Requesting State within 30 days of the person's final release, or returned to the territory of the Requesting State after having left it.

2.  Before granting a request under paragraph 1(a) above, the Requested State may request the documents referred to in Article 10, and any statements made by the person extradited with respect to the offense for which the consent of the Requested State is requested.

### Article 21

### Transit

1.  Either Contracting State may authorize transportation through its territory of a person surrendered to the other State by a third State.  A request for transit shall

SENSITIVE BUT UNCLASSIFIED

-20-

be made through the diplomatic channel or directly between the
United States Department of Justice and the Ministry of Justice
of the French Republic. The facilities of INTERPOL may also be
used to transmit such a request. It shall contain a
description of the person being transported and a brief
statement of the facts of the case. A person in transit may be
detained in custody during the period of transit.

2.    No authorization is required where air
transportation is being utilized by one Contracting State and
no landing is scheduled on the territory of the other
Contracting State. If an unscheduled landing occurs on the
territory of the other Contracting State, that Contracting
State may require the request for transit as provided in
paragraph 1. That Contracting State shall detain the person to
be transported until the request for transit is received and
the transit is effected, so long as the request is received
within 96 hours of the unscheduled landing.


Article 22

Representation and Expenses


1.    The Requested State shall advise and assist the
Requesting State in connection with a request for extradition.
Such advice and assistance shall be rendered in accordance with
the provisions of the accompanying agreed minute, which shall
form an integral part of this Treaty.

SENSITIVE BUT UNCLASSIFIED

22

-21-

2.   The Requesting State shall bear the expenses related to the translation of documents and the transportation of the person surrendered.  The Requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings.

3.   Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons sought under this Treaty.

### Article 23
#### Consultation

The United States Department of Justice and the Ministry of Justice of the French Republic may consult with each other directly or through the facilities of INTERPOL in connection with the processing of individual cases and in furtherance of maintaining and improving procedures for the implementation of this Treaty.

### Article 24
#### Application

1.   This Treaty shall apply to offenses committed before as well as after the date it enters into force.

SENSITIVE BUT UNCLASSIFIED

23

-22-

2.   Upon the entry into force of this Treaty, the
Treaty of Extradition between the United States of America and
the Republic of France signed at Paris January 6, 1909 and the
Supplementary Convention signed at Paris February 12, 1970 with
Exchanges of Letters signed at Paris June 2 and 11, 1970, shall
cease to have effect between the United States of America and
the French Republic.  Nevertheless, the 1909 Treaty, as
supplemented in 1970, shall apply to any extradition
proceedings in which extradition documents have already been
submitted to the courts of the Requested State at the time this
Treaty enters into force.

Article 25

Ratification and Entry into Force

Each Contracting State shall notify the other of the
completion of the constitutional procedures required for the
ratification of this Treaty.  The Treaty shall enter into force
on the first day of the second month following the date of
receipt of the last notification.

SENSITIVE BUT UNCLASSIFIED

EX-ISMAIL-000039

24

-23-

Article 26

Termination


Either Contracting State may terminate this Treaty at any time by giving written notice to the other Contracting State through the diplomatic channel, and the termination shall be effective six months after the date of receipt of such notice.


IN WITNESS WHEREOF, the respective Plenipotentiaries have signed this Treaty.

DONE at Paris, in duplicate, this _23d_ day of April, 1996, in the English and French languages, both texts being equally authentic.

SENSITIVE BUT UNCLASSIFIED

25

**Agreed Minute on Representation**

It is agreed that each country wishes to provide the other with the greatest degree of legal representation and legal advice (at no cost to the other) as would be permitted under its constitution and laws.

In the spirit of this agreement, the two countries further agreed to provide each other legal advice and representation (including representation in court) at least equal to that given to any other country pursuant to an extradition relationship whether existing at the present time or entered into in the future.

For the United States, the agreement means that, at a minimum, the United States will provide legal counsel to review each request for extradition submitted by France with a view to advising and counseling France concerning strengths and weaknesses in its case. Further, to the extent necessary and appropriate, the legal counsel will work with France to improve the documentation in order to increase the likelihood of France's being successful in its request for extradition. Further, the United States undertakes to provide representation for France in all courtroom litigation arising in connection with a request for extradition and all pre-hearing and post-hearing matters connected therewith. Finally, the United States undertakes to provide representation for France in connection with all appellate and "Habeas Corpus" actions in regard to a request for extradition.

SENSITIVE BUT UNCLASSIFIED

26

For France the agreement means that at a minimum, France agrees to the following:

1)  to include in the file presented to the Chambre d'Accusation any memoranda or document transmitted by the U.S. Government in support of its extradition request in order to allow the United States Government to conduct a continuing written defense of its extradition request;

2)  to request that the United States provide supplementary information or explanations as deemed necessary;

3)  to communicate to the U.S. Government the notice of transmittal of the extradition request to the Parquet General of the Chambre d'Accusation;

4)  to seek to postpone the ruling and to transfer the case to another session of the Chambre d'Accusation, in order to allow the U.S. Government, if necessary, the opportunity to argue its position and to submit additional memoranda in response to the oral arguments put forward by the defense. This postponement would be within a strict time limit and could be pronounced automatically or at the request of the Parquet;

5)  to receive communications from a U.S. Consular official or official of the U.S. Department of Justice designated to represent the United States interests in matters related to the extradition request.  The names of these officials will be given to the Ministry of Justice and, if necessary, the prosecutor in question, for each extradition request;

6)  to provide the authorized representative of the United States an opportunity, as soon as the extradition

SENSITIVE BUT UNCLASSIFIED

27

request is made, to furnish by note to the Ministry of Justice, all legal or factual data that he or she deems useful to support the request;

7)    to communicate to the U.S. Government, by means of notice from the Ministry of Justice to the Embassy of the United States in Paris, that the request has been transmitted to the appropriate public prosecutor's office;

8)    to notify the Embassy of the United States in Paris the date of the first hearing during which the extradition request will be examined by the Chambre d'Accusation;

9)    to provide an opportunity for the authorized representative of the United States to furnish, before the hearing, an additional note within a sufficient time period for the interested party to be notified and for the note to be added to the file;

10)    to provide an opportunity for the authorized representatives of the United States to communicate, in a timely fashion, through the Ministry of Justice, to the same degree permitted to the Ministry of Justice, with the parquet general prior to the hearing examining the extradition request.

SENSITIVE BUT UNCLASSIFIED

*Ambassade de France*
*aux Etats-Unis*

**UNOFFICIAL TRANSLATION**

L/LEI

2024 OCT 22  A 4: 20

DEPARTMENT OF STATE

**Re: Request for extradition of Mr. HUZEFA HAFIZ ISMAIL**

The Embassy of France presents its compliments to the Department of State and has the honor to transmit, together with court documents and their translation (all in duplicate), a request to the American government for the extradition of Mr. HUZEFA HAFIZ ISMAIL born on ████████ 1983 (place of birth unknown), an American citizen.

On July 30th, 2024, he was issued an arrest warrant by Mr. Julien GAU, vice-president in charge of the Pre-trial investigation at the Court of Paris (France) for:

MONEY LAUNDERING: AIDING THE DECEPTIVE JUSTIFICATION OF THE ORIGIN OF GOODS AND INCOME OF THE PERPETRATOR OR UNAUTHORIZED IMPORTATION OF NARCOTICS IN AN ORGANIZED GANG - MONEY LAUNDERING: AIDING THE FALSE JUSTIFICATIO0N OF THE ORIGIN OF THE ASSETS AND INCOME OF THE PERPETRATOR OF A DRUG TRAFFICKING OFFENSE – AGRRAVATED MONEY LAUNDERING : PARTICIPATION IN AN ORGANIZED GROUP IN AN OPERATION TO INVEST, CONCEAL OR CONVERT THE PROCEED AF A CRIME – ORGANIZED EXTORSION – FRAUDULENT ACCES TO AN AUTOMATED DATA PROCESSING SYSTEM - FRAUDULENT OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM – HINEDRING THE OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM – FRAUDULENT INTRODUCTION OF DATA INTO AN AUTOMATED DATA PROCESSING SYSTEM – FRAUDULENT EXTRACTION OF DATA FROM AN AUTOMATED DATA PROCESSING SYSTEM – PARTICIPATION IN A CRIMNAL CONSPIRACY TO PEPARE A CRIME – PARTICIPATION IN A CRIMNAL CONSPIRACY TO PREPARE AN OFFENSE PUNISHABLE BY 10 YEARS IMPRISONMENT - PARTICIPATION IN A CRIMNAL CONSPIRACY TO PREPARE AN OFFENSE PUNISHABLE BY AT LEAST 5 YEARS IMPRISONMENT.

This request, accompanied by an English translation, is transmitted pursuant to:

- The Extradition Treaty of April 23rd, 1996, between France and the United States of America;

- The Extradition Agreement of July 19th, 2003 between the European Union and the United States of America.

The Embassy of France would be very grateful to the Department of State for referring this request to the American judicial authorities and for notifying it of their subsequent actions in this regard.

.../...
SBU - LEGAL

- 2 / 2 -

The Embassy of France would be most obliged to the Department of State for asking the American judicial authorities to specify, at the time of the person's release, the length of detention he served for extradition purposes alone.

The Embassy of France avails itself of this opportunity to renew to the Department of State the expression of its highest consideration./.

Washington, DC, October 21th, 2024

Agnès Von Der Mühll
Ministre Conseillère

**Department of State**
**Supervisory Paralegal Specialist**
**Office of The Legal Advisor – Law Enforcement & Intelligence**

**Department of Justice**
**Mr. Thomas BURROWS**
**Office of International Affairs**

SBU - LEGAL

*Ambassade de France*
*aux Etats-Unis*

Réf : Demande d'extradition de Huzefa Hafiz ISMAIL
N° : 2024-0434671

L'Ambassade de France présente ses compliments au Département d'Etat et a l'honneur de lui adresser, par la présente note diplomatique, une demande d'extradition originale, accompagnée de sa traduction en langue anglaise, formée auprès du Gouvernement américain contre le nommé Huzefa Hafiz ISMAIL, né le ████ 1983 (lieu inconnu), de nationalité américaine, en vertu :

- du Traité d'extradition du 23 avril 1996, entre la France et les Etats-Unis d'Amérique signé à Paris le 23 avril 1996
- de l'Accord entre l'Union européenne et les Etats-Unis d'Amérique en matière d'extradition signé le 25 juillet 2003 in Washington, D.C.

Huzefa Hafiz ISMAIL fait l'objet d'un mandat d'arrêt délivré le 30 juillet 2024 par M. Julien GAU, vice-président chargé de l'instruction au tribunal judiciaire de Paris pour des faits de : BLANCHIMENT : AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'IMPORTATION NON AUTORISEE DE STUPEFIANTS EN BANDE ORGANISEE - BLANCHIMENT : AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'UN DELIT DE TRAFIC DE STUPEFIANTS – BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVESRION DU PRODUIT D'UN DELIT – EXTORSION EN BANDE ORGANISEE - ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES - MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES – ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES – INTRODUCTION FRAUDULEUSE DE DONNEES DANS SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES – EXTRACTION FRAUDULEUSE DE DONNEES D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES - PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME - PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI DE 10 ANS D'EMPRISONNEMENT - PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI D'AU MOINS 5 ANS D'EMPRISONNEMENT.

L'Ambassade de France remercie le Département d'Etat de bien vouloir lui faire connaître la suite réservée à cette demande.

L'Ambassade de France prie, en outre, le Département d'Etat, de bien vouloir inviter les autorités judiciaires américaines à préciser au moment

SBU - LEGAL

de la remise de l'intéressé la durée de la détention subie au seul titre extraditionnel dans leur pays par le susnommé.

L'Ambassade de France saisit cette occasion pour renouveler au Département d'Etat les assurances de sa très haute considération./.

Agnès Von Der Mühll
Ministre Conseillère

Washington, le 21 octobre 2024

**Département d'Etat**
**Office of The Legal Advisor**
**Law Enforcement & Intelligence**

**Département de la Justice**
**Bureau des Affaires Internationales**
**M. Thomas Burrows**

SBU - LEGAL



**MINISTÈRE
DE L'EUROPE
ET DES AFFAIRES
ÉTRANGÈRES**

*Liberté
Égalité
Fraternité*

C.A.D. WASHINGTON
ARRIVE PAR VALISE

OCT 1 7 2024 4 2

**Direction des Français à l'étranger
et de l'administration consulaire**

**Service des conventions,
des affaires civiles
et de l'entraide judiciare**

**Mission des conventions
et de l'entraide judiciaire**

Paris, le 04/10/2024

**DE : YANNICK ANDRIANARAHINJAKA**

**Chef de la mission des conventions et de l'entraide judiciaire**

FAE/SAEJ/CEJ n° 2024 – 0413063

Rédacteur : Martin CHOLLET

<u>Objet</u> : **Demande d'extradition** formée auprès des autorités américaines à l'encontre du nommé **Huzefa Hafiz ISMAIL**, né le 1983, de nationalité américaine.

<u>Référence</u> : Dossier n°REM-2408J3S0

PJ : 1 dossier

A la demande du ministère de la Justice, le Département vous prie de bien vouloir trouver ci-joint, avec les pièces de justice, une demande formée auprès des autorités américaines en vue de l'extradition du nommé **Huzefa Hafiz ISMAIL**, né le 1983, de nationalité américaine.

L'intéressé est recherché par les autorités françaises au titre d'un mandat d'arrêt décerné le 30 juillet 2024 par le juge d'instruction près le tribunal judiciaire de Paris, pour des faits qualifiés de blanchiment, blanchiment aggravé, extorsion en bande organisée, accès et maintien frauduleux dans un système de traitement automatisé des données, introduction frauduleuse de données dans un système de traitement automatisé des données, extraction frauduleuse de données d'un système de traitement automatisé des données, entrave au fonctionnement d'un système de traitement automatisé des données, participation à une association de malfaiteurs en vue de la préparation d'un crime, participation à une association de malfaiteurs en vue de la préparation d'un délit puni de 10 ans d'emprisonnement, participation à une association de malfaiteurs en vue de la préparation d'un délit puni d'au moins 5 ans d'emprisonnement.

Cette demande est formée sur le fondement du Traité bilatéral franco-américain signé à Paris le 23 avril 1996, de l'Accord entre l'Union européenne et les États-Unis en matière d'extradition du 25 juin 2003, de la Convention sur la cybercriminalité du Conseil de l'Europe du 23 novembre 2001, de la Convention unique des Nations Unies sur les stupéfiants du 30 mars 1961, de la Convention des Nations Unies sur le trafic illicite de stupéfiants et de substances psychotropes du 19 décembre 1988, et de la Convention des Nations Unies contre la criminalité transnationale organisée du 15 novembre 2000.

Tél : 01.43.17.90.12
Mél : martin.chollet@diplomatie.gouv.fr
27 rue de la Convention - CS 91533
75732 Paris Cedex 15

1/2

SBU - LEGAL

Le Département vous serait reconnaissant de bien vouloir remettre cette demande aux autorités américaines, dès que possible, et de lui faire connaitre la suite réservée./.

**YANNICK ANDRIANARAHINJAKA**

À :
Ambassade de France aux États-Unis d'Amérique
WASHINGTON

Tél : 01.43.17.90.12
Mél : martin.chollet@diplomatie.gouv.fr
27 rue de la Convention - CS 91533
75732 Paris Cedex 15

SBU - LEGAL

EX-ISMAIL-000049

COUR D'APPEL DE PARIS
PARQUET DU TRIBUNAL JUDICIAIRE
DE PARIS

6ème DIVISION - SECTION A2

Exécution des peines

Entraide Pénale Internationale

TÉL.: 01 44 32 56 84
FAX: 01 44 32 58 56

Paris, September 26, 2024

Mrs., the Prosecutor of the Republic
at the Paris Judicial Court

to

Madam the Public Prosecutor at the
Paris Court of Appeal of Paris

**SUBJECT: Request for the extradition of Mr. Huzefa Hafiz ISMAIL addressed to the US authorities**

Our ref.: 21064000646

I have the honor to formally request, in support of the attached documents, the extradition of Mr. Huzefa Hafiz ISMAIL, born on ⬛⬛⬛ 1983, on the basis of an Arrest Warrant issued on July 30, 2024, by Mr. Julien GAU, Vice-President in charge of pre-trial investigations at the Tribunal Judiciaire of Paris, who was the subject of a European Arrest Warrant issued on August 30, 2024, by Mrs. Natacha RATEAU, First Deputy Public Prosecutor at the Tribunal Judiciaire of Paris.

**I / Identity of the person whose extradition is requested:**

Name: **ISMAIL**
First name: **Huzefa Hafiz**
DOB ⬛⬛ 983
Nationality: **USA**
Passport number: ⬛⬛ 7428
Holder of golden visa: ⬛⬛ 5037 and Emirate United Number: ⬛ 097

*Arrested on August 27, 2024, in the State of Texas - the United States of America.*



Copie certifiée
conforme à l'original

Fernando TORRES
Traducteur - Interprète
ESPAGNOL / ANGLAIS
FRANÇAIS
Traduit le 26/09/2024

SBU - LEGAL

**II / The facts:**

*Overview: the SkyECC encrypted telephony solution:*

Sky ECC is a technical solution for encrypted telephone communication favored by criminal organizations, particularly in terms of anonymization through the use of SkyPin, encryption of the said solution, subscription terms and distribution methods.

After several international police and judicial investigations, the mechanics of the application were revealed. SkyECC is an encrypted telephony solution developed and deployed by Vancouver-based Canadian company SKY GLOBAL In. which guarantees its customers enhanced anonymity and untraceability. The servers hosting this telephony solution were located in Roubaix (France), and the phones were illegally distributed in France.

Technical investigations made it possible to decode the extremely sophisticated encryption of these phones, which were used extensively in high-intensity transnational organized crime (gang murders, massive drug imports, kidnappings, arms trafficking). The profits generated, mainly through the use of cryptocurrencies, appeared to be huge and entirely secretive.

Investigations revealed that the SkyECC solution consisted of particularly sophisticated encryption software used on smartphones in organized crime circles. The solution includes the following functionalities:

- End-to-end encryption;
- Deactivation of phone functions such as the built-in camera, microphone or GPS location, which could leave traces on the device that could be exploited by the police;
- Possibility of remote deletion, with a "distress" password that can be entered under pressure to erase all data on the device;
- No data is stored on the server, so it cannot be accessed by the police;
- The encrypted application can be hidden behind a normal-looking application, so that it is not immediately visible, especially to the police in the event of an arrest;
- Possibility of sending "read-only" communications, so that they cannot be copied.

By way of example, during judicial investigations into murder, kidnapping and drug trafficking, the solution has enabled suspects or suspect contacts to delete the contents of equipped telephones by giving or sending a "panic" password.

*Overview: the ENCROCHAT encrypted telephony solution:*

The precursor to SKY ECC, ENCROCHAT was an encrypted telephony solution consisting of ANDROID phones sold at a price of 1,000 euros, plus a subscription of 1,500 euros for a 6-month period, enhanced with an encryption software overlay and devoid of GPS, USB Port, webcam and microphone functionalities, equipped with a dual operating system simulating a normal phone. The solution enabled ENCROCHAT messages to be erased using a specific pin code, as well as remote erasure by the vendor/assistance. Given these features, the solution was used by criminal groups convinced of their anonymity.

Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000051

Following a judicial data capture operation, the company ceased operations in June 2020. According to the latest press release, the dismantling of ENCROCHAT resulted in 6,558 arrests worldwide, including 197 High Value Targets, as well as the seizure of 739.7 million euros in cash, 30.5 million tablets of chemical drugs, 103.5 tons of cocaine, 164.3 tons of cannabis and 3.3 tons of heroin[1].

### *Summary of the facts:*

Analysis of encrypted conversations from the SkyECC application led investigators to identify an individual using an encrypted pseudonym to launder funds from drug trafficking (last SKY PIN "3DOR3D", pseudonym "CEO", "DARK BANK", "CEO - DARK BANK"; previous SKY PIN "RARK9J", "3TFFI7"). From the screenshots alone, 26 million euros appeared to have been deposited in two months (January 02, 2021, and February 27, 2021) via 15 cryptocurrency addresses, which for their part, from August 16, 2019, to February 28, 2021, received the sum of 998,760,384 USDT [stable coin Tether] and resent 996,487,465.

Among the addresses identified, one of them, which carried out 995 transfers (634 IN and 354 OUT) between June 20, 2020, and April 5, 2021, for a total transaction volume of 284,475,154 US dollars (IN+OUT), included among its main creditors a Binance bank account opened in the name of Ekaterina JDANOVA, a Russian national residing in Dubai. She was arrested in France on October 1, 2023, charged and remanded in custody.

The analysis of Ekaterina JDANOVA's telephone revealed her participation in chat groups in which fundraising or remittances were offered in exchange for this remuneration, groups in which "CEO" in particular took part.

As a result of the SkyECC exchanges identified, the data on Ekaterina JDANOVA's telephone and the cryptocurrency flows revealed, it appeared that the individual using the pseudonyms "CEO" and "DARK BANK" was involved in a major global money-laundering operation, organizing cash collections and remittances as well as cryptocurrency transfers.

Ekaterina JDANOVA's telephone number alone showed that the total amount of these collections was 232,586,032 euros, of which at least 76,235,009 euros corresponded to confirmed collections.

The large number of messages exchanged between the various members of the network highlighted its highly structured organization, and identified CEO / DARKBANK as its head, supported by a group of associates specialized in cash collection.

As part of these activities, the latter relied on close collaborators, identified as QUATERBACK and WINGMAN: CEO/DARKBANK's right-hand men, secondary organizers of the network and in charge of passing on the necessary information and issuing instructions, as well as Mr. BROOKS: the network's accountant, who kept the accounts relating to the various cash collections.

Copie certifiée
conforme à l'original

---

[1] EUROPOL : Dismantling encrypted criminal EncroChat communications leads to over 6 500 arrests and close to EUR 900 million seized | Europol (europa.eu) ,
Dismantling of an encrypted network sends shockwaves through organised crime groups across Europe | Europol (europa.eu).

SBU - LEGAL

Numerous collections or remittances were made in Europe (France, Italy, Belgium and the Netherlands) for a total amount of over 20 million euros, giving rise to compensation in cryptocurrency. Between November 2020 and February 2021, the individual implicated had collected more than 50 million euros.

The activity of the DARKBANK network on the collection market showed that the total amount of these collections amounted to 232,586,032 euros, and the amount of collections confirmed by message amounted to 76,235,009 euros.

In addition, investigations led to the identification of the use by the user of the SKY PIN "3DOR3D" of the ENCROCHAT encrypted solution, and more specifically of the pseudonym "CEO_".

Indeed, "3DOR3D" told one of his SKY ECC correspondents on June 22, 2020 "Let me come back to u later today because all UK drivers were Encro and in middle of changing things up" "Encro went down and lost big chunk of contacts and still waiting on them to add me on sky".

At the same time, he told another SKY ECC correspondent on June 28, 2020, that his ENCROCHAT nickname was "CEO_" and that he was in DUBAI:

| 2020-06-28 15:36:39 | 2020-06-28 17:36:39 7MG7QU | Who's this |
| 2020-06-29 18:29:46 | 2020-06-29 20:29:46 7MG7QU | Hello |
| 2020-06-29 18:31:49 | 2020-06-29 20:31:49 3DOR3D | Hello bro |
| 2020-06-29 18:32:28 | 2020-06-29 20:32:28 7MG7QU | Who's this? |
| 2020-06-29 18:34:14 | 2020-06-29 20:34:14 3DOR3D | CEO |
| 2020-06-29 18:36:04 | 2020-06-29 20:36:04 7MG7QU | What was you're encro? |
| 2020-06-29 18:37:15 | 2020-06-29 20:37:15 3DOR3D | CEO_ |
| 2020-06-29 18:37:15 | 2020-06-29 20:37:15 3DOR3D | Yours ? |
| 2020-06-29 18:38:06 | 2020-06-29 20:38:06 7MG7QU | Wigglyswan |
| 2020-06-29 18:41:02 | 2020-06-29 20:41:02 7MG7QU | Are u in uk? |
| 2020-06-29 18:41:17 | 2020-06-29 20:41:17 3DOR3D | No bro ... Dub |

Analysis of the SKY ECC messages from "3DOR3D" and the ENCROCHAT messages from "CEO_" revealed that this user was using the same vehicle, possibly a MERCEDES G63 BRABUS, given the vehicle's visible characteristics (carbon hood attachment with air intake, red interior stitched with rhombuses).

3DOR3D:



Copie certifiée
conforme à l'original

SBU - LEGAL



CEO_ :

**Picture 1:** 72b101e067793e7a9b6c ce6cwb2701c2 Jpg
This picture has been sent by CEO to SSNEW on 08/0412020 at 11:21:14



**Photo 3:** 514552489e4b52555db598bac416656b.jpg
Photo sent by CEO to Newpallmall on March 24, 2020, at 14:27:34



Copie certifiée
conforme à l'original
SBU - LEGAL

EX-ISMAIL-000054

**Photo 4:** a312b478d867631160dcOc8(189cc5ac8.jpg
Photo sent by CEO to hulkingflower on March 24, 2020, at 14:38:58



MERCEDES G63 BRABUS (open source):





## *On how the money-laundering network works*

### *Money pick-up*

The analysis of conversations between CEO / DARKBANK and a user using PIN ED8988 ("BAZ"), on the SkyECC application, revealed that they were organizing *money pick-ups* for hundreds of thousands of euros. Several meetings were arranged between them between November and December 2020, in Paris.

Copie certifiée
conforme à l'original

SBU - LEGAL

Additionally, the only communications extracted from Ekaterina JDANOVA's cell phone showed that, several times a day, she was offered collections by CEO / DARKBANK and his "deputies", mainly in Italy, the Netherlands, Spain, Belgium and France. During this period, 836 collections (for a total of 232,586,032 euros) were reported, 304 of which were confirmed by *tokens* (for a confirmed total of 76,236,009 euros), while the status of the other collections remained uncertain.

It appeared that CEO / DARKBANK was proceeding in this way with several users of the SkyECC application, in particular with user 7MXVLD ("Cheese ralph"), between November 26, 2020, and November 27, 2020. The latter highlighted the organization of a fundraiser for a total of 800,000 euros in Paris. CEO / DARKBANK informed the caller that he was able to offer a rate of 6%. 7MXVLD gave him the French number of a man called "T-Max"           21 86) who was to deliver the cash. In return, 3DOR3D gave 7MXVLD a Canadian telephone number           09 99). At the end of the afternoon, 3DOR3D confirmed by message to 7MXVLD that the operation had been completed.

Further analysis of ED8988's conversations showed that collections had been extended beyond France, including cash remittances to Spain and the Netherlands.

It appeared that the money handed over in cash was of illicit origin, deriving in particular from drug trafficking, both in Europe and worldwide. So, through these collections, it was money from drug trafficking that was being laundered.

In addition, analysis of the communications revealed a real market, with its own supply, demand and rules. CEO / DARKBANK appeared to work with its "suppliers", i.e. groups with cash to collect. Acting as an interface with the collecting groups, CEO / DARKBANK's role was one of "mediation", and it sometimes had to decide in favor of the remitting groups, since its objective was to retain contracts with its "suppliers". CEO / DARKBANK also stressed that, in order to remain competitive, the rates offered by the network should not be too high.

Thus, the investigations carried out revealed a particularly well-structured operation of this collection activity, enabling the network to carry out an average of one to several daily collections in several countries. This methodical operation could be broken down into three stages:

- Collection proposal by the management team: once CEO / DARBANK or his deputies had been informed that cash was available for collection, they sent out a message on several communication groups. In principle, the allocation of collections took place naturally, without CEO / DARBBANK having to decide;
- Rate negotiation between CEO / DARKBANK and the collection team: teams interested in the collection in question then proposed their "rate", i.e. the commission calculated as a percentage applied to the total amount collected. These rates were frequently negotiated. In fact, due to market competition, it appears that CEO / DARKBANK often tried to negotiate the proposed rates downwards in order to make their services more attractive to cash suppliers;
- Real-time coordination of collection by the collection team: each party coordinated collection in real time. CEO / DARKBANK, however, seemed to have little presence at this stage of the collection.
- Financial compensation in cryptocurrency between the collection team and the management team: after a collection, the collection team made a cryptocurrency transfer to the designated wallet.

*Origin of cash funds and laundering of drug-related proceeds and income*

Copie certifiée
conforme à l'original

SBU - LEGAL

As for the origin of the funds, they were most likely to have come from criminal organizations, given the amounts collected or remitted, the locations of the protagonists and the cash collections/deliveries (particularly in Latin America and Benelux), the modus operandi used, and the evidence of messages clearly evoking an activity linked to narcotics, more specifically cocaine.

The investigations revealed that 3DOR3D was in contact with drug traffickers in Europe and elsewhere in the world.

In particular, the following communications were highlighted:

- With the SKY PIN user "DNFNVD" (alias: Medellin Cartel Chico), who was reporting stuff in Costa Rica and Panama, and with whom a photo of a "loaf of cocaine" was exchanged, which was forwarded by 3DOR3D to another user of the SKY ECC solution with SKY PIN "VRHDIV", with whom numerous collections were highlighted;
- With user "FD97E9", exchanging details of sample transmission and cocaine sales;
- With SKY PIN user "JFLSQC", identified by Belgian police as "Jamal BOUAOUIOUICH", listed as a drug trafficker;
- The exchanges with SKY PIN user "4UI343" revealed that 3DOR3D was involved in the payment of transactions between drug traffickers. In a message dated June 22, 2020, 4UI343 organized the transfer of narcotics to a man called "Rocket", and asked 3DOR3D to collect the cash involved in the transaction. Exchanges between 3DOR3D and 4UI343 mainly involved the transmission of tokens - i.e. photographs of banknote serial numbers used as validation when receiving money - and the organization of cash collections in England.

In addition, the investigation of Ekaterina JDANOVA's wallet revealed common interactions with DARKBANK's wallet: Ekaterina JDANOVA received 2,868,500 USDT and 13 ETH between December 20, 2020, and May 13, 2021, from another major DARKBANK contributor, and 1,257,063 USDT from a wallet interacting with the previous one. The latter wallet in turn transferred $80,220,583 to the 3281 wallet held by Darkbank.

Thus, not only was Ekaterina JDANOVA a key contributor to a wallet used by CEO / DARKBANK, but she also interacted extensively with wallets also linked to DARKBANK.

Arrested on October 1, 2023, by the Nice border police as she disembarked from a flight from Dubai, it appeared to the intelligence services that Ekaterina JDANOVA was known°for her activities in laundering money from Russian-speaking ransomware, and suspected of having links with members of Russian intelligence.

Informed of Ekaterina JDANOVA's arrest, the American authorities provided the French authorities with a spontaneous transmission of information concerning Ekaterina JDANOVA's involvement in a BitPaymer ransomware network. This ransomware, very active between 2017 and 2021, had been successively named: BitPaymer, WastedLocker, Hades and Phoenix. The American authorities counted hundreds of victims of this ransomware, in the USA and abroad, for a total estimated loss of $150 million. The ransomware used the Dridex Trojan, access to which was controlled by 7 to 8 people, making it difficult to identify them. It was the first ransomware to demand such high ransom amounts (millions of dollars) and to use a complex money-laundering network, especially through the use of cryptocurrency mixers.



Copie certifiée
conforme à l'original

SBU - LEGAL

The evidence uncovered close links between the defendant and major transnational criminal groups, both in the drugs and ransomware sectors. These groups generate huge profits. These groups generate huge profits, demonstrating the existence of a parallel illegal economy, which in turn finances hidden activities that infringe fundamental rights and freedoms.

The scale of the sums exchanged on the DARKBANK platform, the complexity of its organization and its impact on several continents highlight both the seriousness of the facts and the scale of the disturbance they cause.

*Example 1:*

On October 16, 2020, 3DOR3D (CEO / DARBANK) was in contact with PINs DNFNVD (Tibu) and VRHDIV (Lambo). VRHDIV (Lambo). asked 3DOR3D if there was anything in Costa Rica :

| 2020-10-16 15:03:43 | VRHDIV | | bro is any stuff in costa rica? | 3DOR3D, VRHDIV |
|---|---|---|---|---|

On the same day, DNFNVD (Tibu) wrote to 3DOR3D (CEO / DARBANK) to give him a token and phone number for the "thing" in Costa Rica, and to send him USDT.

| 2020-10-16 15:16:42 | DNFNVD | | Send me the token and number pls | 3DOR3D, DNFNVD |
|---|---|---|---|---|
| 2020-10-16 15:16:43 | DNFNVD | | Of costa | 3DOR3D, DNFNVD |
| 2020-10-16 15:30:50 | DNFNVD | | For stuff | 3DOR3D, DNFNVD |
| 2020-10-16 15:30:59 | DNFNVD | | Bro pls send me usdt | 3DOR3D, DNFNVD |
| 2020-10-16 15:41:27 | DNFNVD | | Brother | 3DOR3D, DNFNVD |

The chat continued with VRHDIV (Lambo), who asked DARKBANK to send him the logo and a photo of the product. Tibu then sent DARKBANK a photo of a block of cocaine with the "R=67" logo. 3DOR3D (CEO / DARBANK) in turn sent this photo to Lambo and told him to take a look.



Copie certifiée conforme à l'original

SBU - LEGAL

| 2020-10-16 18:00:03 | VRHDIV | | 98 bor | 3DOR3D, VRHDIV |
| 2020-10-16 18:56:36 | VRHDIV | | send me the dump? | 3DOR3D, VRHDIV |
| 2020-10-16 18:56:37 | VRHDIV | | please | 3DOR3D, VRHDIV |
| 2020-10-16 18:58:52 | 3DOR3D | | Ok | 3DOR3D, VRHDIV |
| 2020-10-16 18:58:57 | VRHDIV | | pic of material pleass | 3DOR3D, VRHDIV |
| 2020-10-16 18:59:30 | 3DOR3D | | Yeah | 3DOR3D, VRHDIV |
| 2020-10-16 18:59:13 | DNFNVD |  | IMG-1602853827870 | 3DOR3D, DNFNVD |
| 2020-10-16 16:00:08 | 3DOR3D |  | IMG-1602853993843 | 3DOR3D, VRHDIV |
| 2020-10-16 16:00:50 | 3DOR3D | | Check it out bro | 3DOR3D, VRHDIV |

VRHDIV (Lambo) explained to 3DOR3D (CEO / DARBANK) that he had a man who would go empty because the amount of cash was equivalent to two bags. He mentioned that another individual would drop off the first individual near the address as he didn't want to communicate too close to home.

| 2020-10-16 16:38:21 | VRHDIV | | bro he go emty because is 2 bags with money | 3DOR3D, VRHDIV |
| 2020-10-16 16:38:23 | VRHDIV | | and then he drop him close to house and he bring money | 3DOR3D, VRHDIV |
| 2020-10-16 16:35:42 | VRHDIV | | did not want to give adres close to house | 3DOR3D, VRHDIV |

3DOR3D (CEO / DARBANK) sent VRHDIV (Lambo) a photo of another phone with multiple currency conversions of an English pound. Lambo confirmed that all 500 had the same logo, then asked DARKBANK how much 1,645,000 was in USD. 3DOR3D (CEO / DARBANK) replied that 1,645,000 euros minus 12% made 1,693,700 USD. Lambo agreed and told him to pay the difference of the balance in Brazil of 190 so that only 94 remained to be paid.

Copie certifiée
conforme à l'original
SBU - LEGAL

Fernando TORRES
Traducteur - Interprète
ESPAGNOL / ANGLAIS
FRANÇAIS
Traduit le 26/09/2024
À Évreux

| 2020-10-16 16:41:48 | 3DOR3D |  | IMG-1602955492935 | 3DOR3D, VRHDIV |
| 2020-10-16 16:42:33 | 3DOR3D | | How many ? | 3DOR3D, VRHDIV |
| 2020-10-16 16:44:21 | VRHDIV | | just one to look at | 3DOR3D, VRHDIV |
| 2020-10-16 16:44:41 | VRHDIV | | all 500 is same stupmp | 3DOR3D, VRHDIV |
| 2020-10-16 16:46:19 | 3DOR3D | | Ok | 3DOR3D, VRHDIV |
| 2020-10-16 16:48:27 | VRHDIV | | bro this 1645000 how much yess on dollars | 3DOR3D, VRHDIV |
| 2020-10-16 17:23:41 | VRHDIV | | tas bro 1,645 euro bgw much is dollars minus % | 3DOR3D, VRHDIV |
| 2020-10-16 17:24:46 | 3DOR3D | | 1,848.0001 -12% 1,893.7009 | 3DOR3D, VRHDIV |
| 2020-10-16 17:26:18 | VRHDIV | | ok bro pay the something balance begg5 180 | 3DOR3D, VRHDIV |
| 2020-10-16 17:28:26 | VRHDIV | | 350 you pay pay 180 more pause bzr | 3DOR3D, VRHDIV |
| 2020-10-16 17:36:18 | VRHDIV | | so please pay 180 beer not 150 | 3DOR3D, VRHDIV |
| 2020-10-16 17:41:15 | 3DOR3D | | Oby you said 350 + 08 | 3DOR3D, VRHDIV |
| 2020-10-16 17:41:57 | VRHDIV | | ok the pay the difference of the 150 so is 04 bdi to pay plage | 3DOR3D, VRHDIV |

Therefore, these messages demonstrated that 3DOR3D (CEO / DARBANK) was involved as an intermediary in the acquisition of 500 kilos of cocaine stored in Costa Rica on October 16, 2020, and that it had arranged part of the financing for these narcotics in SAO PAOLO, Brazil, on behalf of Lambo.

*Example 2*

On July 22, 2020, PIN FD97E9 (Patek) wrote that the Colombian group he was dealing with did not like to circulate photos of their product. He needed 28 million pesos in MEDELLIN and CUCUTA. He wrote to 3DOR3D (CEO / DARBANK) to tell his network that a sample could be taken and that the merchandise had been quickly sold - by another network.

Copie certifiée
conforme à l'original
SBU - LEGAL

| | | | | |
|---|---|---|---|---|
| 2020-07-22 16:58:09 | FD97E9 | | They dont like their stuff pios going around | 3DOR3D, FD97E9 |
| 2020-07-22 16:58:09 | FD97E9 |  | IMG-1595436923837 | 3DOR3D, FD97E9 |
| 2020-07-22 16:58:39 | FD97E9 | | Beacuse this is my colo group | 3DOR3D, FD97E9 |
| 2020-07-22 16:58:11 | FD97E9 | | Yes that what i mean | 3DOR3D, FD97E9 |
| 2020-07-22 17:00:05 | FD97E9 | | I sort out cucuti | 3DOR3D, FD97E9 |
| 2020-07-22 17:00:05 | FD97E9 | | 28 mil peso they asking medd | 3DOR3D, FD97E9 |
| 2020-07-22 17:00:22 | FD97E9 | | And cucuta | 3DOR3D, FD97E9 |
| 2020-07-22 17:00:26 | FD97E9 | | Ask them to take sample | 3DOR3D, FD97E9 |
| 2020-07-22 17:00:29 | FD97E9 | | Plz | 3DOR3D, FD97E9 |
| 2020-07-22 17:01:12 | FD97E9 | | Plz let me know asap | 3DOR3D, FD97E9 |
| 2020-07-22 17:01:49 | FD97E9 | | U know how is costa market | 3DOR3D, FD97E9 |
| 2020-07-22 19:21:21 | FD97E9 | 0600B57.txt | HARRY EYES 👀 😊 "We take them." CONAKKI 🐯🐯🐯😊 "Can they pas today. tomo?" | 3DOR3D, FD97E9 |

Copie certifiée
conforme à l'original

SBU - LEGAL

| 2020-07-22 19:21:42 | FD97E9 | | But bro honestly u was the first i offered | 3DOR3D, FD97E9 |
| 2020-07-22 19:21:50 | FD97E9 | | Costa market is like this | 3DOR3D, FD97E9 |
| 2020-07-22 19:22:01 | FD97E9 | | 1 hour i take to sell everything | 3DOR3D, FD97E9 |
| 2020-07-22 19:22:45 | FD97E9 | | 12 pm | 3DOR3D, FD97E9 |
| 2020-07-22 19:22:46 | FD97E9 | | Its 2 pm | 3DOR3D, FD97E9 |
| 2020-07-22 19:22:46 | FD97E9 | | Hahah | 3DOR3D, FD97E9 |
| 2020-07-22 19:22:46 | FD97E9 | | See newspaper them say the hour of arrival | 3DOR3D, FD97E9 |

The following day, Patek wrote to 3DOR3D (CEO / DARBANK) stating that the merchandise had been sold because "they" liked the sample and that there would be 500 more this week.

| 2020-07-23 09:52:23 | FD97E9 | | Sold my bro they like samples | 3DOR3D, FD97E9 |
| 2020-07-23 10:15:48 | FD97E9 | | This week 500 more | 3DOR3D, FD97E9 |

*Example 3*

On September 3, 2020, Tibu offered 3DOR3D's "associates" (CEO / DARBANK) to take the merchandise with the "Z20" stamp.

| 2020-09-03 19:47:43 | DNFNVD | | Brother maybe going to be in costa | 3DOR3D, DNFNVD |
| 2020-09-03 19:47:55 | DNFNVD | | Your mates take | 3DOR3D, DNFNVD |
| 2020-09-03 19:49:16 | DNFNVD | | Your mate can take | 3DOR3D, DNFNVD |
| 2020-09-03 19:58:30 | DNFNVD | | Ok bro i send u now pictures | 3DOR3D, DNFNVD |
| 2020-09-03 20:20:17 | DNFNVD |  | IMG-1599164413585 | 3DOR3D, DNFNVD |

Example 4

On September 8, 2020, Patek informed 3DOR3D (CEO / DARBANK) of the arrival of 700 "pieces" at LIMON in Costa Rica and said it was waiting for the price. The merchandise logo was "3R".

Copie certifiée
conforme à l'original

SBU - LEGAL

| | | | | |
|---|---|---|---|---|
| 2020-09-08 17:58:03 | FD97E9 | | Bro | 3DOR3D, FD97E9 |
| 2020-09-08 17:58:05 | FD97E9 | | U online | 3DOR3D, FD97E9 |
| 2020-09-08 17:58:10 | FD97E9 | | Guys arrived to costa | 3DOR3D, FD97E9 |
| 2020-09-08 17:58:12 | FD97E9 | | 700 bits | 3DOR3D, FD97E9 |
| 2020-09-08 17:58:14 | FD97E9 | | In limon | 3DOR3D, FD97E9 |
| 2020-09-08 17:58:56 | FD97E9 | | Now? | 3DOR3D, FD97E9 |
| 2020-09-08 17:58:57 | FD97E9 | | Can u talk no? | 3DOR3D, FD97E9 |
| 2020-09-08 17:59:25 | FD97E9 |  | IMG-1509587987195 | 3DOR3D, FD97E9 |
| 2020-09-08 18:14:28 | FD97E9 | | Waiting price | 3DOR3D, FD97E9 |
| 2020-09-08 18:14:30 | FD97E9 | | Be online | 3DOR3D, FD97E9 |

**Conclusion**: These exchanges show that CEO / DARKBANK is aware of the practices of its contacts in the context of international drug trafficking, and that he is acting as an intermediary in their activity by moving funds from the sale of these products, thereby qualifying as laundering the importation of narcotics in an organized gang.

### *The involvement of Huzefa Hafiz ISMAIL:*

The analysis of images received and sent by 3DOR3D (CEO / DARBANK) confirmed his activity as a "broker", or financial intermediary, by receiving photographs of tokens and cryptocurrency transactions, mainly in USDT, known as Tether, awaiting validation by the blockchain, in particular with user BA69AQ, whose pseudonym was "the QB" or "QUARTER BACK", to whom 3DOR3D gave instructions.

All transactions were carried out either in cash, via money pickup after the sending of tokens, or in cryptocurrencies. No conventional bank transfers were discovered, and no official system was used from what we could see. The cryptocurrency was sent to the BINANCE and HUOBI exchanges, which were used to convert one cryptocurrency into another or, as in the case of BINANCE, to convert it into euros and transfer it to a conventional bank account.

By studying the deposit addresses visible in the screenshots exchanged, it was possible to group them together into a portfolio, with activity starting on August 16, 2019. On February 28, 2021, the day of the investigator's analysis, 998,760,384 USDT had been received at these addresses, and 996,487,466 had been redirected.

Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000063

The analysis of CEO / DARBANK and QB / QUATERBACK communications, correlated with the above-mentioned financial flows, also suggested that Ekaterina JDANOVA was using the PIN HYPG9I, alias "KATYA", in direct contact with CEO / DARBANK and QB / QUATERBACK. Finally, the US authorities announced that the BINANCE account assigned to Ekaterina JDANOVA had received 40 BTC from extortion committed as part of the ransom demand resulting from action by the BitPaymer ransomware.

Thanks to the analysis of Sky ECC exchanges, the main cryptocurrency addresses of 3DOR3D or DARKBANK were identified, including

-   0x3a3bafad999c705fcc36818a1f60764445af3281, on the "Ethererum" blockchain, enabling USDT transactions;
-   1DiTUAEK9VC229fU7bBd74qgzyxbNrDq49, on the bitcoin blockchain.

As the first cryptocurrency address, the volume of transactions between the *wallet*'s creation on June 20, 2020, and its closure on April 5, 2021, amounted to $284,475,154. Its overall activity identified it as a *wallet* playing the role of a transaction hub. Its analysis also showed that it was at the center of financial exchanges between contributors of Russian, Ukrainian and Turkish nationality and beneficiaries of Colombian nationality, all via persons residing in the United Arab Emirates.

CEO / DARKBANK shared the "Seed" private key attached to his wallet in the "RARK9J:19" messaging group, made up of RARK9J aka "CEO" and BA69AQ aka "QUARTER BACK", demonstrating the shared management of the latter and the close collaboration between users of the aforementioned PINS.

On both cryptocurrency addresses, Ekaterina JDANOVA appeared as the main contributor, from her BINANCE address 0x8abcce33f9809930607a7e19607313e2a6830788.

Thus, on the first CEO / DARKBANK address, the sum of 13,791,341 USDT and 0.74 ETH was transmitted between October 4, 2020, and May 1, 2021, while on November 30 and December 20, 2020, the sum of 2,361,500 USDT was paid from the DARKBANK address to that of Ekaterina JDANOVA.

For the second cryptocurrency address, Ekaterina JDANOVA's Binance account sent her 99.99 BTC on December 20, 2020, followed by 66.84 BTC on November 30, 2020, for a total of $3,665,092.

The investigation of Ekaterina JDANOVA's *wallet* also revealed common interactions with DARKBANK's first cryptocurrency address. For example, between December 20, 2020, and May 13, 2021, Ekaterina JDANOVA received 2,868,500 USDT and 13 ETH from another major DARKBANK contributor.

The analysis of communications from 3DOR3D alias CEO / DARKBANK and its main correspondent BA69AQ / QUARTERBACK, correlated with the above-mentioned financial flows, also tended to attribute to Ekaterina JDANOVA the use of a Sky ID HYPG9I, with the pseudonym "Katya", in direct contact with 3DOR3D / CEO / DARK BANK and BA69AQ / QUARTERBACK. When questioned on this subject after her arrest, Katya confirmed the use of this alias on *Signal* and *Telegram*, and finally admitted to having used the Sky PIN HYGP91 on several occasions.

The U.S. authorities reported that the BINANCE account assigned to her had received 40 BTC from extortion as part of a ransom demand resulting from the *BitPaymer* ransomware.

The analysis of the telephone he was carrying at the time of his arrest on October 1, 2023, revealed his participation in at least two newsgroups where collections or remittances were offered in return for payment, involving ten individuals, including those using the pseudonyms "CEO" and "THE

Copie certifiée
conforme à l'original

SBU - LEGAL

For example, the *Signal* "Activity-Katya KTD" group, active during the first half of 2023, led to the identification of numerous collections or remittances on European territory, amounting to more than 20,000,000 euros, giving rise to compensation in cryptocurrencies.

At the same time, analysis of 3DORD3's conversations on SkyECC revealed cash collections throughout Europe between November 2020 and February 2021, involving 3DORD3 and Ekaterina JDANOVA as part of clearing operations, at least for sums in excess of 50,000,000euros.

### *Identification of Huzefa Hafiz ISMAIL :*

In view of the messages exchanged by the Sky Pin 3DOR3D "CEO/Darkbank" and the use of this communication system, investigations have led to the identification of this individual as Huzefa Hafiz ISMAIL, born on ▮▮▮▮ 1983, of American nationality and holder of, inter alia:

- Passport ▮▮7428
- Golden visa ▮▮▮▮5037;
- Emirate United number ▮▮8097.

The identification of Huzefa ISMAIL is the result of a combination of several findings.

The investigators first established, from CEO / DARKBANK exchanges via his SKY PIN 3DOR3D, RARK9J and 3TFFI7, with other correspondents (PINs BA69AQ, 8A0ARG and 3C3VNC), that he had spent time in Turkey and had flown from DUBAI to ISTANBUL on February 14, 2021, returning on an ISTANBUL-DUBAI flight on February 21, 2021.

| timestamp_utc | timestamp_amsterdam | message_from_id | message |
|---|---|---|---|
| 2021-02-14 10:43:50 | 2021-02-14 11:43:50 | 3DOR3D | Enjoy your busy time from now on 😊😊😊😊😊 |
| 2021-02-14 10:43:50 | 2021-02-14 11:43:50 | 3DOR3D | Enjoy your busy time from now on 😊😊😊😊😊 |
| 2021-02-14 10:44:13 | 2021-02-14 11:44:13 | BA69AQ | Okay |
| 2021-02-14 10:44:13 | 2021-02-14 11:44:13 | BA69AQ | Okay |
| 2021-02-14 10:44:16 | 2021-02-14 11:44:16 | BA69AQ | 😄😄😄 |
| 2021-02-14 10:44:16 | 2021-02-14 11:44:16 | BA69AQ | 😄😄😄 |
| 2021-02-14 10:44:28 | 2021-02-14 11:44:28 | BA69AQ | Please come back sooner |
| 2021-02-14 10:44:28 | 2021-02-14 11:44:28 | BA69AQ | Please come back sooner |
| 2021-02-14 10:45:59 | 2021-02-14 11:45:59 | 3DOR3D | Hahaha |
| 2021-02-14 10:45:59 | 2021-02-14 11:45:59 | 3DOR3D | Hahaha |
| 2021-02-14 10:46:05 | 2021-02-14 11:46:05 | 3DOR3D | Good thing I didn't book one way like my old man |
| 2021-02-14 10:46:05 | 2021-02-14 11:46:05 | 3DOR3D | Good thing I didn't book one way like my old man |

Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000065

| 2021-02-14 15:11:27 | 2021-02-14 16:11:27 | 3DOR3D | Online. But haven't turned on other yet Just this for now or else will be getting calls    So keep it hush for a bit. |
| 2021-02-14 15:11:27 2021-02-14 | 2021-02-14 16:11:27 2021-02-14 | 3DOR3D | Online. But haven't turned on other yet Just this for now or else will be getting calls    So keep it hush for a bit. |
| 2021-02-22 14:15:24 | 2021-02-22 15:15:24 | 8A0ARG | Brother |
| 2021-02-22 15:51:11 | 2021-02-22 16:51:11 | 3DOR3D | Yes bro my brother will get tokens and send to u along with ETA.  I am going to be offline for 6hrs |
| 2021-02-24 20:20:57 | 2021-02-24 21:20:57 | BA69AQ | babes deals done from when you were gone to turkey, need the ones prior to you turkey trip. |
| 2021-02-25 03:19:10 | 2021-02-25 04:19:10 | 3DOR3D | Ok cool |

FLY EMIRATES' reply draw the investigators' attention in particular to Huzefa ISMAIL, an American national, passport no. ▇▇▇428, who was travelling on this flight.

| For French Police Purposes Only | | | | | | | |
|---|---|---|---|---|---|---|---|
| Passenger Name: ISMAIL/HUZEFAMR | | | | | | | |
| DO▇ ▇1983, U.S. Passport No▇ ▇▇428 | | | | | | LER 0193 - 2024 | |
| S.No. | Flight Date | Flight No. | Sector | Date of Booking | PNR | Ticket No. | Coupon Status | Seat No. | Contact Details |
| 19 | 14-Feb-2021 | EK0121 | DXB-IST | 13-Feb-2021 | FB6HVS | 1762330464240 | Flown | 002B | 00971 558880738 ,00971558880738,971558880738,huzefahafiz@gmail.com, |
| | 22-Feb-2021 | EK0122 | IST-DXB | | | | Flown | 0058 | |

It also appeared that the Sky Pin user "3DOR3D" was announcing to one of his correspondents that he would be unavailable due to the birth of a new child between ▇▇▇▇▇▇ 2021 even though Huzefa Hafiz ISMAIL was the father of ▇▇▇▇▇▇ born on ▇▇ 2021.

The following exchanges were noted:



Copie certifiée conforme à l'original
SBU - LEGAL

EX-ISMAIL-000066

| | | | |
|---|---|---|---|
| 2021-01-11 12:55:44 | 2021-01-11 13:55:44 | 3DOR3D | No bro I'm in the hospital with my Mrs. Busy today |
| 2021-01-12 09:43:02 | 2021-01-12 10:43:02 | TBRFEN | Mate the breakdown can you send |
| 2021-01-12 10:03:49 | 2021-01-12 11:03:49 | 3DOR3D | Yes bro |
| 2021-01-12 10:03:49 | 2021-01-12 11:03:49 | 3DOR3D | Yes bro |
| 2021-01-12 10:04:09 | 2021-01-12 11:04:09 | 3DOR3D | Sorry been busy with Doctor  Just had new lil one. |
| 2021-01-12 10:04:09 | 2021-01-12 11:04:09 | 3DOR3D | Sorry been busy with Doctor  Just had new lil one. |
| 2021-01-12 10:49:39 | 2021-01-12 11:49:39 | TBRFEN | Mate what is rate for paper from UK to Dubai |
| 2021-01-12 10:49:39 | 2021-01-12 11:49:39 | TBRFEN | Mate what is rate for paper from UK to Dubai |
| 2021-01-12 10:50:53 | 2021-01-12 11:50:53 | 3DOR3D | 10% |
| 2021-01-12 10:50:53 | 2021-01-12 11:50:53 | 3DOR3D | 10% |
| 2021-01-14 11:32:46 | 2021-01-14 12:32:46 | 3DOR3D | Bro you guys need any eur ? |
| 2021-01-14 11:32:46 | 2021-01-14 12:32:46 | 3DOR3D | Bro you guys need any eur ? |
| 2021-01-14 11:38:44 | 2021-01-14 12:38:44 | TBRFEN | No mate , will need paper from UK to here tho |
| 2021-01-14 11:38:44 | 2021-01-14 12:38:44 | TBRFEN | No mate , will need paper from UK to here tho |
| 2021-01-14 11:49:47 | 2021-01-14 12:49:47 | TBRFEN | Mate can you send breakdown of this paper you give , IV asked you for 3 days now and you still not sent |
| 2021-01-14 11:49:47 | 2021-01-14 12:49:47 | TBRFEN | Mate can you send breakdown of this paper you give , IV asked you for 3 days now and you still not sent |
| 2021-01-14 12:05:53 | 2021-01-14 13:05:53 | 3DOR3D | Bro I had a newborn and hadn't gone to work this whole week Sorry bro about the delay |

The analysis of the AMADEUS request identified a child named ▮▮▮▮▮▮ born on ▮▮▮▮ 2021, who had traveled with Huzefa Hafiz ISMAIL and Khadija Yakub ISMAIL on several occasions.



Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000067

In particular:



RP/BOMWI2104/BOMWI2104    BT/SU 18NOV21/0737Z P8Y6NP BOMWI2104/2008BT/17NOV21 RF BTL

1.ISMAIL ██████████████ CHD) 2.ISMAIL/HUZEFA HAFIZ MR

3.ISMAIL/ ███████ CHD)

**4.ISMAIL/KHADIJA YAKUB MRS(INF,** ████████████████ **21)**

5.ISMAIL ████████ CHD)

6 AP BOM 22011207-08 - BATHIJA TRAVELS PVT LTD - A

7 TK OK18NOV/BOMWI2104

--- TST RLR DCS ---

RP/JNBSA08AA/JNBSA08AA    VM/GS 21JUL23/1607Z NAGA7A JNBSA08AA/0001AA/21JUL23 RF /DCS-SYNCUS

: ███████ SMAIL ███████ CHD)

2.ISMAIL ████████████ NI0)

3.ISMAIL/HUZEFA HAFIZ MR(ADT)

4.ISMAIL ███████ CHD)

5.ISMAIL/KHADIJA YAKUB MRS(ADT)

6.ISMAIL ███████ CHD)

7 SA 359 K 21JUL S JNBCPT    FLWN

8 AP +971 558880738-M

9 APE ██████ @GMAIL.COM

10 APN SA/M ████████ 0738/EN/P3

11 TK PAX OK21JUL/JNBSA08AA//ETSA/S7/P1-6

12 SSR CHLD SA HK1/P4

13 SSR CHLD SA HK1/P6



Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000068

14 SSR CHLD SA HK1/P1

15 SSR DOCS SA HK1 ////22AUG83/M//ISMAIL/HUZEFA HAFIZ/P3

16 SSR DOCS SA HK1 ////20JUL85/F//ISMAIL/KHADIJA YAKUB/P5

17 SSR DOCS SA HK1 ///05JAN10/M//ISMAIL ███████████

18 SSR DOCS SA HK1 ///09JUL12/M//ISMAIL ███████████

19 SSR DOCS SA HK1 ////17JAN15/F//ISMAIL ███████████

**20 SSR DOCS SA HK1 ////11JAN21/F/** ████ SMAI ████ P1

21 SSR CTCE SA HK1 ██████ GMAIL.COM/P3

22 SSR CTCM SA HK1 ████ 0738/P3

23 SSR CTCE SA HK1 ██████ GMAIL.COM/P5

24 SSR CTCM SA HK1 ████ 0738/P5

25 SSR CTCE SA HK1 ██████ GMAIL.COM/P2

26 SSR CTCM SA HK1 ████ 0738/P2

27 OSI SA SKN8000

28 RM PRICING ENTRY FXP/R,P,U232323,JNB.JNB/A-KSAOW/S7/P1-6

29 RM 102.164.11.4

30 RM MODETICKET

31 RM FARE18769.56 ZAR/P1-6

32 RM TIDGYH8JMUVAA

The SKY PIN "3DOR3D" (DARKBANK) also mentioned a Russian wife or ex-wife.

| | | | |
|---|---|---|---|
| 2020-12-04 10:04:49 | 2020-12-04 11:04:49 | 3DOR3D | You have Russian phone and I have Russian wire |
| 2020-12-04 10:04:51 | 2020-12-04 11:04:51 | A5331A | U can get also same bro |
| 2020-12-04 10:04:51 | 2020-12-04 11:04:51 | A5331A | U can get also same bro |
| 2020-12-04 10:04:56 | 2020-12-04 11:04:56 | 3DOR3D | *had |
| 2020-12-04 10:04:56 | 2020-12-04 11:04:56 | 3DOR3D | *had |
| 2020-12-04 10:04:56 | 2020-12-04 11:04:56 | 3DOR3D | *had |
| 2020-12-04 10:05:10 | 2020-12-04 11:05:10 | 3DOR3D | *wife |

Intelligence gathered through police cooperation also revealed that Ismail HUZEFA had two girlfriends: one of Indian nationality with whom he would have two children, and one of Russian nationality.



Copie certifiée
conforme à l'original

Fernando TORRES
Traducteur - Interprète
ESPAGNOL / ANGLAIS
FRANÇAIS
Traduit le 26/09/2024
À Évreux

SBU - LEGAL

The analysis of SKY ECC messages from "3DOR3D" and ENCROCHAT messages from "CEO_" revealed the use by this user of a vehicle that could correspond to a MERCEDES G63 (see above), while police cooperation revealed that Huzefa Hafiz ISMAIL was the owner of several luxury vehicles, including a MERCEDES GLS 63 and a MERCEDES G63.

It also emerged that in ENCROCHAT messages, 16 "nicknames" had been attributed to "CEO_" by 22 ENCROCHAT users, including:

- amrk
- CEO huzaif
- Money Dxb
- US Money Man
- Watch man

This while:

- Huzefa Hafiz Ismail's first name may explain the nickname "CEO huzaif".
- Huzefa Hafiz Ismail is a resident of Dubai (DXB being the airport code for Dubai, which may explain the nickname "money Dxb"),
- Huzefa Hafiz Ismail is an American citizen (which may explain the nicknames "US Money Man" and "amrk");
- Huzefa Hafiz Ismail is said to own a company selling luxury watches under the name "quintessential.ae" (which may explain the nickname "WATCHMAN").

Complete list of nicknames:

| User who gave the nickname | Nickname given to "ceo_" |
|---|---|
| tunalvy | amrk |
| yenigozluk | amrk |
| blueray.com | CEO |
| ditahonour | CEO |
| prettyone | CEO |
| virtualcactus | CEO |
| newpallmall | CEO huzaif |
| credits | ceo_ Privatechat bank |
| don.com | H20 |
| ultimateflex | haji |
| blackjerry | kusho ind |
| cheetahfern | Mexicans |
| solidgoose | Money Dxb |
| bmwnew | shoku Luis transf |
| wealthymace | timezone |
| kamna.is.real | token ceo |
| solidgoose | US Money Man |
| endiosconfiamos | VIP |
| ironwasp | VIP |
| lostradio | watchman |
| ruralspear | watchman |
| blacknarco | zuckerberg |



Copie certifiée
conforme à l'original



The result of cross-referencing this intelligence was that CEO / DARKBANK was Huzefa ISMAIL.

### III / Criminal qualifications:

The above-mentioned facts are as follows:

- **MONEY LAUNDERING: AIDING THE DECEPTIVE JUSTIFICATION OF THE ORIGIN OF GOODS AND INCOME OF THE PERPETRATOR OF UNAUTHORIZED IMPORTATION OF NARCOTICS IN AN ORGANIZED GANG**
Offenses provided for under articles 222-38, 222-36 §2, §1, 222-41 and 132-71 of the Criminal Code and articles L.5132-7, L.5132-8 §1, R.5132-74, R.5132-77, R.5132-78 of the code of public health and Ministerial Decree 1 of 22/02/1990.
Punishable by articles 222-38, 222-36 §2, 222-44 §1, 222-45, 222-47, 222-48, 222-49, 222-50, 222-51, 131-26-2 of the Criminal Code.
*Offenses committed from June 6, 2019, to October 1, 2023, in Paris, France and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, Belgium, Germany, Italy and the United Kingdom.*

- **MONEY LAUNDERING: AIDING THE FALSE JUSTIFICATION OF THE ORIGIN OF THE ASSETS AND INCOME OF THE PERPETRATOR OF A DRUG TRAFFICKING OFFENSE**
Offenses provided for in articles 222-38 §1, 222-36 §1, 222-37 of the Criminal Code and articles L.5132-7 of the code of public health and Ministerial Decree 1 of 22/02/1990.
Punishable by articles 222-38, 222-44 §1, 222-45, 222-47, 222-48, 222-49, 222-50 of the Criminal Code.
*Offenses committed from June 6, 2019, to October 1, 2023, in Paris, France and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, Belgium, Germany, Italy and the United Kingdom.*

- **AGGRAVATED MONEY LAUNDERING: PARTICIPATION IN AN ORGANIZED GROUP IN AN OPERATION TO INVEST, CONCEAL OR CONVERT THE PROCEEDS OF A CRIME**
Offenses provided for under articles 324-2 2°, 324-1 §2, 324-1-1 and 132-71 of the Criminal Code.
Punishable under articles 324-2 §1, 324-3, 324-7 and 324-8 of the Criminal Code.
*Offenses committed from June 6, 2019, to October 1, 2023, in Paris, France and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, Belgium, Germany, Italy and the United Kingdom.*

- **ORGANIZED EXTORTION**
Provided for by articles 312-6 §1, 312-1 §1, 132-71 of the Criminal Code.
Punishable under articles 312-6 §1, 312-13, 312-14, 131-26-2 of the Criminal Code.
*Offenses committed from June 6, 2019, to October 1, 2023, in Paris, France and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, Belgium, Germany, Italy and the United Kingdom.*

- **FRAUDULENT ACCESS TO AN AUTOMATED DATA PROCESSING SYSTEM**
Provided for by article 323-1 §1 of the Criminal Code.
Punishable under articles
Punishable under articles 323-1 §1, 323-5 of the Criminal Code.
*Offenses committed from June 6, 2019, to October 1, 2023, in Paris, France and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, Belgium, Germany, Italy and the United Kingdom.*

Copie certifiée
conforme à l'original

Traduit le 26/09/2024

SBU - LEGAL

- **FRAUDULENT OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM**
Provided for by article 323-1 §1 of the Criminal Code.
Punishable under articles 323-1 §1, 323-5 of the Criminal Code.
*Offenses committed from June 6, 2019, to October 1, 2023, in Paris, France and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, Belgium, Germany, Italy and the United Kingdom.*

- **HINDERING THE OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM**
Provided for by article 323-2 §1 of the Criminal Code.
Punishable under articles 323-2 §1, 323-5 of the Criminal Code.
*Offenses committed from June 6, 2019, to October 1, 2023, in Paris, France and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, Belgium, Germany, Italy and the United Kingdom.*

- **FRAUDULENT INTRODUCTION OF DATA INTO AN AUTOMATED PROCESSING SYSTEM**
Provided for by article 323-3 §1 of the Criminal Code.
Punishable under articles 323-3 §1, 323-5 of the Criminal Code.
*Offenses committed from June 6, 2019, to October 1, 2023, in Paris, France and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, Belgium, Germany, Italy and the United Kingdom.*

- **FRAUDULENT EXTRACTION OF DATA FROM AN AUTOMATED PROCESSING SYSTEM**
Provided for by article 323-3 §1 of the Criminal Code.
Punishable under articles 323-3 §1, 323-5 of the Criminal Code.
*Offenses committed from June 6, 2019, to October 1, 2023, in Paris, France and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, Belgium, Germany, Italy and the United Kingdom.*

- **PARTICIPATION IN A CRIMINAL CONSPIRACY TO PREPARE A CRIME**
Provided for by article 450-1 §1, §2 of the Criminal Code.
Punishable under articles 450-1 §2, 450-3, 450-5 of the Criminal Code.
*Offenses committed from June 6, 2019, to October 1, 2023, in Paris, France and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, Belgium, Germany, Italy and the United Kingdom.*

- **PARTICIPATION IN A CRIMINAL CONSPIRACY TO PREPARE AN OFFENSE PUNISHABLE BY 10 YEARS' IMPRISONMENT**
Provided for by article 450-1 §1, §2 of the Criminal Code.
Punishable under articles 450-1 §2, 450-3, 450-5 of the Criminal Code.
*Offenses committed from June 6, 2019, to October 1, 2023, in Paris, France and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, Belgium, Germany, Italy and the United Kingdom.*

- **PARTICIPATION IN A CRIMINAL CONSPIRACY TO PREPARE AN OFFENSE PUNISHABLE BY AT LEAST 5 YEARS' IMPRISONMENT**
Provided for by article 450-1 §1, §3 of the Criminal Code.
Punishable under articles 450-1 §3, 450-3 of the Criminal Code.
*Offenses committed from June 6, 2019, to October 1, 2023, in Paris, France and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, Belgium, Germany, Italy and the United Kingdom.*

The maximum sentence is 30 years' imprisonment.

Copie certifiée
conforme à l'original

Fernando TORRES
Traducteur - Interprète
ESPAGNOL / ANGLAIS
FRANÇAIS
Traduit le 26/09/2024

**SBU - LEGAL**

**IV / Procedure/**

On March 09, 2021, the SkyECC encrypted messaging solution was dismantled by the French, Belgian and Dutch authorities, after it became apparent that this encryption solution was used exclusively to facilitate organized crime activities. Exploiting encrypted conversations from the SkyECC data lake, investigators from the Office central de lutte contre la criminalité liée aux technologies de l'information et de la communication (OCLCTIC) isolated a communication between users of the identifiers "3DOR3D" and "ED8988", which appeared to relate to a money pickup in Paris, involving "900k". The exchanges revealed a cash collection activity linked to drug trafficking, which was then laundered by the network.

On March 5, 2021, the national jurisdiction in charge of fighting crime (JUNALCO) referred an incidental investigation to the Central Directorate of the Judicial Police (DCPJ) in the SkyECC case, on charges of laundering the importation of drugs in an organized gang, laundering drug trafficking, laundering in an organized gang of any crime or misdemeanor, and conspiracy to prepare such crimes.

Investigations revealed that 3DORD/CEO-DARKBANK was involved in money laundering operations as a "broker", i.e. a financial intermediary. In particular, it collected cash from illicit transactions and supplied it to third parties, who, in exchange for a commission, credited the addresses it used with cryptoassets.

One of the main creditors of the cryptocurrency addresses used by 3DORD/CEO-DARKBANK was the Binance 28677232 account opened in the name of Ekaterina JDANOVA, a Russian national. In execution of a search warrant, she was arrested at Nice airport on October 1, 2023.

On October 5, 2023, an initial indictment was issued by the Public Prosecutor at the Tribunal Judiciaire of Paris, on charges of laundering the importation of narcotics in an organized gang, laundering drug trafficking, laundering in an organized gang of any crime or offense, complicity in fraudulent access to and maintenance of an automated data processing system, complicity in the fraudulent introduction of data into an automated data processing system, complicity in the fraudulent extraction of data from an automated data processing system, complicity in hindering the operation of an automated data processing system, organized gang extortion and criminal conspiracy to prepare the aforementioned crimes and misdemeanors, which allowed the opening of an investigation and the pursuit of investigative acts by an examining magistrate.

Ekaterina JDANOVA was indicted and remanded in custody. Subsequent investigations, including questioning of Ekaterina JDANOVA and the analysis of her telephone, enabled the identification of the members of the network she relied on for the purpose of fund-raising, several of whom were active in France in particular. These individuals were arrested and questioned, and the homes of two of them were searched.

Additionally, in view of the messages exchanged via the SKY PIN 3DOR3D "CEO/DARKBANK" and the use of this communication system, the investigations identified the user as Hufeza Hafiz ISMAIL, born on          983, of American nationality, residing in Dubai since January 4, 2017.



Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000073

### V / Statutes of Limitations

The facts for which the extradition of Huzefa Hafiz ISMAIL, born on ▮▮▮▮▮ 1983, is requested hereby, are not covered by the statute of limitations of public action under French law.

The acts were committed up to October 1, 2023. The statute of limitations under French law for the offenses described is 6 years, in accordance with article 8 of the Code of Criminal Procedure, with the exception of the offense of laundering of assets and proceeds from the illicit import of narcotics in an organized gang, for which a period of 30 years is provided in accordance with the provisions of article 7 of the Code of Criminal Procedure, and the offense of extortion in an organized gang, for which a period of 20 years is provided in accordance with the same provisions. The present request for provisional arrest is an act interrupting public proceedings within the meaning of article 9-2 of the French Code of Criminal Procedure.

***The aforementioned articles are attached to this extradition request.***

*The extradition request concerning Mr. Huzefa Hafiz ISMAIL is made on the basis of the bilateral Franco-American treaty of April 23, 1996, the agreement between the European Union and the United States of America of June 25, 2003, the Council of Europe Convention on Cybercrime of November 23, 2001, which came into force on January 1, 2007, the United Nations Single Convention on Narcotic Drugs, adopted in New York on March 30, 1961, the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, adopted in Vienna on December 19, 1988, and the United Nations Convention against Transnational Organized Crime, adopted in New York on November 15, 2000.*

Please find enclosed with this letter:

- Certified copy of the Arrest Warrant issued by Mr. Julien GAU, Vice-President in charge of pre-trial investigation at the Tribunal Judiciaire of Paris dated July 30, 2024, for the arrest of Mr. Huzefa Haziz ISMAIL, bearing the latter's photograph;

- Certified copy of the European Arrest Warrant issued by Mrs. Natacha RATEAU, First Deputy Public Prosecutor at the Tribunal Judiciaire of Paris on July 30, 2024, for the arrest of Mr. Huzefa Hafiz ISMAIL;

- The legislation defining and punishing the offenses, as well as the statute of limitations and the jurisdiction of the French courts.

***On behalf of Mrs. the Prosecutor of the Republic***

Mr. Philippe TOCANIER
Deputy Prosecutor



Copie certifiée
conforme à l'original

SBU - LEGAL

1

**PARIS COURT *OF APPEAL***
**PARIS *TRIBUNAL JUDICIAIRE* (civil court)**

**Julien GAU's chambers**
Vice-President in charge of the investigation
Public Prosecution no.: 21064000646
Investigation no.: JIJI83123000001
Court identifier: 2100697077P
Proceedings: criminal



**ARREST WARRANT**
**FRENCH REPUBLIC – IN THE NAME OF THE FRENCH PEOPLE**

On July 30, 2024,
We, Julien GAU, Vice-President in charge of the investigation at the Paris *Tribunal judiciaire*,
Considering the Articles 122, 123, 124, 131, 133, 134, 141-2 of the Code of Criminal Procedure;
Considering the notification order communicated on July 12, 2024;
Considering the public prosecutor's requisitions on July 12, 2024;
Considering the proceedings filed against:



**Huzefa Hafiz ISMAIL**
Born on ▮▮▮▮▮▮ 1983
Residing: in DUBAI
Possible destinations: in particular, the UNITED STATES OF AMERICA, DUBAI
Gender: Masculine
Nationality: American
Indicted on the following counts:

MONEY LAUNDERING: ASSISTANCE WITH THE MISLEADING JUSTIFICATION OF THE ORIGIN OF ASSETS AND INCOME OF THE PERPETRATOR OF THE UNAUTHORIZED IMPORTATION OF DRUGS AS PART OF AN ORGANIZED GANG
Offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom.
Offenses defined under ART.222-38, ART.222-36, paragraph 2, paragraph 1, ART. 222-41, ART. 132-71 of the Criminal Code, ART. L.5132-7, ART.L.5132-8 paragraph 1, ART.R.5132674, ART.R.5132-77, ART.R.5132-78 of the Public Health Code, Art 1 of the ministerial order dated 22/02/1990 and sanctioned under ART.222-38, ART.222-36, paragraph 2, ART.222-44 paragraph 1, ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50, ART.222-51, ART.131-26-2 of the Criminal Code.

MONEY LAUNDERING: ASSISTANCE WITH THE MISLEADING JUSTIFICATION OF THE ORIGIN OF ASSETS AND INCOME OF THE PERPETRATOR OF A DRUG TRAFFICKING OFFENSE
Offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom.

Public Prosecution no.21064000646 – File no.: JIJ183123000001
Huzefa Hafiz ISMAIL's arrest warrant

SBU - LEGAL

2

Offenses defined under ART. 222-38 paragraph 1, ART.222-36 paragraph 1, ART.222-37 of the Criminal Code, ART. L.5132-7 of the Public Health Code, ART.1 of the ministerial order dated 22/02/1990 and sanctioned under ART. 222-38, ART.222-44, ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50 of the Criminal Code.

-SERIOUS MONEY LAUNDERING: PARTICIPATION AS PART OF AN ORGANIZED GANG IN AN INVESTMENT, CONCEALMENT OPERATION OR THE CONVERSION OF THE PROCEEDS OF AN OFFENSE
Offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom.
Offenses defined under ART. 324-2 2°, ART.324-1 paragraph 2, ART.324-1-1, ART.132-71 of the Criminal Code and sanctioned under ART.324-2 paragraph 1, ART.324-3, ART.324-7, ART.324-8 of the Criminal Code.

-EXTORTION AS PART OF AN ORGANIZED GANG.
Offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom.
-Offenses defined under ART.312-6 paragraph 1, ART.312-1 paragraph 1, ART.132-71 of the Criminal Code and sanctioned under ART.312-6 paragraph 1, ART.312-13, ART.312-14, ART.131-26-2 of the Criminal Code.

-FRAUDULENT ACCESS IN AN AUTOMATED DATA PROCESSING SYSTEM
Offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom.
Offenses defined under ART.323-1 paragraph 1 of the Criminal Code and sanctioned under ART.323-1 paragraph 1, ART.323-5 of the Criminal Code.

-FRAUDULENT RETENTION IN AN AUTOMATED DATA PROCESSING SYSTEM
Offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom.
Offenses defined under ART.323-1 paragraph 1 of the Criminal Code and sanctioned under ART.323-1 paragraph 1, ART. 323-5 of the Criminal Code.

-IMPEDIMENT OF THE FUNCTIONING OF AN AUTOMATED DATA PROCESSING SYSTEM
Offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom.
Offenses defined under ART.323-2 paragraph 1 of the Criminal Code and sanctioned under ART.323-2 paragraph 1, ART. 323-5 of the Criminal Code.

-FRAUDULENT INTRODUCTION OF DATA IN AN AUTOMATED DATA PROCESSING SYSTEM
Offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom.

Public Prosecution no.21064000646 – File no.: JIJ18312300000
Huzefa Hafiz ISMAIL's arrest warrant

SBU - LEGAL

EX-ISMAIL-000076

3

Offenses defined under ART.323-3 paragraph 1 of the Criminal Code and sanctioned under ART.323-3 paragraph 1, ART.323-5 of the Criminal Code.

-FRAUDULENT EXTRACTION OF DATA CONTAINED IN AN AUTOMATED DATA PROCESSING SYSTEM
Offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom.
Offenses defined under ART.323-3 paragraph 1 of the Criminal Code and sanctioned under ART.323-3 paragraph 1, ART.323-5 of the Criminal Code.

-PARTICIPATION IN A CRIMINAL CONSPIRACY WITH THE VIEW TO THE PREPARATION OF A CRIME
Offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom.
Offenses defined under ART.450-1 paragraph 1, paragraph 2 of the Criminal Code and sanctioned under ART.450-1 paragraph 2, ART.450-3, ART.450-5 of the Criminal Code.

-PARTICIPATION IN A CRIMINAL CONSPIRACY WITH THE VIEW TO THE PREPARATION OF AN OFFENSE SANCTIONED BY 10 YEARS' IMPRISONMENT
Offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom.
Offenses defined under ART.450-1 paragraph 1, paragraph 2 of the Criminal Code and sanctioned under ART.450-1 paragraph 2, ART.450-3, ART.450-5 of the Criminal Code.

-PARTICIPATION IN A CRIMINAL CONSPIRACY WITH THE VIEW TO THE PREPARATION OF AN OFFENSE SANCTIONED BY AT LEAST 5 YEARS' IMPRISONMENT
Offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom.
Offenses defined under ART.450-1 paragraph 1, paragraph 3 of the Criminal Code and sanctioned under ART.450-1 paragraph 3, ART.450-3 of the Criminal Code.

Vu ne varietur
Traduction conforme à l'original en langue française
n° 1848

## SUMMARY OF THE EVENTS:

The exploitation of the encrypted conversations resulting from SKYECC data resulted in the investigators at the central office to combat crime related to information technologies and communication (OCLCTIC) to isolate a communication between the SKY ID 2DOR3D users (pseudonym: CEO-DARKBANK) and ED8988 that appeared to relate to a money pickup in Paris, relating to "900K".

The exploitation of the communications "3DOR3D/CEO-DARKBANK" implied that other money pickups had been organized in Paris, and that a money pickup for a value of 800,000 euros had indeed occurred between the 26th November and 27th November 2020 in PARIS, and attributing to the same individual the SKY PIN 3TFFI7 (successive pseudonyms "CEO", "CEO/add new SKY RARK9J" and "CEO BOX TT", active from November 24, 2019 to

opie certifiée
iforme à l'original

4

April 29, 2020), RARK9J (successive pseudonym "CEO", "NEW CEO", "CILO" and "CEO. Ciphr CCF16355", active from May 1, 2020 until August 25, 2020), then 3DOR3D (pseudonym "CEO/DARK BANK", active from June 11, 2020 until March 8, 2021 – end of functioning of SKY ECC).

This exploitation also evidenced a role of laundering and intermediation, in particular in the context of international drug trafficking transactions, and the identification, solely based on the screenshots taken, of 26 million euros of deposits in 2 months (2nd January-February 27, 2021), via 15 addresses, having received from August 16, 2019 until February 28, 2021 the amount of 998,760,384 USDT [Tether stablecoin] and sent 996,487,465.

Amongst the addresses identified as having been used by "3DOR3D/CEO-DARKBANK", it was observed that the address 0x3a3bafad999c705fcc36818a1f60764445af3281 (address active from June 20, 2020 until April 5, 2021, giving rise to a total volume of transactions, (ingoing and outgoing) of around 285,3000,000 American dollars), with amongst its principal creditors the Binance account 28677322, opened in the name of Ekaterina JDANOVA.

Accordingly, the following was observed:
-that between October 4, 2020 and May 1, 2021, this account BINANCE had credited the address af3281 for an amount of 13,791,341 USDT and 0.74 ETH;
-that on 30th November and December 28, 2020, this account BINANCE had funded the address 1DiTUAEK9VC229fU7bBd74qgzyxbNrDq49 [in bitcoin from the address 0x3a3bafad999c705fcc3618a1f60764445af3281] for an amount of 166.83 BTC [representing a value of 3,665,092 USD];
-that this account BINANCE had also made transactions with other address in financial relations with the address 0x3a3bafad999c705fcc36818a1f60764445af3281.

The exploitations of the communications "3DOR3D"/ "CEO-DARKBANK" and its principal correspondent "BA69AQ"/ "QUARTERBACK", correlated with the aforementioned financial flows, also implied attribution to Ekaterina JDANOVA the use of a SKY ID "HYPG9I", pseudonym "KATYA", in direct contact with "3DOR3D / CEO-DARK BANK" and "BA69AQ / QUARTERBACK".

Finally, the American authorities acknowledged that the account BINANCE attributed to Ekaterina JDANOVA had received 40 BTC resulting from an extortion committed in the context of a ransom request resulting from a BitPaymer ransomware action.

Ekaterina JDANOVA, of Russian nationality, residing in DUBAI, was arrested at Nice airport, in enforcement of an arrest warrant on October 1, 2023, whereas she was going to France.

By an introductory prosecution dated October 5, 2023, a judicial investigation was opened on the following counts:
- Laundering of drug importation as part of an organized gang, offenses provided and sanctioned under Articles 222-38, 222-36 paragraph 2, 222-44, 222-45, 222-47, 222-48, 222-49, 222-50, 222-51, 131-26-2 of the Criminal Code;
- Laundering of drug trafficking, offenses provided and sanctioned under Articles 222-44, 222-45, 222-47, 222-48, 222-49, 222-50 of the Criminal Code;
- Laundering as part of an organized gang of any crime or offense, offenses provided and sanctioned under Articles 324-2 paragraph 1, 324-3, 324-7, 324-8 of the Criminal Code;



Copie certifiée conforme à l'original

Vu ne varietur
Traduction conforme à l'original en langue française
N° 1848

Public Prosecution no.21064000646 – File no.: JIJ18312309000le – KOCHANSKI
Huzefa Hafiz ISMAIL's arrest warrant

SBU - LEGAL

5

-Complicity of access and fraudulent maintenance in an automated data processing system, offenses provided and sanctioned under Articles 323-1, 323-5 of the Criminal Code;

-Complicity of fraudulent introduction of data in an automated data processing system, offenses provided and sanctioned under Articles 323-3, 323-5 of the Criminal Code;

-Complicity of fraudulent extraction of data from an automated data processing system, offenses provided and sanctioned under Articles 323-3, 323-5 of the Criminal Code;

-Complicity of impeding the functioning of an automated data processing system, offenses provided and sanctioned under Articles 323-2, 323-5 of the Criminal Code;

-Extortion as part of an organized gang, offenses provided and sanctioned under Articles 312-6, 312-13, 312-14, 131-26-2 of the Criminal Code;

-Criminal conspiracy with the view to the preparation of the aforementioned crimes and offenses, offenses provided and sanctioned under Articles 450-1, 450-3, 450-5 of the Criminal Code.

Ekaterina JDANOVA was indicted and placed under pre-trial custody.

The exploitation of the telephone discovered in Ekaterina JDANOVA's possession, evidenced her participation in at least two discussion groups ("ACTIVITY-BADCOM BDC" and "ACTIVITY-KATYA KDT"), groups in which collections or receipts of funds were proposed in return for remuneration, in which ten individuals were participating, including, in particular the individuals using the pseudonyms "CEO" and "THE QB".

The exploitation of the messages of the SIGNAL group "ACTIVITY-KATYA KTD', active during the first semester 2023, evidenced numerous collections or receipts of funds on European territory, in particular in France, Italy and Belgium, for a total amount of more than 20,000,000 euros, resulting in compensation in crypto-currency.

At the same time, the exploitation of the SKY ECC conversation of the sole SKY PIN 3DOR3D "CEO/DARKBANK" evidenced, between November 2020 and February 2021, (cessation of the functioning of the system in March 2021), collections or issuances of cash also throughout European territory (France, Belgium, the Netherlands, Italy, the United Kingdom), involving "3DOR3D / CEO-DARKBANK" and other users of this solution, in the context of set-off operations, for an amount exceeding 50,000,000 euros – relating to collections/issuances of funds likely to be related to Ekaterina JDANOVA.

In view of the messages exchanged by the SKY PIN 3DOR3D "CEO/DARKBANK" and the use of this communication system, the investigations identified this individual as being:



Vu ne varietur
Traduction conforme à l'original en langue française
n°1848

Public Prosecution no.21064000646 – File no.: JIJ183123000001
Huzefa Hafiz ISMAIL's arrest warrant

SBU - LEGAL

6

Huzefa Hafiz ISMAIL
born on ██████ 983
of American nationality,
holder, in particular, of a passport ██████ 7428
established in DUBAI since January 4, 2017,
having obtained a golden visa ████████ 5037
and having as EMIRATE UNIFED NUMBER ████ 8097.



From the messages exchanged, it was observed that the user of the SKY PIN "3DOR3D / CEO-DARKBANK", also users of the SKY PIN RARK9J and 3TFFI7:

-asserted to have an ex-partner, of Russian nationality, which is the case for Huzefa Hafiz ISMAIL;

-had stayed in TURKEY from 14th to 22nd of February 2021, taking the flights DUBAI-ISTANBUL / ISTANBUL-DUBAI, on which was listed Huzefa Hafiz ISMAIL;

-announced to one of his correspondents his unavailability due to the birth of a new child between ████████ and the ████████ 2021, and Huzefa Hafiz ISMAIL is father of ████████ born on ████████ 2021.

Whereas Huzefa Hafiz ISMAIL resides outside of the territory of the French Republic,

That given the nature of the offenses, their extent, and also the elements evidences by the investigations, the issuance of this arrest warrant appears necessary and proportionate to the localization and arrest of Huzefa Hafiz ISMAIL;

**ACCORDINGLY**:

Summon and order all officers or judicial police agents and any agents of the public forces, in accordance with the law, to search and present before Us, Huzefa Hafiz ISMAIL;

Order the prison director of the place of arrest to receive and hold him in custody under arrest warrant until ordered otherwise;

Request any depository of the public forces to whom this mandate shall be presented to provide his assistance for its enforcement as necessary;

In the event of identification, the examining magistrate on duty must be contacted immediately (06.74.78.04.28).

In witness whereof, this mandate was signed by Us and stamped by our seals.

The Vice-President in charge of the investigation.

[Official stamp and signature]

Pour traduction certifiée conforme à l'original en langue française *visé ne variatur* sub numéro 1848 ; Ce jour, le 08/08/2024. Jane Kochanski

Copie certifiée
conforme à l'original

Vu ne varietur
Traduction conforme à l'original en langue française

Public Prosecution no.21064000646 – File no.: JIJ183123000001
Huzefa Hafiz ISMAIL's arrest warrant

SBU - LEGAL

EX-ISMAIL-000080





**MINISTÈRE**
**DE LA JUSTICE**
*Liberté*
*Égalité*
*Fraternité*

### COUR D'APPEL DE PARIS
### TRIBUNAL JUDICIAIRE DE PARIS

---

**MANDAT D'ARRÊT EUROPÉEN**

[A030] Le présent mandat a été émis par une autorité judiciaire compétente. Je demande que la personne mentionnée ci-dessous soit arrêtée et remise aux autorités judiciaires aux fins de l'exercice de poursuites pénales ou de l'exécution d'une peine ou d'une mesure de sûreté privative de liberté.

---

**a) Renseignements relatifs à l'identité de la personne recherchée :**

[A006] Nom patronymique : **ISMAIL**

[A007] Prénom(s) : **Huzefa Hafiz**

[A008] Nom d'épouse, s'il y a lieu :

[A011] Alias, s'il y a lieu :

[A012] Sexe : **Masculin**

[A013] Nationalité : **Américaine**

Titulaire du passeport ▮▮▮▮28.

Titulaire du golden visa : ▮▮▮▮037 et du EMIRATE UNIFED NUMBER : ▮▮▮97.

[A009] Date de naissance : ▮▮▮▮1983

[A010] Lieu de naissance : **Inconnu**

[A061] Résidence et/ou adresse connue : **sans domicile connu en France**

Etabli à DUBAI depuis le ▮▮▮▮2017

[M083] La ou les langues que la personne recherchée comprend (si connu) : **ignorée**

[A058] Traits distinctifs/description de la personne recherchée : **ignorés**

[A059 et A060] Photo et empreintes digitales de la personne recherchée, si elles sont disponibles et s'il est possible de les communiquer, ou les coordonnées de la personne à contacter afin d'obtenir ces informations ou un profil A.D.N. (si ces données peuvent être communiquées, mais n'ont pas été incluses) : **Une photographie**

1

Copie certifiée
conforme à l'original

**b) Décision sur laquelle se fonde le mandat d'arrêt européen :**

[A031 et A032] Mandat d'arrêt ou décision judiciaire ayant la même force : **Mandat d'arrêt décerné le 30 juillet 2024**

[A033]  Type : **Mandat d'arrêt délivré par Julien GAU, vice-président chargé de l'instruction au Tribunal judiciaire de Paris (art 131.CPP)**

[A035 et A036]  Jugement exécutoire : **Néant**

[A037]  Référence : **21064000646**

---

**c) Indications sur la durée de la peine :**

[A034] Durée maximale de la peine ou mesure de sûreté privatives de liberté qui peut être prononcée pour l'infraction/les infractions commise(s) :

### 30 ans de réclusion criminelle

[A038]  Durée de la peine ou mesure de sûreté privatives de liberté infligée :

[A039]  Peine restant à purger :

---

**[M083] d) Indiquez si l'intéressé a comparu en personne au procès qui a mené à la décision :**

1. ☐  Oui, l'intéressé a comparu en personne au procès qui a mené à la décision.

2. ☐  Non, l'intéressé n'a pas comparu en personne au procès qui a mené à la décision.

3. Si vous avez coché la case du point 2, veuillez confirmer si :

☐  3.1 a) l'intéressé a été cité à personne le.... (jour/mois/année) et a ainsi été informé de la date et du lieu fixés pour le procès qui a mené à la décision, et s'il a été informé qu'une décision pouvait être rendue en cas de non-comparution ;

OU

☐  3.1 b) l'intéressé n'a pas été cité à personne, mais a été informé officiellement et effectivement par d'autres moyens de la date et du lieu fixés pour le procès qui a mené à la décision, de telle sorte qu'il a été établi de manière non équivoque que l'intéressé a eu connaissance du procès prévu, et a été informé qu'une décision pouvait être rendue en cas de non-comparution ;

OU

07/08/2024.  2

Jane KOCHANSKI
Anglais
06 80 83 2...  N° 1847

Copie certifiée
conforme à l'original

SBU - LEGAL

☐   3.2 ayant eu connaissance du procès prévu, l'intéressé a donné mandat à un conseil juridique, qui a été désigné soit par l'intéressé soit par l'État, pour le défendre au procès, et a été effectivement défendu par ce conseil pendant le procès ;

OU

☐   3.3 l'intéressé s'est vu signifier la décision le …. (jour/mois/année) et a été expressément informé de son droit à une nouvelle procédure de jugement ou à une procédure d'appel, à laquelle l'intéressé a le droit de participer et qui permet de réexaminer l'affaire sur le fond, en tenant compte des nouveaux éléments de preuve, et peut aboutir à une infirmation de la décision initiale, et

☐   l'intéressé a indiqué expressément qu'il ne contestait pas la décision ;

OU

☐   l'intéressé n'a pas demandé une nouvelle procédure de jugement ou une procédure d'appel dans le délai imparti ;

OU

☐   3.4 l'intéressé n'a pas reçu personnellement la signification de la décision, mais

—   il la recevra personnellement sans délai après la remise, et

—   lorsqu'il l'aura reçue, il sera expressément informé de son droit à une nouvelle procédure de jugement ou à une procédure d'appel, à laquelle l'intéressé a le droit de participer et qui permet de réexaminer l'affaire sur le fond, en tenant compte des nouveaux éléments de preuve, et peut aboutir à une infirmation de la décision initiale, et

—   il sera informé du délai dans lequel il doit demander une nouvelle procédure de jugement ou une procédure d'appel, soit … jours.

4. Si vous avez coché la case du point 3.1 b), 3.2 ou 3.3 ci-dessus, veuillez indiquer comment la condition concernée a été remplie :
...................................................................................................................................................................
...................................................................................................................................................................

**e) Infraction(s) :**

[M083] LE PRESENT MANDAT SE RAPPORTE AU TOTAL A **12 INFRACTIONS.**

[A042, A 043, A044 et A045] Description des circonstances dans lesquelles la ou les infractions ont été commises, y compris le moment (la date et l'heure), le lieu ainsi que le degré de participation de la personne recherchée à l'infraction ou aux infractions :

Auteur des faits commis du 6 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux Etats-Unis, en Belgique, en Allemagne, en Italie, au Royaume-Uni, et depuis temps non prescrit.

L'exploitation des conversations chiffrées issues de SKYECC conduisait les enquêteurs à identifier un individu utilisant un pseudonyme crypté afin de blanchir des fonds provenant d'un trafic de stupéfiants. Au

Copie certifiée
conforme à l'original

Jane KOCHANSKI
Anglais

07/08/2024.

N°1847.

SBU - LEGAL

vu des seules captures d'écran réalisées, 26 millions d'euros apparaissaient avoir été déposés en 2 mois (2 janvier - 27 février 2021) via 15 adresses.

Parmi les adresses identifiées, l'une d'elle comptait comme créditeur un compte bancaire Binance ouvert au nom d'Ekaterina JDANOVA, ressortissante russe résidant à DUBAI. Elle était interpellée le 1er octobre 2023, mise en examen et placée en détention provisoire.

L'exploitation du téléphone d'Ekaterina JDANOVA mettait en évidence sa participation à deux groupes de discussion sur lesquels des collectes ou des remises de fonds étaient proposées contre rémunération.

L'un des participants utilisait le pseudonyme de « CEO ». Les investigations ont conduit à identifier cet individu comme étant : **Huzefa Hafiz ISMAIL**.

Il apparaissait de nombreuses collectes ou remises de fonds sur le territoire européen (France, Italie, Belgique) pour un montant total de plus de 20.000.000 d'euros, donnant lieu à compensation en cryptomonnaie. L'individu mis en cause avait collecté pour sa part entre novembre 2020 et février 2021 des collectes pour une somme dépassant les 50.000.000 euros.

---

**[A040 ET A041] Nature et qualification juridique de la ou des infractions et dispositions légales applicables :**

**BLANCHIMENT: AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'IMPORTATION NON AUTORISEE DE STUPEFIANTS EN BANDE ORGANISEE**

Définie par ART.222-38, ART.222-36 AL.2, AL.1, ART.222-41, ART.132-71 C.PENAL. ART.L.5132-7, ART.L.5132-8 AL.1, ART.R.5132-74, ART.R.5132-77, ART.R.5132-78 C.SANTE.PUB. ART.1 ARR.MINIST DU 22/02/1990.

Réprimée par ART.222-38, ART.222-36 AL.2, ART.222-44 §I, ART.222-45, ART.222-47, ART:222-48, ART.222-49, ART.222-50, ART.222-51, ART.131-26-2 C.PENAL.

**BLANCHIMENT: AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'UN DELIT DE TRAFIC DE STUPEFIANTS**

Définie par ART.222-38 AL.1, ART.222-36 AL.1, ART.222-37 C.PENAL. ART.L.5132-7 C.SANTE.PUB. ART.1 ARR.MINIST DU 22/02/1990.

Réprimée par ART.222-38, ART.222-44, ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50 C.PENAL.

**BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVERSION DU PRODUIT D'UN DELIT**

Définie par ART.324-2 2°, ART.324-1 AL.2, ART.324-1-1, ART.132-71 C.PENAL.

Réprimée par ART.324-2 AL.1, ART.324-3, ART.324-7, ART.324-8 C.PENAL.

**EXTORSION EN BANDE ORGANISEE**

Définie par ART.312-6 AL.1, ART.312-1 AL.1, ART.132-71 C.PENAL.



Copie certifiée
conforme à l'original

Réprimée par ART.312-6 AL.1, ART.312-13, ART.312-14, ART.131-26-2 C.PENAL.

**ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-1 AL.1 C.PENAL.
Réprimée par ART.323-1 AL.1, ART.323-5 C.PENAL.

**MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-1 AL.1 C.PENAL.
Réprimée par ART.323-1 AL.1, ART.323-5 C.PENAL.

**ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-2 AL.1 C.PENAL.
Réprimée par ART.323-2 AL.1, ART.323-5 C.PENAL.

**INTRODUCTION FRAUDULEUSE DE DONNEES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE**
Définie par ART.323-3 AL.1 C.PENAL.
Réprimée par ART.323-3 AL.1, ART.323-5 C.PENAL.

**EXTRACTION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE**
Définie par ART.323-3 AL.1 C.PENAL.
Réprimée par ART.323-3 AL.1, ART.323-5 C.PENAL.

**PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME**
Définie par ART.450-1 AL.1, AL.2 C.PENAL.
Réprimée par ART.450-1 AL.2, ART.450-3, ART.450-5 C.PENAL.

**PARTICIPATION A ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI DE 10 ANS D'EMPRISONNEMENT**
Définie par ART.450-1 AL.1, AL.2 C.PENAL.
Réprimée par ART.450-1 AL.2, ART.450-3, ART.450-5 C.PENAL.

**PARTICIPATION A ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI D'AU MOINS 5 ANS D'EMPRISONNEMENT**
Définie par ART.450-1 AL.1, AL.3 C.PENAL.

Copie certifiée
conforme à l'original

Jane KOCHANSKI
Anglais

5

N° 1847

SBU - LEGAL

Réprimée par ART.450-1 AL.3, ART.450-3 C.PENAL.

**[M063] I. Cocher le cas échéant, s'il s'agit d'une ou des infractions suivantes punies en France d'une peine d'une durée égale ou supérieure à 3 ans telles qu'elles sont définies par le droit français :**

☒  **Participation à une organisation criminelle**

☐  Terrorisme

☐  Traite des êtres humains

☐  Exploitation sexuelle des enfants et pornographie infantile

☐  Trafic illicite de stupéfiants et de substances psychotropes

☐  Trafic illicite d'armes, de munitions et d'explosifs

☐  Corruption

☐  Fraude, y compris la fraude portant atteinte aux intérêts financiers des Communautés européennes au sens de la convention du 26 juillet 1995 relative à la protection des intérêts financiers des Communautés européennes

☒  **Blanchiment du produit du crime**

☐  Faux monnayage, y compris la contrefaçon de l'euro

☒  **Cybercriminalité**

☐  Crimes et délits contre l'environnement, y compris le trafic illicite d'espèces animales menacées et le trafic illicite d'espèces et d'essences végétales menacées

☐  Aide à l'entrée et au séjour irréguliers

☐  Homicide volontaire, coups et blessures graves

☐  Trafic illicite d'organes et de tissus humains

☐  Enlèvement, séquestration et prise d'otage

☐  Racisme et xénophobie

☐  Vols commis en bande organisée ou avec arme

☐  Trafic illicite de biens culturels, y compris antiquités et œuvres d'art

☐  Escroquerie

☒  **Extorsion**

☐  Contrefaçon et piratage de produits

☐  Falsification de documents administratifs et trafic de faux

☐  Falsification de moyens de paiement

6

Copie certifiée conforme à l'original

SBU - LEGAL

☐ Trafic illicite de substances hormonales et autres facteurs de croissance

☐ Trafic illicite de matières nucléaires et radioactives

☐ Trafic de véhicules volés

☐ Viol

☐ Incendie volontaire

☐ Crimes et délits relevant de compétence de la Cour pénale internationale

☐ Détournement d'avion/navire

☐ Sabotage

**II. [A044] Description complète de l'infraction ou des infractions qui ne relèvent pas des cas visés au point I ci-avant :**

**f) [M083] Autres circonstances pertinentes en l'espèce (informations facultatives) :**
(NB : il est possible d'inclure ici des remarques sur l'extra-territorialité, les actes interruptifs de prescription et autres conséquences de l'infraction)

**g) [M083] Le présent mandat se rapporte également à la saisie et à la remise des objets qui peuvent servir de pièces à conviction.**

Le présent mandat se rapporte également à la saisie et à la remise des objets acquis par la personne recherchée du fait de l'infraction :

description des objets (et lieu où ils se trouvent) (s'ils sont connus) :

**h) [M083] ☐ L'infraction ou les infractions pour laquelle ou lesquelles ce mandat a été émis est ou sont passibles d'une peine ou mesure de sûreté privative de liberté à caractère perpétuel ou a (ont) eu pour effet une telle peine ou mesure :**

LE SYSTEME JURIDIQUE DE L'ETAT MEMBRE D'EMISSION PREVOIT UNE REVISION DE LA PEINE INFLIGEE – SUR DEMANDE OU AU PLUS TARD APRES 20 ANS – EN VUE DE LA NON-EXECUTION DE CETTE PEINE OU MESURE.

ET/OU

LE SYSTEME JURIDIQUE FRANÇAIS PREVOIT L'APPLICATION DE MESURES DE CLEMENCE AUXQUELLES LA PERSONNE PEUT PRETENDRE EN VERTU DE LA LEGISLATION EN VUE DE LA NON-EXECUTION DE CETTE PEINE.

**i) [A030] Autorité judiciaire qui a émis le mandat :**

Copie certifiée conforme à l'original

Jane KOCHANSKI
Anglais
05 60 63 25 3...
N° 1847

Expert traducteur près la Cour...

SBU - LEGAL

DESIGNATION OFFICIELLE DE L'AUTORITE JUDICIAIRE : Procureur de la République près le Tribunal judiciaire de Paris

NOM DE SON REPRÉSENTANT : **Madame Natacha RATEAU**
FONCTION (TITRE) : **Premier vice-procureur**
REFERENCE DU DOSSIER : **21064000646**
ADRESSE : **Parvis du Tribunal de Paris - 75859 CEDEX 17**

PERMANENCE DU PARQUET :
N° DE TELEPHONE : **+33 1 70 60 80 60**
N° DE TELECOPIE : **+ 33 1 44 32 78 77**
COURRIEL : mandats.e2.tj-paris@justice.fr

COORDONNEES DE LA PERSONNE A CONTACTER AFIN DE PRENDRE LES DISPOSITIONS PRATIQUES NECESSAIRES A LA REMISE DE LA PERSONNE :

**Madame Natacha RATEAU, magistrate de l'ordre judiciaire**

N° DE TELEPHONE DE LA PERMANENCE : **+33 1 70 60 80 60**
N° DE TELECOPIE : **+ 33 1 44 32 78 77**
COURRIEL : mandats.e2.tj-paris@justice.fr

ainsi que le service national des transférements (DAP) et Madame Rohra GHOLEM, Chef de service, Responsable du SNT, aux numéros suivants :
N° DE TELEPHONE MOBILE DE PERMANENCE : 00 33 681 49 77 99
N° DE TELEPHONE : 00 33 188 28 60 28
COURRIEL : snt.dap-ems@justice.gouv.fr

SIGNATURE DE L'AUTORITE JUDICIAIRE D'EMISSION (PROCUREUR GENERAL OU PROCUREUR DE LA REPUBLIQUE), OU DE SON REPRESENTANT

NOM : **Madame Natacha RATEAU**

FONCTION (TITRE) : **Premier vice-procureur**

DATE : **30 JUILLET 2024**

CACHET OFFICIEL (S'IL EST DISPONIBLE) :

Copie certifiée
conforme à l'original

Jane KOCHANSKY
Anglais

06 60 89 25

N° 1847

2 | 08 | 2024.

SBU - LEGAL

EX-ISMAIL-000088

**APPENDIX**

## TEXTS DEFINING AND SANCTIONING THE OFFENSES

### LAUNDERING: ASSISTANCE WITH THE MISLEADING JUSTIFICATION OF THE ORIGIN OF THE ASSETS AND REVENUES OF THE UNAUTHORIZED IMPORTER OF DRUGS AS PART OF AN ORGANIZED GANG

Defined by ART.222-38, ART.222-36 paragraph 2, paragraph 1, ART.222-41, ART.132-71 of the Criminal Code. ART.L.5132-7, ART.L.5132-8 paragraph 1, ART.R.5132-74, ART.R.5132-77, ART.R.5132-78 of the Public Health Code. ART.1 of the ministerial order dated 22/02/1990.

Sanctioned under ART.222-38, ART.222-36 paragraph 2, ART.222-44 §l, ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50, ART.222-51, ART.131-26-2 of the Criminal Code.

### LAUNDERING: ASSISTANCE WITH THE MISLEADING JUSTIFICATION OF THE ORIGIN OF ASSETS AND REVENUES OF THE OFFENDER OF A DRUG TRAFFICKING OFFENSE

Defined by ART.222-38 paragraph 1, ART.222-36 paragraph 1, ART.222-37 of the Criminal Code. ART.L.5132-7 of the Public Health Code. ART.1 of the ministerial order dated 22/02/1990.

Sanctioned under ART.222-38, ART.222-44, ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50 of the Criminal Code.

### Article 222-36 of the Criminal Code

The unlawful importation or exportation of drugs is sanctioned by ten years' imprisonment and a fine of 7,500,000 euros.

These offenses are sanctioned by thirty years' imprisonment and a fine of 7,500,000 when they are committed as part of an organized gang.

The first two paragraphs of Article 132-23 relating to the minimum period are applicable to the offenses provided herein.

The individuals or legal entities guilty of the offenses provided herein shall also incur the following complementary penalty: prohibition from carrying out the activity as provider of ongoing professional training within the meaning of Article L. 6313-1 of the Labor Code for a period of five years.

### Article 222-37 of the Criminal Code

The unlawful transport, possession, offer, sale, acquisition or use of drugs is sanctioned by ten years' imprisonment and a fine of 7,500,000.

The facilitation, by any means whatsoever, the unlawful use of drugs, having drugs dispensed through fictitious or convenience prescriptions, or having drugs dispenses upon presentation of such prescriptions, in awareness of their fictitious or convenience aspect.

The first two paragraphs of Article 132-23 relating to the minimum period are applicable to the offenses provided in this Article.

1

Vu ne varietur
Traduction conforme à l'original en langue française
n° 1859

Copie certifiée conforme à l'original

Jane KOCHANSKY
Anglais
19/08/2024

SBU - LEGAL

EX-ISMAIL-000089

Article 222-38 of the Criminal Code
The following shall be subject to ten years' imprisonment and a fine of 750,000 euros: the facilitation, by any means, of the misleading justification of the origin of the assets or revenues of the offender of one of the offenses mentioned in Articles 222-34 to 222-37 or assist in an investment, concealment or conversion operation of the proceeds of one of these offenses. The fine may reach up to one half of the value of the assets or funds subject of the laundering operations.

When the offense relates to assets or funds resulting from one of the crimes mentioned in Articles 222-34, 222-35 and 222-36, second paragraph, the offender shall be sanctioned by the penalties provided for the applicable crimes.
The first two paragraphs of Article 132-23 relating to the minimum period are applicable to the offenses provided for in this Article.

Article 222-41 of the Criminal Code
According to the provisions of this section, drugs constitute the substances or plants classified as drugs under Article L. 5132-7 of the Public Health Code.

Article 132-71 of the Criminal Code
According to the law, an organized gang shall be defined as any group formed or organization established with the view to the preparation, characterized by one or several substantive events, of one or several offenses.

Article L.5132-7 of the Public Health Code
Toxic plants, substances or preparations are classified as drugs or psychotropics or are registered on the lists I and II by decision of the general director of the national agency for drug and health product security, without prejudice to the regulatory provisions applicable to toxic plants, substances or preparations registered on the lists I and II mentioned in 4° of Article L. 5132-1 contained in products other than medication for human use.

Article L.5132-8 of the public health code
The production, processing, transport, importation, exportation, possession, offering, sale, acquisition and use of plants, substances or preparations classified as toxic are subject to conditions defined by decrees in the Council of State.
These decrees may prohibit any operation relating to these plants and substances; they may, in particular, after recommendation by the national Academies of medicine and pharmacy, prohibit the prescription and incorporation in these preparations of certain of these plants and substances or specialties containing the latter.
The conditions for the prescription and issuance of such preparations are fixed after recommendation by the Medical Council national committees and the Council of Pharmacists.

Article R.5132-74 of the Criminal Code
The following are prohibited, unless express authorization is provided: the production, processing, transport, importation, exportation, possession, offering, sale, acquisition or use, and, generally, the agricultural, artisanal, commercial and industrial operations relating to the substances or preparations and plants or parts of the plants classified as drugs, upon proposal of the general director of the drug and health product security

Vu ne varietur
Traduction conforme à l'original en langue française
1°1850

Copie certifiée
conforme à l'original

Jane KOCHANSKI
Anglais

9/08/2024

SBU - LEGAL

EX-ISMAIL-000090

National Agency, after recommendation by the national commission for drugs and psychotropics, by order of the health minister.

When these substances or preparations and these plants or parts thereof are used in veterinary medicine, the general director of the drug and health product security national agency requests, prior to its proposition, the recommendation from the general director of the national agency for sanitary security for food, environment and labor.

### Article R.5132-77 of the Public Health Code

The authorization mentioned in Article R. 5132-74 may only be granted to an individual. In the companies mentioned in Articles L. 5124-2 and L. 5142-1, the authorization may be requested for the head pharmacists, interim head pharmacist, the delegate pharmacists and the deputy head pharmacists and for the head veterinary surgeon, the interim head veterinary surgeon, the delegate veterinary surgeons and the and the deputy head veterinary surgeons. In the event of the absence of the authorization holders for the duration not exceeding fifteen days, the authorization benefits under the same conditions, the replacements thereof, duly registered in this capacity on the national committee of pharmacists or veterinary surgeons. The authorization indicates the substances or preparations and the plants or parts thereof, the production, processing, transport, importation, exportation, possession, offering, sale, acquisition or use of which is authorized.

It may be subject to specific conditions concerning the possession of substances or preparations, plants or parts thereof classified as drugs and the control of their extraction, processing or transformation.

It sets the quantity of drugs which may be sold or issued when it is granted for research or educational purposes. Nevertheless, no quantity is set for the governmental programs for the collection of drugs for the purposes of public health research.

It may not be granted and shall be immediately withdrawn from any person sentenced for an offense under the provisions hereof or for an unlawful use of drugs.

When the substance or preparation is a raw material for pharmaceutical use, the authorization may only be granted if the establishment is authorized under the conditions provided for under Article L. 5138-1.

### Article R.5132-78 of the Public Health Code

Except for the cases of transit or for passing through customs, it is prohibited to import or export drugs without special authorization issued for each operation by the general director of the national agency for drug and health product security. This authorization is issued under the conditions provided in Article R. 5132-75. The authorization mentions the name and quantity of the product subject of the operation, the type and quantity of the drug substance therein, the name and address of the issuant and recipient, the means of transport and the customs office.

In the event of transit or passing through customs, the merchandise is accompanied with the exportation authorization issued by the competent administrative authority of the exporting State.

The documents certifying the authorizations issued in accordance with this Article are retained by the holders of these authorizations for three years as from the date of their issuance to be presented in the event of a requisition by the supervisory authorities.

By derogation to the first paragraph, for the establishments, provided for by the authorization, issued in accordance with Article R. 5132-74, an authorization may be issued for a series of operations by the general director of the national agency for drug

3

Copie certifiée
conforme à l'original

Vu ne varietur
Traduction conforme à l'original en langue française
12.850

Jane KOCHANSKI
Anglais

19/08/2024

SBU - LEGAL

and health product security, for the importations and exportations of reference standards containing drugs used exclusively for scientific purposes.

### Art.1 of the ministerial order dated February 22, 1990

The conditions under which the drugs intended for human use and the products mentioned in Article L. 658-11 of the public health code, containing toxic substances at too minimal a level of dosage or concentration to be subject to the provisions of Articles R. 5190 to R. 5219 of the public health code are those applicable on the date of publication of this order.

### Article 222-44 of the Criminal Code

I.- The individuals who have committed the offenses provided in sections 1 to 4 of this chapter shall also incur the following complementary penalties:

1° The prohibition, according to the terms provided in Article 131-27, either from carrying out a public position or a professional or social activity, in the course or during which the offense was committed, or, for the offenses provided by Articles 222-1 to 222-6,222-7,222-8,222-10, 1° and 2° of Article 222-14, 1° to 3° of Article 222-14-1, Articles 222-15,222-23 to 222-26,222-34,222-35,222-36,222-37,222-38 and 222-39, from carrying out a commercial or industrial profession, from managing, administering, directing or controlling by any means whatsoever, directly or indirectly, on one own's behalf or on behalf of a third party, a commercial or industrial enterprise or a commercial company. These prohibitions may be accumulated;

2° The prohibition from possessing or holding a licensed weapon, for a maximum period of five years;

3° The suspension, for a maximum duration of five years, of the driving license, this suspension may be limited to driving outside of the professional activity; in the cases provided under Articles 222-19-1 and 222-20-1, the suspension may not be adjourned, even in part, and may not be limited to driving outside of the professional activity; in the cases provided by 1° to 6° and the last paragraph of Articles 222-19-1 and 222-20-1, the duration of this suspension is a maximum period of ten years;

4° The cancellation of the driving license with the prohibition of requesting the issuance of a new driving license during a maximum period of five years;

5° The confiscation of one or several vehicles belonging to the offender;

6° The confiscation of one or several weapons, owned by the offender or of which he has free disposal thereof;

7° The confiscation of the item used or intended to be used to commit the offense or the item which was the produce thereof;

8° In the cases provided for under Articles 222-19-1 and 222-20-1, the prohibition from driving certain motorized vehicles, including those for which the driving license is not required, for a maximum duration of five years;

9° (Repealed);

Copie certifiée
conforme à l'original

4
Vu ne varietur
Traduction ... ne et en langue française
n° 1859

SBU - LEGAL

Jane KOCHANSKI
Anglais

EX-ISMAIL-000092

9° bis (Repealed);

10° In the cases provided for in Articles 222-19-1 and 222-20-1, the immobilization, for a maximum period of one year, of the vehicle used by the offender to commit the offense, if he is the owner;

11° The confiscation of the animal used to commit the offense;

12° The prohibition, whether definitive or temporary, from possessing an animal;

13° In the cases provided for under Articles 222-19-1 and 222-20-1, the confiscation of the vehicle that was used by the offender to commit the offense, if he is the owner. The confiscation of the vehicle is obligatory under the cases provided for in 4° and in the last paragraph of these Articles, and under the cases provided for in 2°, 3° and 5° of these Articles, in the event of a repeat offense or if the person has already been finally sentenced for one of the torts provided under Articles L. 221-2, L. 224-16, L. 234-1, L. 234-8, L. 235-1, L. 235-3, L. 413-1 of the Traffic code or for the minor offense mentioned in this same Article L. 413-1. However, the jurisdiction may decide not to pronounce this penalty, in a specifically substantiated decision;

14° In the cases provided for under 2° and in the last paragraphs of Articles 222-19-1 and 222-20-1 of this Code, the prohibition, for a maximum period of five years, from driving a vehicle that is not equipped by an approved professional or by the construction of an interlock device by an electronic Alcotest, approved under the conditions provided for under Article L. 234-17 of the traffic code. When this prohibition is pronounced at the same time as the penalty for the cancellation or suspension of the driving license, it shall apply, for the duration set by the court, following the enforcement of this penalty;

15° (Repealed);

Any sentence for the offenses provided for in 1° to 6° and the last paragraph of Article 222-19-1 shall automatically give rise to the cancellation of the driving license with the prohibition from requesting a new license for a maximum period of ten years.

II.- In the event of conviction for the crimes or offenses committed with a weapon provided for under sections 1,3,3 ter and 4 herein, the issuance of the complementary penalties provided for in 2° and 6° of I is obligatory. The duration of the penalty provided under 2° of I shall be increased to a maximum period of fifteen years.

Nevertheless, the court may, in a specifically substantiated decision, when the penalty is pronounced by a magistrates' court, decide not to issue these penalties, in consideration for the circumstances of the offense and the offender's personality.

Article 222-45 of the Criminal Code
The individuals, who have committed the offenses provided for under the sections 1, 1 bis, 3 and 4 shall also be subject to the following penalties:

Vu ne varietur
S~ecution conforme à l'original en langue française
n° 1359

Copie certifiée
conforme à l'original

Jane KOCHANSKI
Anglia

SBU - LEGAL

1° The prohibition, according to the terms provided for under Article 131-26, of civic, civil and family rights;

2° The prohibition, according to the terms provided for under Article 131-27, from carrying out a public position;

3° The prohibition from carrying out a professional or voluntary activity, either definitively or for a maximum duration of ten years, involving regular contact with minors.

Article 222-47 of the Criminal Code

In the cases provided for under Articles 222-1 to 222-15,222-23 to 222-30 and 222-34 to 222-40, prohibition of residency may be pronounced as a complementary penalty, according to the terms provided for under Article 131-31.

In the cases provided for under Articles 222-7 to 222-13 and 222-14-2, when the offenses are committed during public protests, the following complementary penalty may be pronounced from prohibiting in public protests, under the conditions provided for in Article 131-32-1.

In the cases provided for under Articles 222-23 to 222-30, when they are committed on minors, by 6° bis of Articles 222-3, 222-8, 222-10, 222-12 and 222-13, by par Article 222-14-4 and Articles 222-34 to 222-40, and the prohibition from leaving French national territory may be pronounced for a maximum duration of five years.

Article 222-48 of the Criminal Code

The prohibition from French territory may be pronounced under the conditions provided for under Article 131-30, either definitively or for a maximum duration of ten years, against any foreigner who has committed one of the offenses defined under Articles 222-1 to 222-12, 222-14, 222-14-1, 222-14-4, 222-15, 222-15-1, 222-23 to 222-31 and 222-34 to 222-40.

Article 222-49 of the Criminal Code

In the cases provided for under Articles 222-34 to 222-40, the following shall be pronounced: the confiscation of installations, equipment and any item having been used, directly or indirectly, for the commission of the offense, and any proceed thereof, upon such relevant individual and in their location, insofar as their owner could not be unaware of the fraudulent origin or use.

In the cases provided for by Articles 222-34, 222-35, 222-36, 222-37 and 222-38, the following may also be pronounced: the confiscation of all or part of the offender's assets or, subject to the rights of the owner in good faith, for which he has free disposal thereof, regardless of the type, moveable or immoveable, divided or undivided.

Article 222-50 of the Criminal Code

The individuals or legal entities which have committed one of the offenses provided under Articles 222-34 to 222-40 shall also incur the following complementary penalties:

1° The definitive removal of the permit for selling beverages or restaurant permit;

2° The closure, definitively or for a maximum duration of five years, of any establishment open to the public or used by the public, in which the offenses defined herein were committed by the owner or with the owner's complicity.

Copie certifiée
conforme á l'original

Vu ne varietur
Traduction conforme à l'original en langue française
n° 1859

SBU - LEGAL

EX-ISMAIL-000094

Article 222-51 of the Criminal Code
The temporary closure provided under Article 222-50 results in the suspension of the permit to sell beverages or restaurant permit for the same duration. The expiry period of the latter shall be suspended during the closure period.

The definitive closure provided for under Article 222-50 shall result in the definitive withdrawal of the permit to sell beverages or restaurant permit.

Article 131-26-2 of the Criminal Code
I. – The issuance of the complementary penalty of ineligibility mentioned in 2° of Article 131-26 and in Article 131-26-1 is obligatory against any person who has committed an offense mentioned in II herein or a crime.
This conviction is mentioned in the form no. 2 of the criminal record, provided under Article 775 of the Code of Criminal Procedure throughout the entire period of duration of ineligibility.
II. – The offenses for which the ineligibility must be pronounced are as follows:
1° The offenses provided under Articles 222-9, 222-11, 222-12, 222-14, 222-14-1, 222-14-4, 222-14-5, 222-15, 222-15-1 and 222-27 to 222-33-2-2 of said Code;
2° The offenses provided in Articles 225-1 to 225-2;
3° The offenses provided in Articles 313-1, 313-2 and 314-1 to 314-3, and their concealment or laundering;
4° The offenses provided in chapter I of title II of book IV;
5° The offenses provided in Articles 432-10 to 432-15,433-1 and 433-2,434-9,434-9-1,434-43-1,435-1 to 435-10 and 445-1 to 445-2-1, and their concealment or laundering;
6° The offenses provided in Articles 441-2 to 441-6, and their concealment or laundering;
7° The offenses provided for in Articles L. 86 to L. 88-1, L. 91 to L. 104, L. 106 to L. 109, L. 111, L. 113 and L. 116 of the electoral code;
8° The offenses provided in Articles 1741 and 1743 of the General Tax Code, when they are committed as part of an organized gang or when they result from one of the practices mentioned in 1° to 5° of II of Article L. 228 of the tax procedure book and their concealment or laundering;
9° The offenses provided for in Articles L. 465-1 to L. 465-3-3 of the Monetary and Financial Code, and their concealment or laundering;
10° The offenses provided in Articles L. 241-3 and L. 242-6 of the Commercial Code, and their concealment or laundering;
11° The offenses provided in Article L. 113-1 of the electoral code and in Article 11-5 of the law no. 88-227 of March 11, 1988 relating to financial transparency of political affairs;
12° The offenses provided in I of Article LO 135-1 of the electoral code and in Article 26 of the law no. 2013-907 of October 11, 2013 relating to transparency of public affairs;
14° The offense of participation in a criminal conspiracy provided under Article 450-1 of this Code, when it relates to a crime or offense mentioned in 1° to 13° herein.
III. – Nevertheless, the court may, in a duly substantiated decision, decide not to issue the penalty provided herein, in consideration of the circumstances of the offense and the offender's personality.

Vu ne varietur
L'Huissier conforme à l'original en langue française
4° 1859

Copie certifiée conforme à l'original

Jane KOCHANSKI
Anglais

SBU - LEGAL

EX-ISMAIL-000095

**SERIOUS MONEY LAUNDERING: PARTICIPATION IN AN ORGANIZED GANG IN AN INVESTMENT, CONCEALMENT OPERATION OR THE CONVERSION OF THE PROCEEDS OF AN OFFENSE**

Defined by ART.324-2 2°, ART.324-1 paragraph 2, ART.324-1-1, ART.132-71 of the Criminal Code.

Sanctioned by ART.324-2 paragraph 1, ART.324-3, ART.324-7, ART.324-8 of the criminal code.

Article 324-1 of the Criminal Code

Money laundering involves the facilitation, by any means, of a misleading justification of the origin of assets or revenues of the offender of a crime or tort, having provided the latter with direct or indirect profit.

Money laundering also involves assistance in an investment or concealment operation or the conversion of the direct or indirect proceeds of a crime or offense.

Money laundering is sanctioned by five years' imprisonment and a fine of 375,000 euros.

Article 324-1-1 of the Criminal Code

For the application of Article 324-1, the assets or revenues are presumed to be the direct or indirect proceeds of a crime or offense insofar as the substantive, legal or financial conditions of the investment, concealment, or the conversion operation may not have any other justification than concealing the actual origin or beneficiary of these assets or revenues.

Article 324-2 of the Criminal Code

Money laundering is sanctioned by ten years' imprisonment and a fine of 750,000 euros:

1° When it is committed regularly or by using the facilities resulting from a professional activity;

2° When it is committed as part of an organized gang.

Article 132-71 of the Criminal Code

*See the aforementioned.*

Article 324-3 of the Criminal Code

The fines mentioned in Articles 324-1 and 324-2 may be pronounced for up to one half of the value of the assets or funds relating to the laundering operations.

Article 324-7 of the Criminal Code

The individuals who have committed the offenses defined under Articles 324-1 and 324-2 shall also be subject to the following complementary penalties:

1° The prohibition, according to the terms provided in Article 131-27, either from carrying out a public office or a professional or social activity in the course or during which the offense was committed, with such prohibition being definitive or provisional in the case provided for in Article 324-2 and for a maximum duration of five years in the case provided for in Article 324-1, or from carrying out a commercial or industrial profession, directing, administering, managing or controlling, in any means whatsoever, directly or indirectly, on one own's behalf or on behalf of a third

8

Copie certifiée conforme à l'original

Vu ne varietur N° 1859

Jane KOCHANSKY Anglais

19/08/2024

SBU - LEGAL

party, a commercial or industrial enterprise or a commercial company. These prohibitions of exercise may be accumulated;

2° The prohibition from possessing or carrying a licensed weapon, for a maximum duration of five years;

3° The prohibition, for the maximum duration of five years, from issuing cheques other than those which enable the withdrawal of funds by the drawer with the drawee or those which are certified and using credit cards;

4° The suspension, for a maximum duration of five years, of the driving license, and this suspension may be limited to driving outside of the professional activity;

5° The cancellation of the driving license with the prohibition of requesting a new driving permit for a maximum duration of five years;

6° The confiscation of one or several vehicles belonging to the offender;

7° The confiscation of one or several weapons owned by the offender or for which he has the free disposal thereof;

8° The confiscation of the item used or intended to be used to commit the offense or the item which was the produce thereof, with the exception of returnable items;

9° The prohibition, according to the terms provided for in Articles 131-26 and 131-26-1, of civic, civil and family rights;

10° The prohibition of residency according to the terms provided for in Article 131-31;

11° The prohibition, for a maximum duration of five years, from leaving French territory;

12° The confiscation of all or part of the offender's assets or, subject to the rights of the owner in good faith, for which he has the free disposal, regardless of the type, moveable or immoveable, divided or undivided.

Article 324-8 of the Criminal Code
The prohibition from French territory may be pronounced under the conditions provided in Article 131-30, either definitively, or for a maximum duration of ten years, against any foreigner who has committed one of the offenses defined in Articles 324-1 and 324-2.

## EXTORTION AS PART OF AN ORGANIZED GANG
Defined under ART.312-6 paragraph 1, ART.312-1 paragraph 1, ART.132-71 of the Criminal Code.
Sanctioned under ART.312-6 paragraph 1, ART.312-13, ART.312-14, ART.131-26-2 of the Criminal Code.

Article 312-1 of the Criminal Code
Extortion involves obtaining through violence, threatened violence or constraint, either a signature, commitment or waiver, or the revelation of a secret, or the issuance of funds, securities or any asset.

Extortion is sanctioned by seven years' imprisonment and a fine of 100,000 euros.

Article 312-6 of the Criminal Code
Extortion as part of an organized gang is sanctioned by twenty years' imprisonment and a fine of 150,000 euros.

Copie certifiée
conforme à l'original

Jane KOCHANSKY
Anglais

06 60 83 25
19/08/2024

Vu ne varietur
traduction conforme à l'original en langue française
N° 1859

SBU - LEGAL

It is sanctioned by thirty years' imprisonment and a fine of 150,000 euros when it is preceded, accompanied or followed by violence on another, having resulted in a mutilation or permanent disability.

It is sanctioned by a life sentence when it is committed either with the use or threatened use of a weapon, or by a person carrying a licensed weapon or for which possession thereof is prohibited.

The first two paragraphs of Article 132-23 relating to the minimum period are applicable to the offenses provided herein.

Article 132-71 of the Criminal Code
*See the aforementioned*

Article 312-13 of the Criminal Code
I. – The individuals who have committed one of the offenses provided herein shall also incur the following complementary penalties:

1° The prohibition of civic, civil and family rights, according to the terms provided for in Article 131-26;

2° The prohibition, according to the terms provided in Article 131-27, either from carrying out a public office or a professional or social activity in the course or during which the offense was committed, with such prohibition being definitive or provisional in the cases provided for in Articles 312-3 to 312-7 and for a maximum duration of five years in the cases provided for in Articles 312-1, 312-2 and 312-10, or from carrying out a commercial or industrial profession, from directing, administering, managing or controlling, by any means, directly or indirectly, on one own's behalf or on behalf of a third party, a commercial or industrial enterprise. These prohibitions of exercise may be accumulated;

3° (Repealed);

4° The confiscation of the item used or intended to be used to commit the offense or the item which is the produce thereof, with the exception of returnable items;

5° The prohibition of residency according to the terms provided by Article 131-31.

II. – In the event of conviction for the offenses herein, the issuance of the complementary penalty of prohibition of possessing or carrying a licensed weapon for a maximum period of five years is obligatory.

Nevertheless, the court may, in a specifically substantiated decision, when the sentence is issued by a magistrates' court, decide not to pronounce this penalty, in consideration of the circumstances of the offense and the offender's personality.

Article 312-14 of the Criminal Code
The prohibition from the French territory may be pronounced under the conditions provided for in Article 131-30, either definitively, or for a maximum duration of ten

10

Copie certifiée conforme à l'original

Vu ne varietur
"rexetion conforme à l'original en langue française

SBU - LEGAL

Jane KOCHANSKY
Anglais

19/08/2024

years, against any foreigner who has committed one of the offenses defined in section 1 herein.

Article 131-26-2 of the Criminal Code
*See the aforementioned*

## FRAUDULENT ACCESS IN AN AUTOMATED DATA SYSTEM
Defined by ART.323-1 paragraph 1 of the Criminal Code.
Sanctioned by ART.323-1 paragraph 1, ART.323-5 of the Criminal Code.

## FRAUDULENT RETENTION OF DATA IN AN AUTOMATED DATA SYSTEM
Defined by ART.323-1 paragraph 1 of the Criminal Code.
Sanctioned by ART.323-1 paragraph 1, ART.323-5 of the Criminal Code.

Article 323-1 of the Criminal Code
The fraudulent access or retention in all or part of an automated data processing system is sanctioned by three years' imprisonment and a fine of 100,000 €.

If the withdrawal or modification of data contained in the system, results either in an alteration of functioning of this system, the penalty is five years' imprisonment and a fine of 150,000 €.

When the offenses provided in the first two paragraphs were committed against a personal data automated processing system setup by the State, the penalty is increased to seven years' imprisonment and a fine of 300,000 €.

Article 323-5 of the Criminal Code
The individuals who have committed the offenses provided herein shall also incur the following complementary penalties:

1° The prohibition, for a maximum period of five years, of civic, civil and family rights, according to the terms provided in Article 131-26;

2° The prohibition, for a maximum period of five years, from carrying out a public position or a professional or social activity, in the course or during which the offense was committed;

3° The confiscation of the item used or intended to be used to commit the offense or the item which is the produce thereof, with the exception of returnable items;

4° The closure, for a maximum period of five years, of establishments or one of several establishments of the company used to commit the offenses;

5° The exclusion from public procurement contracts, for a maximum period of five years;

Copie certifiée conforme à l'original

Vu ne varietur
Traduction conforme à l'original en langue française
1° 1859        11

SBU - LEGAL

Jane KOCHANSKI
Anglais

6° The prohibition, for a maximum period of five years, from issuing cheques other than those which enable the withdrawal of funds by the drawer from the drawee, or those which are certified;

7° The posting or disclosure of the decision rendered under the conditions provided under Article 131-35.

## IMPEDIMENT IN THE FUNCTIONING OF AN AUTOMATED DATA SYSTEM
Defined by ART.323-2 paragraph 1 of the Criminal Code.
Sanctioned by ART.323-2 paragraph 1, ART.323-5 of the Criminal Code.

Article 323-2 of the Criminal Code
The impediment or distortion in the functioning of an automated data system is sanctioned by five years' imprisonment and a fine of 150,000 €.

When this offense has been committed against a personal data automated data processing system setup by the State, the penalty is increased to seven years' imprisonment and a fine of 300,000 €.

Article 323-5 of the Criminal Code
*See the aforementioned.*

## FRAUDULENT EXTRACTION OF DATA CONTAINED IN AN AUTOMATED DATA PROCESSING SYSTEM
Defined by ART.323-3 paragraph 1 of the Criminal Code.
Sanctioned by ART.323-3 paragraph 1, ART.323-5 of the Criminal Code.

## FRAUDULENT INTRODUCTION OF DATA IN AN AUTOMATED DATA PROCESSING SYSTEM
Defined by ART.323-3 paragraph 1 of the Criminal Code.
Sanctioned by ART.323-3 paragraph 1, ART.323-5 of the Criminal Code.

Article 323-3 of the Criminal Code
The fraudulent introduction of data in an automated data processing system, fraudulent the extraction, possession, reproduction, transmission, deletion or modification of data included therein is sanctioned by five years' imprisonment and a fine of 150,000 €.

When this offense was committed against a personal data automated processing system setup by the State, the penalty is increased to seven years' imprisonment and a fine of 300,000 €.

Article 323-5 of the Criminal Code
*See the aforementioned.*

Vu ne varietur
Traduction conforme à l'original en langue française
N° 1859

## PARTICIPATION IN A CRIMINAL CONSPIRACY WITH THE VIEW TO THE PREPARATION OF A CRIME
Defined by ART.450-1 paragraph 1, paragraph 2 of the Criminal Code.

12

Jane KOCHANSKI
Anglais

Copie certifiée
conforme à l'original

13/08

SBU - LEGAL

EX-ISMAIL-000100

Sanctioned by ART.450-1 paragraph 2, ART.450-3, ART.450-5 of the Criminal Code.

## PARTICIPATION IN A CRIMINAL CONSPIRACY WITH THE VIEW TO THE PREPARATION OF AN OFFENSE SANCTIONED BY 10 YEARS' IMPRISONMENT

Defined by ART.450-1 paragraph1, paragraph 2 of the Criminal Code.
Sanctioned by ART.450-1 paragraph 2, ART.450-3, ART.450-5 of the Criminal Code.

## PARTICIPATION IN A CRIMINAL CONSPIRACY WITH THE VIEW TO THE PREPARATION OF AN OFFENSE SANCTIONED BY AT LEAST 5 YEARS' IMPRISONMENT

Defined by ART.450-1 paragraph 1, paragraph 3 of the Criminal Code.
Sanctioned by ART.450-1 paragraph 3, ART.450-3 of the Criminal Code.

### Article 450-1 of the Criminal Code

The following shall be defined as a criminal conspiracy: any group formed or organization established with the view to the preparation, characterized by one or several substantive events, of one or several crimes or one or several offenses sanctioned by at least five years imprisonment.

When the offenses prepared are crimes or offenses sanctioned by ten years' imprisonment, the participation in a criminal conspiracy is sanctioned by ten years' imprisonment and a fine of 150,000 euros.

When the offenses prepared are torts sanctioned by at least five years' imprisonment, the participation in a criminal conspiracy is sanctioned by five years' imprisonment and a fine of 75,000 euros.

### Article 450-3 of the Criminal Code

The individuals who have committed the offenses provided under Article 450-1 shall also incur the following complementary penalties:

1° The prohibition of civic, civil and family rights according to the terms provided under Article 131-26;

2° The prohibition, according to the terms provided under Article 131-27, either from carrying out a public position or a professional or social activity in the course or during which the offense was committed, or from carrying out a commercial or industrial activity, from directing, administering, managing or controlling, by any means whatsoever, directly or indirectly, on one own's behalf or on behalf of a third party, a commercial or industrial enterprise or a commercial company. These prohibitions of activity may be accumulated;

3° The prohibition of residency, according to the terms provided under Article 131-31. The following may also be pronounced against these persons: the other complementary penalties applicable for the crimes and offenses that the group or organization had intended to prepare.

### Article 450-5 of the Criminal Code

The individuals or legal entities convicted of the offenses provided under the second paragraph of Article 450-1 and Article 321-6-1 also incur the complementary penalty of confiscation of all or part of their assets or, subject to the rights of the owner in good faith, for which they have the free disposal thereof, regardless of their type, moveable or immoveable, divided or undivided.

Copie certifiée
conforme à l'original

Vu ne varietur
Traduction conforme à l'original en langue française   13
1 (85)

Jane KOCHANSKI
Anglais

SBU - LEGAL

EX-ISMAIL-000101

## APPENDIX

## TEXTS RELATING TO THE TIME BAR PERSIODS AND INTERNATIONAL JURISDICTION

- ## CONCERNING THE STATE ACTION TIME-BAR PERIOD

Article 7 of the Code of Criminal Procedure
**The state action time-bar period for crimes is time-barred at twenty full years** as from the date of commission of the offense.

**The state action time-bar period for the crimes mentioned in Articles** 706-16, **706-26** and 706-167 of said Code, in Articles 214-1 to 214-4 and 221-12 of the Criminal Code and in book IV bis of said Code **shall be time-barred at thirty full years as from the date of commission of the offense.**

The state action time-bar period for the crimes mentioned in Article 706-47 of said Code, when they are committed on minors, shall be time-barred at thirty full years as from the majority of the latter ; nevertheless, if it concerns rape, in the event of the commission on another minor by the same person, prior to the expiry of this time-period, of another rape, sexual assault or sexual offense, this time-bar period for this rape is extended, as the case maybe, until the expiry of the time-bar period of this new offense.

The state action period for the crimes mentioned in Articles 211-1 to 212-3 of the Criminal Code is not subject to time-bar.

Article 8 of the Code of Criminal Procedure
**The state action for tortuous offenses shall be time-barred at six full years** as from the date of commission of the offense.

The state action for the torts mentioned in Article 706-47 of said Code, when they are committed on minors, with the exception of those mentioned in Articles 222-29-1 and 227-26 of the Criminal Code, is time-barred at ten full years as from the date of majority of said minors.

The state action for the torts mentioned in Articles 222-12, 222-29-1 and 227-26 of said Code, when they are committed on minors, is time-barred at twenty full years as from the date of majority of said minors.

Nevertheless, a sexual assault or sexual offense committed on a minor, in the event of the commission on another minor by the same person, before the expiry of the time periods provided in the second and third paragraphs herein, of a sexual assault or sexual offense, the time-bar period for the first offense is extended, as the case maybe, until the expiry date of the time-bar period for the subsequent offense.

The time-bar period for the offense mentioned in Article 434-3 of the Criminal Code shall be time-barred, when the lack of information concerns a sexual assault or sexual offense committed on a minor, by ten full years as from the victim's majority and, when the lack of information concerns a rape committed on a minor, by twenty full years as from the victim's majority.

Copie certifiée
conforme à l'original

Vu ne varietur
Traduction conforme à l'original en langue française
N° 1859

14

Jane KOCYANSKI
Anglais

09/08/2024

SBU - LEGAL

**The state action for the torts mentioned** in Article 706-167 of said Code, when they are sanctioned by ten years' imprisonment, and those for the torts mentioned in Articles 706-16 of said Code, at the exclusion of those defined in Articles 421-2-5 to 421-2-5-2 of the Criminal Code, and **706-26 of said Code** and in book IV bis of the Criminal Code **are time-barred at twenty full years as from the date of commission of the offense.**

Article 706-26 of the Code of Criminal Procedure
The offenses provided under Articles 222-34 to 222-40 of the Criminal Code, and the offense of participation in a criminal conspiracy provided under Article 450-1 of said Code, when its purpose is the preparation of one of these offenses, shall be filed, examined and judged according to the rules of said Code, subject to the provisions of said Title.

Article 9-2 of the Code of Criminal Procedure
The state action time-bar period is suspended by the following:

1° Any action, by the public prosecution department or civil party, for the initiation of the state action, provided under Articles 80, 82, 87, 88, 388, 531 and 532 of said Code and in Article 65 of the law dated July 29, 1881 on the freedom of the press;

2° Any investigation action resulting from the public prosecution, any official report drafted by a judicial police officer or agent authorized therefor, exercising the authority of the judicial police, for the search and prosecution of the offenders of an offense;

3° Any investigation action provided under Articles 79 to 230 of said Code, accomplished by an examining magistrate, an investigation chamber or magistrates and judicial police officers delegated therefor, for the search and prosecution of the offenders of an offense;

4° Any judgment or decision, whether or not subject to appeal, if it is not void.

Any action, judgment or decision mentioned in 1° to 4° shall result in a time-bar period for an equal duration to that of the initial period.

This Article is applicable to related offenses and to offenders and accomplices referred to by these same actions, judgments or decisions.

- **CONCERNING FRENCH JURISDICTION**

Article 689 of the Code of Criminal Procedure
The offenders or accomplices of offenses committed outside of France may be prosecuted and judged by the French courts, either when, in accordance with the provisions of book I of the Criminal Code or another legislative text, the French law is applicable, or when an international convention or act taken in accordance with the founding treaty of the European communities grants jurisdiction to the French courts to rule on the offense.

Article 113-2 of the Criminal Code
French criminal law is applicable to offenses committed on French territory.

Vu ne varietur
Traduction conforme à l'original en langue française
1° 1859          15

Copie certifiée
conforme à l'original

Jane KOHANSKI
Anglais

26 80 83 28
19/08/2024

SBU - LEGAL

EX-ISMAIL-000103

The offense is deemed to have been committed on French territory **insofar as one of the operative events occurred on this territory.**

Article 113-7 of the Criminal Code

*French criminal law is applicable to any crime, and any tort sanctioned by imprisonment, committed by a French citizen or foreigner outside of French territory when the victim is of French nationality at the time of the offense.*

Article 113-8 of the Criminal Code

*In the cases provided for under Articles 113-6 and 113-7, the prosecution for offenses may only be exercised upon petition by the public prosecution department. It must be preceded by the victim or his assigns or an official accusation by the authority of the country in which the offense was committed.*

Article 113-8-1 of the Criminal Code

*The complaint or accusation mentioned in Article 113-8 shall not be necessary when the prosecution is exercised before a criminal court, with a concurrent and specialized territorial competence, in accordance with the provisions of the Code of Criminal Procedure, extending over the jurisdiction of several civil courts or throughout national territory.*

Vu ne varietur
langue française
n°1859

Copie certifiée
conforme à l'original

16

SBU - LEGAL

*Ambassade de France*
*aux Etats-Unis*

**UNOFFICIAL TRANSLATION**

L/LEI

2024 OCT 22 A 4: 20

DEPARTMENT OF STATE

**Re: Request for extradition of Mr. HUZEFA HAFIZ ISMAIL**

The Embassy of France presents its compliments to the Department of State and has the honor to transmit, together with court documents and their translation (all in duplicate), a request to the American government for the extradition of Mr. HUZEFA HAFIZ ISMAIL born on            1983 (place of birth unknown), an American citizen.

On July 30th, 2024, he was issued an arrest warrant by Mr. Julien GAU, vice-president in charge of the Pre-trial investigation at the Court of Paris (France) for:

MONEY LAUNDERING: AIDING THE DECEPTIVE JUSTIFICATION OF THE ORIGIN OF GOODS AND INCOME OF THE PERPETRATOR OR UNAUTHORIZED IMPORTATION OF NARCOTICS IN AN ORGANIZED GANG - MONEY LAUNDERING: AIDING THE FALSE JUSTIFICATIOON OF THE ORIGIN OF THE ASSETS AND INCOME OF THE PERPETRATOR OF A DRUG TRAFFICKING OFFENSE – AGRRAVATED MONEY LAUNDERING : PARTICIPATION IN AN ORGANIZED GROUP IN AN OPERATION TO INVEST, CONCEAL OR CONVERT THE PROCEED AF A CRIME – ORGANIZED EXTORSION – FRAUDULENT ACCES TO AN AUTOMATED DATA PROCESSING SYSTEM - FRAUDULENT OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM – HINEDRING THE OPERATION OF AN AUTOMATED DATA PROCESSING SYSTEM – FRAUDULENT INTRODUCTION OF DATA INTO AN AUTOMATED DATA PROCESSING SYSTEM – FRAUDULENT EXTRACTION OF DATA FROM AN AUTOMATED DATA PROCESSING SYSTEM – PARTICIPATION IN A CRIMNAL CONSPIRACY TO PEPARE A CRIME – PARTICIPATION IN A CRIMNAL CONSPIRACY TO PREPARE AN OFFENSE PUNISHABLE BY 10 YEARS IMPRISONMENT - PARTICIPATION IN A CRIMNAL CONSPIRACY TO PREPARE AN OFFENSE PUNISHABLE BY AT LEAST 5 YEARS IMPRISONMENT.

This request, accompanied by an English translation, is transmitted pursuant to:

- The Extradition Treaty of April 23rd, 1996, between France and the United States of America;

- The Extradition Agreement of July 19th, 2003 between the European Union and the United States of America.

The Embassy of France would be very grateful to the Department of State for referring this request to the American judicial authorities and for notifying it of their subsequent actions in this regard.

.../...
SBU - LEGAL

- 2 / 2 -

The Embassy of France would be most obliged to the Department of State for asking the American judicial authorities to specify, at the time of the person's release, the length of detention he served for extradition purposes alone.

The Embassy of France avails itself of this opportunity to renew to the Department of State the expression of its highest consideration./.

Washington, DC, October 21th, 2024

Agnès Von Der Mühll
Ministre Conseillière

**Department of State**
**Supervisory Paralegal Specialist**
**Office of The Legal Advisor – Law Enforcement & Intelligence**

**Department of Justice**
**Mr. Thomas BURROWS**
**Office of International Affairs**

SBU - LEGAL

*Ambassade de France*
*aux Etats-Unis*

<u>Réf</u> : Demande d'extradition de Huzefa Hafiz ISMAIL
<u>N°</u> : 2024-0434671

L'Ambassade de France présente ses compliments au Département d'Etat et a l'honneur de lui adresser, par la présente note diplomatique, une demande d'extradition originale, accompagnée de sa traduction en langue anglaise, formée auprès du Gouvernement américain contre le nommé Huzefa Hafiz ISMAIL, né le ▮▮▮▮▮ 1983 (lieu inconnu), de nationalité américaine, en vertu :

- du Traité d'extradition du 23 avril 1996, entre la France et les Etats-Unis d'Amérique signé à Paris le 23 avril 1996
- de l'Accord entre l'Union européenne et les Etats-Unis d'Amérique en matière d'extradition signé le 25 juillet 2003 in Washington, D.C.

Huzefa Hafiz ISMAIL fait l'objet d'un mandat d'arrêt délivré le 30 juillet 2024 par M. Julien GAU, vice-président chargé de l'instruction au tribunal judiciaire de Paris pour des faits de : BLANCHIMENT : AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'IMPORTATION NON AUTORISEE DE STUPEFIANTS EN BANDE ORGANISEE - BLANCHIMENT : AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'UN DELIT DE TRAFIC DE STUPEFIANTS – BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVESRION DU PRODUIT D'UN DELIT – EXTORSION EN BANDE ORGANISEE - ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES - MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES – ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES – INTRODUCTION FRAUDULEUSE DE DONNEES DANS SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES – EXTRACTION FRAUDULEUSE DE DONNEES D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES - PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME - PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI DE 10 ANS D'EMPRISONNEMENT - PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI D'AU MOIN 5 ANS D'EMPRISONNEMENT.

L'Ambassade de France remercie le Département d'Etat de bien vouloir lui faire connaître la suite réservée à cette demande.

L'Ambassade de France prie, en outre, le Département d'Etat, de bien vouloir inviter les autorités judiciaires américaines à préciser au moment

SBU - LEGAL

de la remise de l'intéressé la durée de la détention subie au seul titre extraditionnel dans leur pays par le susnommé.

L'Ambassade de France saisit cette occasion pour renouveler au Département d'Etat les assurances de sa très haute considération./.

Agnès Von Der Mühll
Ministre Conseillère

Washington, le 21 octobre 2024

**Département d'Etat**
**Office of The Legal Advisor**
**Law Enforcement & Intelligence**

**Département de la Justice**
**Bureau des Affaires Internationales**
**M. Thomas Burrows**



**MINISTÈRE
DE L'EUROPE
ET DES AFFAIRES
ÉTRANGÈRES**

*Liberté
Égalité
Fraternité*

C.A.D. WASHINGTON
ARRIVE PAR VALISE

OCT 1 7 2024  4 2

**Direction des Français à l'étranger
et de l'administration consulaire**

**Service des conventions,
des affaires civiles
et de l'entraide judicaire**

**Mission des conventions
et de l'entraide judiciaire**

Paris, le 04/10/2024

**DE : YANNICK ANDRIANARAHINJAKA**

**Chef de la mission des conventions et de l'entraide judiciaire**

FAE/SAEJ/CEJ n° 2024 – 0413063
Rédacteur : Martin CHOLLET

Objet : **Demande d'extradition** formée auprès des autorités américaines à l'encontre du nommé **Huzefa Hafiz ISMAIL**, né le ▮▮▮ 1983, de nationalité américaine.

Référence : Dossier n°REM-2408J3S0
PJ : 1 dossier

A la demande du ministère de la Justice, le Département vous prie de bien vouloir trouver ci-joint, avec les pièces de justice, une demande formée auprès des autorités américaines en vue de l'extradition du nommé **Huzefa Hafiz ISMAIL**, né le ▮▮▮ 1983, de nationalité américaine.

L'intéressé est recherché par les autorités françaises au titre d'un mandat d'arrêt décerné le 30 juillet 2024 par le juge d'instruction près le tribunal judiciaire de Paris, pour des faits qualifiés de blanchiment, blanchiment aggravé, extorsion en bande organisée, accès et maintien frauduleux dans un système de traitement automatisé des données, introduction frauduleuse de données dans un système de traitement automatisé des données, extraction frauduleuse de données d'un système de traitement automatisé des données, entrave au fonctionnement d'un système de traitement automatisé des données, participation à une association de malfaiteurs en vue de la préparation d'un crime, participation à une association de malfaiteurs en vue de la préparation d'un délit puni de 10 ans d'emprisonnement, participation à une association de malfaiteurs en vue de la préparation d'un délit puni d'au moins 5 ans d'emprisonnement.

Cette demande est formée sur le fondement du Traité bilatéral franco-américain signé à Paris le 23 avril 1996, de l'Accord entre l'Union européenne et les États-Unis en matière d'extradition du 25 juin 2003, de la Convention sur la cybercriminalité du Conseil de l'Europe du 23 novembre 2001, de la Convention unique des Nations Unies sur les stupéfiants du 30 mars 1961, de la Convention des Nations Unies sur le trafic illicite de stupéfiants et de substances psychotropes du 19 décembre 1988, et de la Convention des Nations Unies contre la criminalité transnationale organisée du 15 novembre 2000.

Tél : 01.43.17.90.12
Mél : martin.chollet@diplomatie.gouv.fr
27 rue de la Convention - CS 91533
75732 Paris Cedex 15                          1/2

Le Département vous serait reconnaissant de bien vouloir remettre cette demande aux autorités américaines, dès que possible, et de lui faire connaitre la suite réservée./.

**YANNICK ANDRIANARAHINJAKA**

À :
Ambassade de France aux États-Unis d'Amérique
WASHINGTON

Tél : 01.43.17.90.12
Mél : martin.chollet@diplomatie.gouv.fr
27 rue de la Convention - CS 91533
75732 Paris Cedex 15

2/2

SBU - LEGAL

EX-ISMAIL-000110

**COUR D'APPEL DE PARIS**

**PARQUET DU TRIBUNAL DE PARIS**

**JUDICIAIRE DE PARIS**

**6ème DIVISION – SECTION A2**

**Exécution des peines**

**Entraide Pénale Internationale**

Paris, le 26 septembre 2024

La Procureure de la République

près le tribunal judiciaire de Paris

A

Madame la procureure générale près

la Cour d'appel de Paris

TEL : 01 44 32 56 84

FAX : 01 44 32 58 56

**OBJET : Demande d'extradition visant Monsieur Huzefa Hafiz ISMAIL, à destination des autorités américaines**

N/REF : 21064000646

J'ai l'honneur de solliciter formellement, à l'appui des pièces jointes, l'extradition de Monsieur Huzefa Hafiz ISMAIL, né le ▮▮▮▮ 1983, sur la base d'un mandat d'arrêt décerné le 30 juillet 2024 par Monsieur Julien GAU, vice-président chargé de l'instruction près le Tribunal judiciaire de Paris, lequel a fait l'objet d'un mandat d'arrêt européen, décerné le 30 août 2024 par Madame Natacha RATEAU, premier vice-procureur de la République près le Tribunal judiciaire de Paris.

**I / Identité de la personne concernée**

NOM : ISMAIL
Prénom : **Huzefa Hafiz**
Né le : ▮▮▮▮ 1983
Nationalité : **Américaine**
Titulaire du passeport : ▮▮▮7428
Titulaire du golden visa : ▮▮▮▮▮▮▮037 et du Emirate United Number : ▮▮▮097

*Interpellé le 27 août 2024 dans l'Etat du Texas – Etats-Unis d'Amérique.*

Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000111

**II / Les faits**

*Contexte : la solution de téléphonie chiffrée SkyECC :*

Sky ECC est une solution technique de communication téléphonique chiffrée privilégiée par les organisations criminelles, notamment en ce qui concerne l'anonymisation par usage de SkyPin, le chiffrement de ladite solution, les modalités d'abonnement et les modalités de diffusion.

Au terme de plusieurs enquêtes de police et judiciaires réalisées à l'échelle internationale, la mécanique de l'applicatif était révélée. SkyECC est une solution de téléphonie cryptée développée et déployée par la société canadienne basée à Vancouver SKY GLOBAL In., laquelle assure à ses clients un anonymat renforcé et une impossibilité de traçabilité. Les serveurs hébergeant ladite solution de téléphonie étaient implantés à Roubaix (France), et les téléphones étaient distribués en France en toute illégalité.

Les investigations techniques permettaient de décoder le chiffrement extrêmement sophistiqué de ces téléphones qui étaient massivement utilisés dans le domaine de la criminalité organisée transnationale de très haute intensité (assassinats en bande organisée, importations massives de stupéfiants, enlèvements, trafics d'arme). Les profits générés, principalement par le vecteur des cryptomonnaies, apparaissaient colossaux et intervenus en toute opacité.

Les investigations permettaient de découvrir que la solution SkyECC consistait en un logiciel de cryptage particulièrement sophistiqué, équipant des smartphones dans des milieux de haute criminalité organisée. La solution comporte notamment les fonctionnalités suivantes :

- Chiffrement de bout en bout ;
- Désactivation des fonctionnalités du téléphone telles que la caméra intégrée, le microphone intégré ou encore la localisation GPS, susceptibles de laisser sur l'appareil des traces qui pourraient éventuellement être exploitées par la police ;
- Possibilité d'effacement à distance, mot de passe « panique » (dit « distress ») pouvant être donné sous la pression et permettant d'effacer l'ensemble des données de l'appareil ;
- Aucune donne n'est stockée sur le serveur afin qu'elles ne puissent être accessibles aux services de police ;
- Possibilité de dissimuler l'application cryptée derrière une application d'apparence normale, de sorte qu'elle n'est pas immédiatement visible, notamment par les services de police en cas d'interpellation ;
- Possibilité d'envoyer des communications en « lecture seule » afin qu'elles ne puissent pas être copiées.

A titre d'exemple, lors d'informations judiciaires ouvertes dans des faits de meurtre, d'enlèvement, de séquestration et de trafic de stupéfiants, la solution a permis à des suspects ou contacts de suspect de supprimer le contenu de téléphones équipés en donnant ou envoyant un mot de passe « panique ».

*Contexte : la solution de téléphonie chiffrée ENCROCHAT :*

Précurseur de SKY ECC, ENCROCHAT était une solution de téléphonie cryptée consistant en des téléphones ANDROID vendus au prix de 1.000 euros, outre un abonnement de 1.500 euros pour une période de 6 mois, enrichis d'une surcouche logicielle de chiffrement et dépourvus des fonctionnalités GPS, port USB, webcam et micro, munis d'un double système d'exploitation simulant un téléphone normal. La solution

Copie certifiée conforme à l'original

SBU - LEGAL

permettait, par un code pin spécifique, d'effacer les messages ENCROCHAT, ainsi qu'un effacement à distance par le vendeur/ l'assistance. Eu égard à ces fonctionnalités la solution était utilisée par des groupes criminels convaincus de leur anonymat.

Par suite d'une opération judiciaire de captations de données la solution mettait fin à ses activités en juin 2020. Le démantèlement d'ENCROCHAT a donné lieu selon le dernier communiqué réalisé à 6.558 arrestations dans le monde, dont 197 High Value Targets, ainsi qu'à la saisie, notamment de 739.7 millions d'euros en espèces, de 30.5 millions de cachets de drogue chimique, 103.5 tonnes de cocaïne, 164.3 tonnes de cannabis, 3.3 tonnes d'héroïne[1].

### *Résumé des faits :*

L'exploitation des conversations chiffrées issues de l'application SkyECC conduisait les enquêteurs à identifier un individu utilisant un pseudonyme crypté afin de blanchir des fonds provenant d'un trafic de stupéfiants (dernier SKY PIN « 3DOR3D », pseudonyme « CEO », « DARK BANK », « CEO - DARK BANK » ; SKY PIN antérieurs « RARK9J », « 3TFFI7 »). Au vu des seules captures d'écran réalisées, 26 millions d'euros apparaissaient avoir été déposées en deux mois (02 janvier 2021 et 27 février 2021) via 15 adresses de cryptomonnaie ayant pour leur part, du 16 août 2019 jusqu'au 28 février 2021, réceptionné la somme de 998.760.384 USDT [stable coin Tether] et en ayant renvoyés 996.487.465.

Parmi les adresses identifiées, l'une d'elles, ayant réalisé du 20 juin 2020 au 5 avril 2021 995 transferts (634 IN et 354 OUT) pour un volume total de transactions de 284.475.154 dollars américains (IN+OUT), comptait parmi ses principaux créditeurs un compte bancaire Binance ouvert au nom d'Ekaterina JDANOVA, ressortissante russe résidant à Dubaï. Elle était interpellée en France le 1er octobre 2023, mise en examen et placée en détention provisoire.

L'exploitation du téléphone d'Ekaterina JDANOVA mettait en évidence sa participation à des groupes de discussion sur lesquels des collectes ou des remises de fonds étaient proposées contre cette rémunération, groupes auxquels participait notamment « CEO ».

De l'exploitation des échanges SkyECC identifié, que des données du téléphone d'Ekaterina JDANOVA, ainsi que des flux de cryptomonnaie mis en évidence, il apparaissait que l'individu utilisant notamment les pseudonymes « CEO » et « DARK BANK » se livrait à une très importante activité de blanchiment à l'échelle mondiale, dans le cadre de laquelle étaient organisées des collectes et remises d'espèces ainsi que des transferts de cryptomonnaies.

La seule exploitation du téléphone d'Ekaterina JDANOVA permettait de constater que le montant total de ces collectes évoquées s'élevait à 232 586 032 euros, dont à tout le moins 76 235 009 euros correspondant à des collectes confirmées.

Le nombre très conséquent de messages échangés entre les divers membres du réseau permettait de mettre en exergue l'organisation très structurée de ce dernier, et d'identifier CEO / DARKBANK comme en étant à la tête, s'appuyant sur un ensemble d'associés, spécialisés dans la collecte d'espèces.

Copie certifiée
conforme à l'original

---

[1]EUROPOL : Dismantling encrypted criminal EncroChat communications leads to over 6 500 arrests and close to EUR 900 million seized | Europol (europa.eu) ,
Dismantling of an encrypted network sends shockwaves through organised crime groups across Europe | Europol (europa.eu).

SBU - LEGAL

Dans le cadre de ces affaires, ce dernier s'appuyait sur de proches collaborateurs, identifiés comme étant QUATERBACK et WINGMAN : bras droit de CEO/DARKBANK, organisateurs secondaires du réseau et en charge de la remontée d'information et de la distillation des consignes, ainsi que Mr BROOKS : comptable du réseau tenant les comptes relatifs aux différentes collectes.

Il apparaissait de nombreuses collectes ou remises de fonds sur le territoire européen (France, Italie, Belgique, Pays Bas) pour un montant total de plus de 20 millions d'euros, donnant lieu à compensation en cryptomonnaie. L'individu mis en cause avait réalisé entre novembre 2020 et février 2021 des collectes pour une somme dépassant les 50 millions d'euros.

L'activité du réseau DARKBANK sur le marché des collectes permettait de constater que le montant total de ces collectes s'élevait à 232 586 032 euros, et le montant des collectes confirmées par message s'élevait à 76 235 009 euros.

En outre, les investigations ont conduit à identifier l'usage par l'utilisateur du SKY PIN « 3DOR3D » de la solution cryptée ENCROCHAT, et plus particulièrement du pseudonyme « CEO_ ».

En effet « 3DOR3D » indiquait à l'un de ses correspondant SKY ECC le 22 juin 2020 « Let me come back to u later today because all UK drivers were Encro and in middle of changing things up » « Encro went down and lost big chunk of contacts and still waiting on them to add me on sky ».
Il indiquait parallèlement à un autre correspondant SKY ECC le 28 juin 2020 que son pseudonyme sur ENCROCHAT était « CEO_ », lui indiquant en outre se trouver à DUBAI :

| | | | |
|---|---|---|---|
| 2020-06-28 15:36:39 | 2020-06-28 17:36:39 | 7MG7QU | Who's this |
| 2020-06-29 18:29:46 | 2020-06-29 20:29:46 | 7MG7QU | Hello |
| 2020-06-29 18:31:49 | 2020-06-29 20:31:49 | 3DOR3D | Hello bro |
| 2020-06-29 18:32:28 | 2020-06-29 20:32:28 | 7MG7QU | Who's this? |
| 2020-06-29 18:34:14 | 2020-06-29 20:34:14 | 3DOR3D | CEO |
| 2020-06-29 18:36:04 | 2020-06-29 20:36:04 | 7MG7QU | What was you're encro? |
| 2020-06-29 18:37:15 | 2020-06-29 20:37:15 | 3DOR3D | CEO_ |
| 2020-06-29 18:37:15 | 2020-06-29 20:37:15 | 3DOR3D | Yours ? |
| 2020-06-29 18:38:06 | 2020-06-29 20:38:06 | 7MG7QU | Wigglyswan |
| 2020-06-29 18:41:02 | 2020-06-29 20:41:02 | 7MG7QU | Are u in uk? |
| 2020-06-29 18:41:17 | 2020-06-29 20:41:17 | 3DOR3D | No bro ... Dub |

L'exploitation des messages SKY ECC de « 3DOR3D » et des messages ENCROCHAT de « CEO_ » mettait en évidence l'usage par cet utilisateur d'un même véhicule, pouvant correspondre à une véhicule MERCEDES G63 BRABUS, ce au vu des caractéristiques visibles de ce véhicule (fixation de capot en carbone avec prise d'air, intérieur rouge surpiqué de losanges).

3DOR3D :



Copie certifiée conforme à l'original

SBU - LEGAL

EX-ISMAIL-000114



CEO_ :

**Photo 1** : 72b101e067793e7a9b6cce6c5b2701c2.jpg
Cette photo a été envoyée par CEO à SSNEW le 08/04/2020 à 11:21:14



**Photo 3** : 514552489e4b52555db598bcc4f6656b.jpg
Photo envoyée par CEO à Newpalimall le 24 mars 2020 à 14:27:34





Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000115

**Photo 4 : a312b478d867631160dc0c8d89cc5ec8.jpg**
**Photo envoyée par CEO à hulkingflower le 24 mars 2020 à 14:38:58**



MERCEDES G63 BRABUS (source ouverte) :

 



Copie certifiée
conforme à l'original



### *Sur le fonctionnement du réseau de blanchiment*

#### *Collecte d'espèces (« money pick up »)*

L'analyse des conversations entre CEO / DARKBANK et un utilisateur utilisant le PIN ED8988 (« BAZ »), sur l'application SkyECC permettait de révéler que ces derniers organisaient des livraisons de numéraires, des *money pick up*, pour des centaines de milliers d'euros. Plusieurs rendez-vous étaient convenus entre ces derniers entre les mois de novembre et décembre 2020, à Paris.

SBU - LEGAL

EX-ISMAIL-000116

En outre, les seules communications extraites du téléphone portable d'Ekaterina JDANOVA démontraient que, plusieurs fois par jours, des collectes lui étaient proposées par CEO / DARKBANK et ses « adjoints », principalement en Italie, aux Pays-Bas, en Espagne, en Belgique et en France. Ainsi, sur cette période, 836 collectes (pour un total de 232.586.032 euros) dont 304 confirmées par *tokens* étaient retracées (pour un total confirmé de 76.236.009 euros), le statut des autres collectes restant incertain.

Il apparaissait que CEO / DARKBANK procédait de la sorte avec plusieurs utilisateurs de l'applicatif SkyECC, notamment avec l'utilisateur 7MXVLD (« Cheese ralph »), entre le 26 novembre 2020 et le 27 novembre 2020. Ces derniers mettaient alors en évidence l'organisation d'une collecte pour un montant total de 800 000 euros à Paris. CEO / DARKBANK informait son interlocuteur qu'il était en mesure de proposer un taux de 6%. 7MXVLD lui transmettait le numéro français d'un dénommé « T-Max » ▮▮▮▮▮▮▮▮▮21 86) devant remettre les espèces. En retour 3DOR3D communiquait un numéro de téléphone canadien ▮▮▮▮▮▮ 09 99) à 7MXVLD. En fin d'après-midi, 3DOR3D confirmait par message à 7MXVLD que l'opération avait été réalisée.

L'étude des conversations de ED8988 montrait que les collectes dépassaient la France, incluant par exemple une remise de liquidités en Espagne ou aux Pays-Bas.

Il semblait que l'argent versé en numéraire était d'origine illicite et provenait notamment de trafic de stupéfiants, tant en Europe que dans le monde. Ainsi, au travers de ces collectes, c'est l'argent issu de trafic de stupéfiant qui était blanchi.

En outre, l'analyse des communications mettaient en évidence un véritable marché, avec son offre, sa demande et ses règles. En effet, CEO / DARKBANK apparaissait travaillant avec ses « fournisseurs », c'est-à-dire des groupes ayant des espèces à faire collecter. Ayant un rôle d'interface avec les groupes collecteurs, il affichait un rôle de « médiation » et devait parfois trancher en faveur des groupes remettants, car son objectif était de garder les contrats avec ses « fournisseurs ». Dans une logique de « mise en compétition », CEO / DARKBANK rappelait qu'il ne fallait pas que les taux proposés par le réseau soient trop élevés, afin de rester compétitifs.

Ainsi, les investigations réalisées mettaient en évidence un fonctionnement particulièrement bien structuré de cette activité de collecte, ce qui permettait au réseau de réaliser en moyenne une à plusieurs collectes quotidiennes dans plusieurs pays. Ce fonctionnement méthodique pouvait se découper en trois étapes :

- **Proposition de collecte par l'équipe dirigeante :** une fois CEO / DARBANK ou ses adjoints avertis que des espèces sont disponibles pour être collectées, ils envoyaient un message sur plusieurs groupes de communication. En principe, l'attribution des collectes était effectuée naturellement sans que CEO / DARBBANK n'ait à trancher ;
- **Négociation du taux entre CEO / DARKBANK et l'équipe collectrice :** les équipes intéressées par la collecte évoquée proposaient ensuite leur « taux », soit la commission calculée comme un pourcentage appliqué sur le montant total de la collecte. Ces taux étaient fréquemment négociés. En effet, en raison de la compétition du marché, il apparait que CEO / DARKBANK essayait souvent de négocier les taux proposés à la baisse afin de rendre leurs services plus attractifs pour les fournisseurs d'espèces ;
- **Coordination en temps réel de la collecte par l'équipe collectrice :** chaque partie coordonnait en temps réel la collecte. CEO / DARKBANK semblait néanmoins peu présent à cette étape de la collecte.
- **Compensation financière en crypto-monnaie entre l'équipe collectrice et l'équipe dirigeante :** après une collecte, l'équipe collectrice effectuait un virement en cryptomonnaies sur le porte-monnaie désigné.

*Origine des fonds en numéraire et blanchiment de produits et revenus issus du trafic de stupéfiants*

SBU - LEGAL

S'agissant de l'origine des fonds, ceux-ci apparaissaient selon toute vraisemblance en provenance d'organisations criminelles, ce au vu des montants collectés ou remis, des localisations des protagonistes et des collectes/remises d'espèces (particulièrement en Amérique Latine et au Benelux), du mode opératoire utilisé, et de la mise en évidence de messages évoquant clairement une activité en lien avec des produits stupéfiants, plus particulièrement de la cocaïne.

Ainsi les investigations tendaient à démontrer que 3DOR3D était en relation avec des trafiquants de drogue tant en Europe qu'ailleurs dans le monde.

Etaient notamment mis en évidence des échanges :

- Avec l'utilisateur du SKY PIN « DNFNVD » (pseudo : Medellin Cartel Chico), échanges faisaient état de stuff au Costa Rica et au Panama et avec lequel était échangé une photo de « pain de cocaïne » retransmise par 3DOR3D à un autre utilisateur de la solution SKY ECC au SKY PIN « VRHDIV » avec lequel de nombreuses collectes étaient mises en évidence ;
- Avec l'utilisateur « FD97E9 », échanges portant sur la transmission d'échantillon et la vente de cocaïne ;
- Avec l'utilisateur du SKY PIN « JFLSQC », identifié par la police belge comme étant « Jamal BOUAOUIOUICH », répertorié comme trafiquant de drogue ;
- Avec l'utilisateur su SKY PIN « 4UI343 », échanges laissaient apparaître que 3DOR3D était impliqué dans le paiement des transactions entre trafiquants de produits stupéfiants. Ainsi, dans un message du 22 juin 2020, 4UI343 organisait la cession de produits stupéfiants à un dénommé « Rocket » et avait sollicité 3DOR3D pour la collecte de liquidités liées à cette transaction. Les échanges entre 3DOR3D et 4UI343 s'articulaient principalement autour de transmission de tokens – soit de photographies de numéros de série de billets de banque servant de validation lors de la réception de l'argent – et d'organisation de collectes de cash en Angleterre.

En outre, l'étude du wallet d'Ekaterina JDANOVA permettait de constater des interactions communes avec le wallet de DARKBANK : Ekaterina JDANOVA recevait ainsi 2 868 500 USDT et 13 ETH entre le 20 décembre 2020 et le 13 mai 2021 de la part d'un autre contributeur important de DARKBANK, et 1 257 063 USDT de la part d'un wallet en interaction avec le précédent. Ce dernier wallet transférait quant à lui 80 220 583 dollars au wallet 3281 détenu par Darkbank.

Ainsi, non seulement Ekaterina JDANOVA contribuait de façon déterminante à un portefeuille utilisé par CEO / DARKBANK, mais elle entretenait également de fortes interactions avec des wallets également liés à DARKBANK.

Interpellée le 1er octobre 2023 par la police aux frontières de Nice à la descente d'un vol de Dubaï, il apparaissait selon les services de renseignement qu'Ekaterina JDANOVA était connue pour ses activités de blanchiment de sommes issues de ransomware russophones, et suspectée d'entretenir des liens avec les membres du renseignement russe.

Informées de l'interpellation d'Ekaterina JDANOVA, les autorités américaines communiquaient aux autorités françaises une transmission spontanée d'information qui portait sur l'implication de Ekaterina JDANOVA dans un réseau de ransomware BitPaymer. Ce ransomware, très actif entre 2017 et 2021, avait été successivement baptisé : BitPaymer, WastedLocker, Hades et Phoenix. Les autorités américaines dénombraient des centaines de victimes de ce ransomware, aux Etats-Unis et à l'étranger pour un préjudice total évalué à 150 millions de dollars. Ce ransomware utilisait le cheval de Troie Dridex dont l'accès était contrôlé par 7 à 8 personnes rendant l'identification de ces derniers difficile. Il s'agissait du premier ransomware à demander des rançons aux montants aussi élevés (millions de dollars) et à utiliser un réseau complexe de blanchiment d'argent notamment via l'utilisation de mixeurs de cryptomonnaies.

Ainsi, les faits permettaient de révéler des liens étroits entre la mise en examen et d'importants groupes criminels transnationaux, concernant tant les stupéfiants que les ransomware. Ces groupes génèrent des profits

Copie certifiée
conforme à l'original

SBU - LEGAL

colossaux matérialisant l'existence d'une économie illégale parallèle, qui finance elle-même des activités occultes attentatoires aux droits et libertés fondamentaux.

L'importance des sommes échangées sur la plateforme DARKBANK, la complexité de son organisation et son impact sur plusieurs continents mettent en exergue tant la gravité des faits que l'importance du trouble qu'ils causent.

*Exemple 1 :*

Le 16 octobre 2020, 3DOR3D (CEO / DARBANK) était en contact avec les PIN DNFNVD (Tibu) et VRHDIV (Lambo). VRHDIV (Lambo). demandait à 3DOR3D s'il y avait des choses au Costa Rica :



Le même jour, DNFNVD (Tibu) écrivait à 3DOR3D (CEO / DARBANK) de lui transmettre un *token* et un numéro de téléphone pour le « truc » au Costa Rica et de lui envoyer de l'USDT.

| 2020-10-16 15:16:42 | DNFNVD | | Send me the token and number pls | 3DOR3D, DNFNVD |
|---|---|---|---|---|
| 2020-10-16 15:16:43 | DNFNVD | | Of costa | 3DOR3D, DNFNVD |
| 2020-10-16 15:30:50 | DNFNVD | | For stuff | 3DOR3D, DNFNVD |
| 2020-10-16 15:30:59 | DNFNVD | | Bro pls send me usdt | 3DOR3D, DNFNVD |
| 2020-10-16 15:41:27 | DNFNVD | | Brother | 3DOR3D, DNFNVD |

La conversation se poursuivait avec VRHDIV (Lambo) qui demandait à DARKBANK de lui transmettre le logo et une photo du produit. Tibu transmettait alors à DARKBANK une photo d'un pain de cocaïne avec le logo « R=67 ». 3DOR3D (CEO / DARBANK) transmettait à son tour cette photo à Lambo et lui disait de regarder.



Copie certifiée
conforme à l'original

SBU - LEGAL



VRHDIV (Lambo) expliquait à 3DOR3D (CEO / DARBANK) qu'il avait un homme qui irait à vide parce que la quantité d'espèces équivalait à deux sacs. Il mentionnait qu'un autre individu irait déposer le premier individu près de l'adresse car il ne voulait pas communiquer trop proche de la maison.

3DOR3D (CEO / DARBANK) transmettait à VRHDIV (Lambo) une photo d'un autre téléphone avec les conversions de plusieurs devises d'une livre anglaise. Lambo lui confirmait que les 500 avaient le même logo, puis il demandait à DARKBANK combien faisaient 1.645.000 en USD. 3DOR3D (CEO / DARBANK) lui répondait que cela faisait 1.645.000 euros moins 12% font 1.693.700 USD. Lambo acquiesçait et lui disait de régler la différence du solde positif du Brésil de 190 pour qu'il ne reste plus que 94 à payer.

Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000120

| Time | From | | Message | To |
|---|---|---|---|---|
| 2020-10-16 10:41:48 | 3DOR3D |  | MG-1622654429.26 | 3DOR3D, VRHDIV |
| 2020-10-16 10:42:33 | 3DOR3D | | How many ? | 3DOR3D, VRHDIV |
| 2020-10-16 10:44:21 | VRHDIV | | just one to look at | 3DOR3D, VRHDIV |
| 2020-10-16 10:44:41 | VRHDIV | | at 500 is same stupsp | 3DOR3D, VRHDIV |
| 2020-10-16 10:46:19 | 3DOR3D | | Ok | 3DOR3D, VRHDIV |
| 2020-10-16 10:48:27 | VRHDIV | | bro this 1545000 how much pes on dollars | 3DOR3D, VRHDIV |
| 2020-10-16 17:22:41 | VRHDIV | | les sop 1,545 sum how much in dollars minus % | 3DOR3D, VRHDIV |
| 2020-10-16 17:24:46 | 3DOR3D | | 1,545,000 -12% 1,353,700$ | 3DOR3D, VRHDIV |
| 2020-10-16 17:26:18 | VRHDIV | | sé bro say tha something bueno sopas 100 | 3DOR3D, VRHDIV |
| 2020-10-16 17:28:26 | VRHDIV | | 500 you pay pay 100 ssea crees bor | 3DOR3D, VRHDIV |
| 2020-10-16 17:36:18 | VRHDIV | | es please say 100 box pat 100 | 3DOR3D, VRHDIV |
| 2020-10-16 17:41:15 | 3DOR3D | | they vese aqui 350 + 50 | 3DOR3D, VRHDIV |
| 2020-10-16 17:41:57 | VRHDIV | | sé bro say tha difference of the 100 se h 64 bot to pay please | 3DOR3D, VRHDIV |

Par conséquent, ces échanges démontraient que 3DOR3D (CEO / DARBANK) avait participé en tant qu'intermédiaire dans l'acquisition de 500 kilos de cocaïne entreposés au Costa Rica le 16 octobre 2020 et qu'il avait mis en place une partie du financement de ces produits stupéfiants à SAO PAOLO au Brésil pour le compte de Lambo.

*Exemple 2*

Le 22 juillet 2020, le PIN FD97E9 (Patek) écrivait que le groupe colombien avec lequel il traitait, n'aimait pas faire circuler des photos de leur produit. Il avait besoin de 28 millions de pesos à MEDELLIN et CUCUTA. Il écrivait à 3DOR3D (CEO / DARBANK) de dire à son réseau qu'un échantillon pouvait être prélevé et que la marchandise avait été rapidement vendue par un autre réseau.

Copie certifiée
conforme à l'original

SBU - LEGAL

Fernando TORRES
Traducteur - Interprète
ESPAGNOL / ANGLAIS
FRANÇAIS
Traduit le 26/09/2024

| | | | | |
|---|---|---|---|---|
| 2020-07-22 16:58:09 | FD97E9 | | They dont like their stuff pios going around | 3DOR3D, FD97E9 |
| 2020-07-22 16:58:09 | FD97E9 |  | IMG-1595430923837 | 3DOR3D, FD97E9 |
| 2020-07-22 16:58:09 | FD97E9 | | Be acuse this is my solo group | 3DOR3D, FD97E9 |
| 2020-07-22 16:58:11 | FD97E9 | | Yes that what i mean | 3DOR3D, FD97E9 |

| | | | | |
|---|---|---|---|---|
| 2020-07-22 17:00:05 | FD97E9 | | I sort out pucut | 3DOR3D, FD97E9 |
| 2020-07-22 17:00:05 | FD97E9 | | 28 ml peso they asking medd | 3DOR3D, FD97E9 |
| 2020-07-22 17:00:22 | FD97E9 | | And cucuta | 3DOR3D, FD97E9 |
| 2020-07-22 17:00:28 | FD97E9 | | Ask them to take sample | 3DOR3D, FD97E9 |
| 2020-07-22 17:00:29 | FD97E9 | | Plz | 3DOR3D, FD97E9 |
| 2020-07-22 17:01:12 | FD97E9 | | Plz let me know asap | 3DOR3D, FD97E9 |
| 2020-07-22 17:01:49 | FD97E9 | | U know how is costa market | 3DOR3D, FD97E9 |
| 2020-07-22 19:21:21 | FD97E9 | 186d8c7.txt | HARRY EYES 👁️👁️. We take them. DINAKKI 🐢🐢🐢🐢 "Can they pas today tomo?" | 3DOR3D, FD97E9 |

Copie certifiée
conforme à l'original

SBU - LEGAL

| 2020-07-22 10:21:42 | FD97E9 | | But bro honestly u was the first i offered | 3DOR3D, FD97E9 |
| 2020-07-22 10:21:50 | FD97E9 | | Costa market is like this | 3DOR3D, FD97E9 |
| 2020-07-22 10:22:01 | FD97E9 | | 1 hour  take to sell every-thing | 3DOR3D, FD97E9 |
| 2020-07-22 10:22:45 | FD97E9 | | 12 pm | 3DOR3D, FD97E9 |
| 2020-07-22 10:22:46 | FD97E9 | | Its 2 pm | 3DOR3D, FD97E9 |
| 2020-07-22 10:22:46 | FD97E9 | | Hahah | 3DOR3D, FD97E9 |
| 2020-07-22 10:22:46 | FD97E9 | | See newspaper thee  say the hour of arrival | 3DOR3D, FD97E9 |

Le lendemain, Patek écrivait à 3DOR3D (CEO / DARBANK) en précisant que la marchandise avait été vendue car « ils » avaient apprécié l'échantillon et qu'il y aurait 500 de plus cette semaine.

| 2020-07-23 09:52:23 | FD97E9 | | Sold my bro they like samples | 3DOR3D, FD97E9 |
| 2020-07-23 10:15:49 | FD97E9 | | This week 500 more | 3DOR3D, FD97E9 |

*Exemple 3*

Le 3 septembre 2020, Tibu proposait aux « associés » de 3DOR3D (CEO / DARBANK) de prendre la marchandise avec le sceau « Z20 ».

| 2020-09-03 19:47:43 | DNFNVD | | Brother maybe going to be in costa | 3DOR3D, DNFNVD |
| 2020-09-03 19:47:55 | DNFNVD | | Your mates take | 3DOR3D, DNFNVD |
| 2020-09-03 19:49:16 | DNFNVD | | Your mate can take | 3DOR3D, DNFNVD |
| 2020-09-03 19:58:30 | DNFNVD | | Ok bro I send u now pic-tures | 3DOR3D, DNFNVD |
| 2020-09-03 20:20:17 | DNFNVD | IMG-1599164413585 | | 3DOR3D, DNFNVD |

Fernando TORRES
Traductor – Intérprete
ESPAÑOL / ANGLAIS
FRANÇAIS
Traduit le 26/09/2024
à firmar

*Exemple 4*

Le 8 septembre 2020, Patek informait 3DOR3D (CEO / DARBANK) de l'arrivée de 700 « pièces » à LIMON au Costa Rica et disait qu'il attendait le prix. Le logo de la marchandise était cette fois « 3R »

Copie certifiée conforme à l'original

SBU - LEGAL

EX-ISMAIL-000123

| 2020-09-08 17:58:03 | FD97E9 | Bro | 3DOR3D, FD97E9 |
|---|---|---|---|
| 2020-09-08 17:58:05 | FD97E9 | U online | 3DOR3D, FD97E9 |
| 2020-09-08 17:58:10 | FD97E9 | Guys a need to costs | 3DOR3D, FD97E9 |
| 2020-09-08 17:58:12 | FD97E9 | 700 bts | 3DOR3D, FD97E9 |
| 2020-09-08 17:58:14 | FD97E9 | In limon | 3DOR3D, FD97E9 |
| 2020-09-08 17:58:56 | FD97E9 | Now? | 3DOR3D, FD97E9 |
| 2020-09-08 17:58:57 | FD97E9 | Can u talk no? | 3DOR3D, FD97E9 |
| 2020-09-08 17:59:25 | FD97E9 | IMG-1595587987195 | 3DOR3D, FD97E9 |
| 2020-09-08 18:14:28 | FD97E9 | Waiting price | 3DOR3D, FD97E9 |
| 2020-09-08 18:14:30 | FD97E9 | Be online | 3DOR3D, FD97E9 |

**Conclusion** : il ressort de ces échanges que CEO / DARKBANK a connaissance des pratiques de ses correspondants dans le cadre du trafic de stupéfiants à l'échelle internationale et qu'il agit en qualité d'intermédiaire dans leur activité en procédant à des mouvements de fonds issus de la vente de ces produits, caractérisant les faits de blanchiment d'importation de stupéfiants en bande organisée.

### *Sur l'implication de Huzefa Hafiz ISMAIL :*

L'analyse des images reçues et envoyées par 3DOR3D (CEO / DARBANK) confirmait son activité de « broker », soit d'intermédiaire financier, par la réception de photographies de *token* et de transactions en cryptomonnaies, principalement en USDT, dit *Tether*, en attente de validation par la blockchain, notamment avec l'utilisateur BA69AQ, ayant pour pseudonyme « the QB » ou « QUARTER BACK », auquel 3DOR3D donnait des instructions.

Toutes les transactions réalisées l'étaient soit en espèces, par les *money pickup* après l'envoi de *token*, soit en cryptomonnaies. Aucun transfert bancaire classique n'était découvert, aucun système officiel n'était utilisé d'après les éléments visibles. La sortie de la cryptomonnaie s'effectuait vers les échangeurs BINANCE et HUOBI, lequel échangeur permettait notamment de convertir une cryptomonnaie en une autre ou bien, comme c'est le cas pour BINANCE, de le convertir en euro et le virer sur un compte bancaire classique.

L'étude des adresses de dépôt visibles sur les captures d'écran échangées permettait de les regrouper en un portefeuille, dont l'activité démarrait le 16 août 2019. Le 28 février 2021, au jour de l'analyse de l'enquêteur, 998 760 384 USDT avaient été réceptionnés sur ces adresses, et 996 487 465 avaient été renvoyés.

Copie certifiée
conforme à l'original

SBU - LEGAL

Les exploitations des communications de CEO / DARBANK et de QB / QUATERBACK, corrélées aux flux financiers précités, tendaient en outre à attribuer à Ekaterina JDANOVA l'usage du PIN HYPG9I, pseudonyme « KATYA », au contact direct de CEO / DARBANK et de QB / QUATERBACK. Enfin, les autorités américaines faisaient connaître que le compte BINANCE attribué à Ekaterina JDANOVA avait réceptionné 40 BTC provenant d'une extorsion commise dans le cadre de la demande de rançon résultant d'une action du ransomware BitPaymer

Grâce à l'exploitation des échanges via Sky ECC, les principales adresses de cryptomonnaies de 3DOR3D ou DARKBANK étaient identifiées, soit notamment :



- 0x3a3bafad999c705fcc36818a1f60764445af3281, sur la blockchain « Ethererum », permettant d'effectuer des transactions en USDT ;
- 1DiTUAEK9VC229fU7bBd74qgzyxbNrDq49, sur la blockchain bitcoin.

S'agissant de la première adresse de cryptomonnaie, le volume des transactions entre la création le 20 juin 2020 et la fermeture de ce *wallet* le 5 avril 2021 s'élevait à 284 475 154 dollars. Son activité générale permettait de l'identifier comme un *wallet* jouant le rôle d'un hub de transaction. Son analyse démontrait également qu'elle était au centre d'échanges financiers entre des contributeurs de nationalité russe, ukrainienne, turque et des bénéficiaires de nationalité colombienne, le tout par l'intermédiaire de personnes résidant aux Emirats arabes unies.

CEO / DARKBANK partageait la clé privée « Seed » attachée à son *wallet* dans le groupe de messagerie « RARK9J:19 », composé de RARK9J alias « CEO » et BA69AQ alias « QUARTER BACK », démontrant la gestion partagée de celui-ci et la proche collaboration entre les utilisateurs des PINS susmentionnés.

Sur les deux adresses de cryptomonnaies, Ekaterina JDANOVA apparaissait comme la principale contributrice, depuis son adresse BINANCE 0x8abcce33f9809930607a7e19607313e2a6830788.

Ainsi, sur la première adresse de CEO / DARKBANK, la somme de 13 791 341 USDT et de 0,74 ETH était transmise entre le 04 octobre 2020 et le 1er mai 2021, tandis que le 30 novembre et le 20 décembre 2020, la somme de 2 361 500 USDT était versée depuis l'adresse de DARKBANK vers celle de Ekaterina JDANOVA.

S'agissant de la deuxième adresse de cryptomonnaie, le compte Binance de Ekaterina JDANOVA lui envoyait 99.99 BTC le 20 décembre 2020, puis 66,84 BTC le 30 novembre 2020, soit 3 665 092 dollars.

L'étude du *wallet* d'Ekaterina JDANOVA permettait en outre de constater des interactions communes avec la première adresse de cryptomonnaie de DARKBANK. A titre d'exemple, entre le 20 décembre 2020 et le 13 mai 2021, Ekaterina JDANOVA recevait 2 868 500 USDT et 13 ETH de la part d'un autre contributeur important de DARKBANK.

Les exploitations des communications de 3DOR3D alias CEO / DARKBANK et de son principal correspondant BA69AQ / QUARTERBACK, corrélées aux flux financiers précités, tendaient en outre à attribuer à Ekaterina JDANOVA l'usage d'un Sky ID HYPG9I, ayant pour pseudonyme « Katya », au contact direct de 3DOR3D / CEO / DARK BANK et de BA69AQ / QUARTERBACK. Interrogée à ce sujet après son interpellation, celle-ci confirmait par ailleurs l'usage de ce pseudo sur *Signal* et *Telegram* et reconnaissait finalement avoir utilisé quelques fois le Sky PIN HYGP91.

Les autorités américaines faisaient connaître que le compte BINANCE qui lui était attribué avait réceptionné 40 BTC provenant d'une extorsion commise dans le cadre d'une demande de rançon résultant d'une action du ransomware *BitPaymer*.

L'exploitation du téléphone en sa possession lors de son interpellation le 1er octobre 2023 permettait de mettre en lumière sa participation à, au moins deux groupes de discussion sur lesquels des collectes ou

Copie certifiée conforme à l'original

SBU - LEGAL

remises étaient proposées contre rémunération, auxquels participaient dix individus, dont notamment ceux utilisant les pseudonymes de « CEO » et de « THE QB ».

Ainsi, le groupe *Signal* « Activity-Katya KTD », actif durant le premier semestre 2023, conduisait à mettre en évidence de nombreuses collectes ou remises de fonds sur le territoire européen, pour un montant de plus de 20.000.000 euros, donnant lieu à compensation en cryptomonnaies.

Parallèlement, l'exploitation des conversations de 3DORD3 sur SkyECC permettait de mettre en évidence entre novembre 2020 et février 2021 des collectes d'espèces sur l'ensemble du territoire européen, faisant notamment intervenir 3DORD3 et Ekaterina JDANOVA pour dans le cadre d'opérations de compensation, ce à tout le moins pour une somme dépassant les 50 000 000euros.

### *L'identification de Huzefa Hafiz ISMAIL :*

Au vu des messages échangés par le Sky Pin 3DOR3D « CEO/Darkbank » et de l'utilisation de ce système de communication, les investigations ont conduit à identifier cet individu comme étant Huzefa Hafiz ISMAIL, né le ███████ 1983, de nationalité américaine et titulaire notamment :

- D'un passeport ███████ 7428 ;
- D'un *golden visa* ███████████ 037 ;
- D'un numéro d'identification émirati Emirate Unitied number ████ 097.

L'identification d'Huzefa ISMAIL résulte de la combinaison de plusieurs éléments.

Les enquêteurs ont d'abord établi, à partir des échanges de CEO / DARKBANK via ses SKY PIN 3DOR3D, RARK9J et 3TFFI7, avec d'autres correspondants (les PIN BA69AQ, 8A0ARG et 3C3VNC), qu'il avait effectué un séjour en Turquie et avait pris l'avion entre DUBAI et ISTANBUL le 14 février 2021 puis était revenu par un vol ISTANBUL-DUBAI du 22 février 2021.

| timestamp_utc | timestamp_amsterdam | message_from_id | message |
|---|---|---|---|
| 2021-02-14 10:43:50 | 2021-02-14 11:43:50 | 3DOR3D | Enjoy your busy time from now on 😊😊😊😊😊 |
| 2021-02-14 10:43:50 | 2021-02-14 11:43:50 | 3DOR3D | Enjoy your busy time from now on 😊😊😊😊😊 |
| 2021-02-14 10:44:13 | 2021-02-14 11:44:13 | BA69AQ | Okay |
| 2021-02-14 10:44:13 | 2021-02-14 11:44:13 | BA69AQ | Okay |
| 2021-02-14 10:44:16 | 2021-02-14 11:44:16 | BA69AQ | 😊😊😊 |
| 2021-02-14 10:44:16 | 2021-02-14 11:44:16 | BA69AQ | 😊😊😊 |
| 2021-02-14 10:44:28 | 2021-02-14 11:44:28 | BA69AQ | Please come back sooner |
| 2021-02-14 10:44:28 | 2021-02-14 11:44:28 | BA69AQ | Please come back sooner |
| 2021-02-14 10:45:59 | 2021-02-14 11:45:59 | 3DOR3D | Hahaha |
| 2021-02-14 10:45:59 | 2021-02-14 11:45:59 | 3DOR3D | Hahaha |
| 2021-02-14 10:46:05 | 2021-02-14 11:46:05 | 3DOR3D | Good thing I didn't book one way like my old man |
| 2021-02-14 10:46:05 | 2021-02-14 11:46:05 | 3DOR3D | Good thing I didn't book one way like my old man |

Copie certifiée
conforme à l'original

SBU - LEGAL

| | | | |
|---|---|---|---|
| 2021-02-14 15:11:27 | 2021-02-14 16:11:27 | 3DOR3D | Online. But haven't turned on other yet Just this for now or else will be getting calls   So keep it hush for a bit. |
| 2021-02-14 15:11:27 2021-02-14 | 2021-02-14 16:11:27 2021-02-14 | 3DOR3D | Online. But haven't turned on other yet Just this for now or else will be getting calls    So keep it hush for a bit. |
| 2021-02-22 14:15:24 | 2021-02-22 15:15:24 | 8A0ARG | Brother |
| 2021-02-22 15:51:11 | 2021-02-22 16:51:11 | 3DOR3D | Yes bro my brother will get tokens and send to u along with ETA.  I am going to be offline for 6hrs |
| 2021-02-24 20:20:57 | 2021-02-24 21:20:57 | BA69AQ | babes deals done from when you were gone to turkey, need the ones prior to you turkey trip. |
| 2021-02-25 03:19:10 | 2021-02-25 04:19:10 | 3DOR3D | Ok cool |

La réponse de la compagnie FLY EMIRATES attirait l'attention des enquêteurs notamment sur la personne d'Huzefa ISMAIL, de nationalité américaine, passeport n°505707428, présent sur ce vol.

| For French Police Purposes Only | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Passenger Name: ISMAIL/HUZEFAMR** | | | | | | | | |
| **DOB:** 1983, U.S. Passport No. | | | | | | | LER 0193 - 2024 | |
| Status | Flight Date | Flight No. | Sector | Date of Booking | PNR | Ticket No. | Coupon Status | Seat No. | Contact Details |
| 19 | 14-Feb-2021 | EK0121 | DXB-IST | 13-Feb-2021 | FB6HWS | 1762338464240 | Flown | DOB8 | 00971 5508880738 |
| | 22-Feb-2021 | EK0122 | IST-DXB | | | | Flown | 905B | ,00971550880738,0715508880738,huzefahafiz@gmail.com, |

Il apparaissait en outre que l'utilisateur du Sky Pin « 3DOR3D » annonçait à un de ses correspondants son indisponibilité en raison de la naissance d'un nouvel enfant entre le ███████ 2021, ce alors que Huzefa Hafiz ISMAIL se trouvait père de ███████, née le ███████ 2021.

Ainsi étaient constatés ces échanges :

Fernando TORRES Traducteur - Interprète ESPAGNOL / ANGLAIS FRANÇAIS Traduit le 26/09/2024 À ████

Copie certifiée conforme à l'original

SBU - LEGAL

EX-ISMAIL-000127

| 2021-01-11 12:55:44 | 2021-01-11 13:55:44 | 3DOR3D | No bro I'm in the hospital with my Mrs. Busy today |
| 2021-01-12 09:43:02 | 2021-01-12 10:43:02 | TBRFEN | Mate the breakdown can you send |
| 2021-01-12 10:03:49 | 2021-01-12 11:03:49 | 3DOR3D | Yes bro |
| 2021-01-12 10:03:49 | 2021-01-12 11:03:49 | 3DOR3D | Yes bro |
| 2021-01-12 10:04:09 | 2021-01-12 11:04:09 | 3DOR3D | Sorry been busy with Doctor   Just had new lil one. |
| 2021-01-12 10:04:09 | 2021-01-12 11:04:09 | 3DOR3D | Sorry been busy with Doctor   Just had new lil one. |
| 2021-01-12 10:49:39 | 2021-01-12 11:49:39 | TBRFEN | Mate what is rate for paper from UK to Dubai |
| 2021-01-12 10:49:39 | 2021-01-12 11:49:39 | TBRFEN | Mate what is rate for paper from UK to Dubai |
| 2021-01-12 10:50:53 | 2021-01-12 11:50:53 | 3DOR3D | 10% |
| 2021-01-12 10:50:53 | 2021-01-12 11:50:53 | 3DOR3D | 10% |
| 2021-01-14 11:32:46 | 2021-01-14 12:32:46 | 3DOR3D | Bro you guys need any eur ? |
| 2021-01-14 11:32:46 | 2021-01-14 12:32:46 | 3DOR3D | Bro you guys need any eur ? |
| 2021-01-14 11:38:44 | 2021-01-14 12:38:44 | TBRFEN | No mate , will need paper from UK to here tho |
| 2021-01-14 11:38:44 | 2021-01-14 12:38:44 | TBRFEN | No mate , will need paper from UK to here tho |
| 2021-01-14 11:49:47 | 2021-01-14 12:49:47 | TBRFEN | Mate can you send breakdown of this paper you give , IV asked you for 3 days now and you still not sent |
| 2021-01-14 11:49:47 | 2021-01-14 12:49:47 | TBRFEN | Mate can you send breakdown of this paper you give , IV asked you for 3 days now and you still not sent |
| 2021-01-14 12:05:53 | 2021-01-14 13:05:53 | 3DOR3D | Bro I had a newborn and hadn't gone to work this whole week Sorry bro about the delay |

L'exploitation du retour de la réquisition AMADEUS identifiait une enfant nommée ▮▮▮▮▮ ▮▮▮▮ née le ▮▮▮▮ 2021 qui avait voyagé avec Huzefa Hafiz ISMAIL et Khadija Yakub ISMAIL à plusieurs reprises.



Copie certifiée
conforme à l'original

SBU - LEGAL

Notamment :



RP/BOMWI2104/BOMWI2104        BT/SU 18NOV21/0737Z  P8Y6NP BOMWI2104/2008BT/17NOV21 RF BTL

  1.ISMAIL ████████ (CHD)  2.ISMAIL/HUZEFA HAFIZ MR

  3.ISMAIL, ████████ CHD)

  4.ISMAIL/KHADIJA YAKUB MRS(INF ████████ 21)

  5.ISMAIL ████████ CHD)

  6 AP BOM 22011207-08 - BATHIJA TRAVELS PVT LTD - A

  7 TK OK18NOV/BOMWI2104

--- TST RLR DCS ---

RP/JNBSA08AA/JNBSA08AA    ·    VM/GS 21JUL23/1607Z  NAGA7A JNBSA08AA/0001AA/21JUL23 RF /DCS-SYNCUS

  1. ████ ISMAIL/ ████ CHD)

  2.ISMAIL/ ████ .0)

  3.ISMAIL/HUZEFA HAFIZ MR(ADT)

  4.ISMAIL ████ CHD)

  5.ISMAIL/KHADIJA YAKUB MRS(ADT)

  6.ISMAIL ████ (CHD)

  7  SA 359 K 21JUL 5 JNBCPT    FLWN

  8 AP +971 558880738-M

  9 APE ████ GMAIL.COM

  10 APN SA/M ████ 0738/EN/P3

  11 TK PAX OK21JUL/JNBSA08AA//ETSA/57/P1-6

  12 SSR CHLD SA HK1/P4

  13 SSR CHLD SA HK1/P6





Copie certifiée
conforme à l'original

SBU - LEGAL

14 SSR CHLD SA HK1/P1

15 SSR DOCS SA HK1 ////22AUG83/M//ISMAIL/HUZEFA HAFIZ/P3

16 SSR DOCS SA HK1 ////20JUL85/F//ISMAIL/KHADIJA YAKUB/P5

17 SSR DOCS SA HK1 ////05JAN10/M//ISMAIL ██████████

18 SSR DOCS SA HK1 ////09JUL12/M//ISMAIL ██████████

19 SSR DOCS SA HK1 ////17JAN15/F//ISMAIL ██████████

**20 SSR DOCS SA HK1 ////11JAN21/F/**██████ISMAIL,██████P1

21 SSR CTCE SA HK1 ██████GMAIL.COM/P3

22 SSR CTCM SA HK██████0738/P3

23 SSR CTCE SA HK1 ██████/GMAIL.COM/P5

24 SSR CTCM SA HK1 ██████0738/P5

25 SSR CTCE SA HK1 ██████GMAIL.COM/P2

26 SSR CTCM SA ██████0738/P2

27 OSI SA SKN8000

28 RM PRICING ENTRY FXP/R,P,U232323,JNB.JNB/A-KSAOW/S7/P1-6

29 RM 102.164.11.4

30 RM MODETICKET

31 RM FARE18769.56 ZAR/P1-6

32 RM TIDGYH8JMUVAA

Le SKY PIN « 3DOR3D » (DARKBANK) mentionnait également une épouse ou ex-épouse russe.



| | | | |
|---|---|---|---|
| 2020-12-04 10:04:49 | 2020-12-04 11:04:49 | 3DOR3D | You have Russian phone and I have Russian wire |
| 2020-12-04 10:04:51 | 2020-12-04 11:04:51 | A5331A | U can get also same bro |
| 2020-12-04 10:04:51 | 2020-12-04 11:04:51 | A5331A | U can get also same bro |
| 2020-12-04 10:04:56 | 2020-12-04 11:04:56 | 3DOR3D | *had |
| 2020-12-04 10:04:56 | 2020-12-04 11:04:56 | 3DOR3D | *had |
| 2020-12-04 10:04:56 | 2020-12-04 11:04:56 | 3DOR3D | *had |
| 2020-12-04 10:05:10 | 2020-12-04 11:05:10 | 3DOR3D | *wife |

L'exploitation des renseignements obtenus en coopération policière enseignait de plus que Ismail HUZEFA avait deux compagnes : l'une de nationalité indienne avec laquelle il aurait deux enfants et l'une de nationalité russe.

L'exploitation des messages SKY ECC de « 3DOR3D » et des messages ENCROCHAT de « CEO_ » mettait en évidence l'usage par cet utilisateur d'un véhicule pouvant correspondre à une véhicule MERCEDES

SBU - LEGAL

G63 (cf. supra), ce alors que la coopération policière permettait d'apprendre que Huzefa Hafiz ISMAIL serait propriétaire de plusieurs véhicules de luxe dont une MERCEDES GLS 63 et une MERCEDES G63.

Par ailleurs il était constaté que dans les messages ENCROCHAT, 16 « surnoms » avaient été attribuée à « CEO_ » par 22 utilisateurs d'ENCOCHAT, dont :

- amrk
- CEO huzaif
- Money Dxb
- US Money Man
- Watch man

Ce alors que :

- Le prénom de Huzefa Hafiz Ismail peut expliquer le surnimr de « CEO huzaif »
- Huzefa Hafiz Ismail est résident dubaïote (DXB correspondant au code aéroport de Dubaï, pouvant expliquer le pseudonyme « money Dxb »),
- Huzefa Hafiz Ismail a la nationalité américaine (pouvant expliquer les surnom « US Money Man » et « amrk »), ;
- Huzefa Hafiz ismail serait propriétaire d'une société de vente de montres de luxe à l'enseigne "quintessential.ae" (pouvant expliquer le surnom de « WATCHMAN »).

Liste complete des surnoms :

| Utilisateur ayant donné le surnom | Surnom donné à « ceo_ » |
|---|---|
| tunaivy | amrk |
| yenigozluk | amrk |
| blueray.com | CEO |
| ditahonour | CEO |
| prettyone | CEO |
| virtualcactus | CEO |
| newpallmall | CEO huzaif |
| credits | ceo_ Privatechat bank |
| don.com | H20 |
| ultimateflex | haji |
| blackjerry | kusho ind |
| cheetahfern | Mexicans |
| solidgoose | Money Dxb |
| bmwnew | shoku Luis transf |
| wealthymace | timezone |
| karma.is.real | token ceo |
| solidgoose | US Money Man |
| endiosconfiamos | VIP |
| ironwasp | VIP |
| lostradio | watchman |
| ruralspear | watchman |
| blacknarco | zuckerberg |



Copie certifiée
conforme à l'original

Il résultait du croisement de ces informations que CEO / DARKBANK était Huzefa ISMAIL.

### III / La qualification pénale



Les faits ci-avant mentionnés sont les suivants :

### BLANCHIMENT : AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'IMPORTATION NON AUTORISEE DE STUPEFIANTS EN BANDE ORGANISEE

Définie par ART.222-38, ART.222-36 AL.2, AL.1, ART.222-41, ART.132-71 C. PENAL. ART.L.5132-7, ART.L.5132-8 AL.1, ART.R.5132-74, ART.R.5132-77, ART.R.5132-78 C.SANTE.PUB. ART.1 ARR.MINIST DU 22/02/1990.

Réprimée par ART.222-38, ART.222-36 AL.2, ART.222-44 §I, ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50, ART.222-51, ART.131-26-2 C. PENAL.

*Faits commis du 06 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, en Belgique, en Allemagne, en Italie et au Royaume-Uni.*

### BLANCHIMENT : AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'UN DELIT DE TRAFIC DE STUPEFIANTS

Définie par ART.222-38 AL.1, ART.222-36 AL.1, ART.222-37 C. PENAL. ART.L.5132-7 C.SANTE.PUB. ART.1 ARR.MINIST DU 22/02/1990.

Réprimée par ART.222-38, ART.222-44, ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50 C. PENAL.

*Faits commis du 06 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, en Belgique, en Allemagne, en Italie et au Royaume-Uni.*

### BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVERSION DU PRODUIT D'UN DELIT

Définie par ART.324-2 2°, ART.324-1 AL.2, ART.324-1-1, ART.132-71 C. PENAL.

Réprimée par ART.324-2 AL.1, ART.324-3, ART.324-7, ART.324-8 C. PENAL.

*Faits commis du 06 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, en Belgique, en Allemagne, en Italie et au Royaume-Uni.*

### EXTORSION EN BANDE ORGANISEE

Définie par ART.312-6 AL.1, ART.312-1 AL.1, ART.132-71 C. PENAL.

Réprimée par ART.312-6 AL.1, ART.312-13, ART.312-14, ART.131-26-2 C. PENAL.

*Faits commis du 06 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, en Belgique, en Allemagne, en Italie et au Royaume-Uni.*

### ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES

Définie par ART.323-1 AL.1 C. PENAL.

Réprimée par ART.323-1 AL.1, ART.323-5 C. PENAL.

*Faits commis du 06 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, en Belgique, en Allemagne, en Italie et au Royaume-Uni.*

SBU - LEGAL

EX-ISMAIL-000132

**MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**

Définie par ART.323-1 AL.1 C. PENAL.

Réprimée par ART.323-1 AL.1, ART.323-5 C. PENAL.

*Faits commis du 06 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, en Belgique, en Allemagne, en Italie et au Royaume-Uni.*

**ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**

Définie par ART.323-2 AL.1 C. PENAL.

Réprimée par ART.323-2 AL.1, ART.323-5 C. PENAL.

*Faits commis du 06 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, en Belgique, en Allemagne, en Italie et au Royaume-Uni.*

**INTRODUCTION FRAUDULEUSE DE DONNEES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE**

Définie par ART.323-3 AL.1 C. PENAL.

Réprimée par ART.323-3 AL.1, ART.323-5 C. PENAL.

*Faits commis du 06 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, en Belgique, en Allemagne, en Italie et au Royaume-Uni.*

**EXTRACTION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE**

Définie par ART.323-3 AL.1 C. PENAL.

Réprimée par ART.323-3 AL.1, ART.323-5 C. PENAL.

*Faits commis du 06 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, en Belgique, en Allemagne, en Italie et au Royaume-Uni.*

**PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME**

Définie par ART.450-1 AL.1, AL.2 C. PENAL.

Réprimée par ART.450-1 AL.2, ART.450-3, ART.450-5 C. PENAL.

*Faits commis du 06 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, en Belgique, en Allemagne, en Italie et au Royaume-Uni.*

**PARTICIPATION A ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI DE 10 ANS D'EMPRISONNEMENT**

Définie par ART.450-1 AL.1, AL.2 C. PENAL.

Réprimée par ART.450-1 AL.2, ART.450-3, ART.450-5 C. PENAL.

*Faits commis du 06 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, en Belgique, en Allemagne, en Italie et au Royaume-Uni.*

SBU - LEGAL

Copie certifiée conforme à l'original

**PARTICIPATION A ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI D'AU MOINS 5 ANS D'EMPRISONNEMENT**
Définie par ART.450-1 AL.1, AL.3 C. PENAL.
Réprimée par ART.450-1 AL.3, ART.450-3 C. PENAL.
*Faits commis du 06 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, en Belgique, en Allemagne, en Italie et au Royaume-Uni.*

La peine maximale encourue est de 30 ans de réclusion criminelle.

### IV / La procédure

Le 09 mars 2021, la solution de messagerie chiffrée SkyECC était démantelée par les autorités françaises, belges et néerlandaises, après qu'il leur est apparu que cette solution de chiffrement servait exclusivement à faciliter des activités relevant de la criminalité organisée. L'exploitation des conversations chiffrées issues du lac de données de SkyECC conduisait les enquêteurs de l'Office central de lutte contre la criminalité liée aux technologies de l'information et de la communication (OCLCTIC) à isoler une communication entre les utilisateurs des identifiants « 3DOR3D » et « ED8988 », laquelle paraissait relative à un *money pickup* à Paris, portant sur « 900k ». Les échanges permettaient de mettre en évidence une activité de collecte de liquidités en lien avec le trafic de stupéfiants, ensuite blanchies par le réseau.

Le 05 mars 2021, la juridiction nationale chargée de la lutte contre la criminalité (JUNALCO) saisissait la direction centrale de la police judiciaire (DCPJ) d'une enquête incidente au dossier SkyECC des chefs de blanchiment d'importation de stupéfiants en bande organisée, blanchiment de trafic de stupéfiants, blanchiment en bande organisée de tout crime ou délit et association de malfaiteurs en vue de la préparation de ces crimes.

Les investigations permettaient d'identifier que 3DORD/CEO-DARKBANK participait aux opérations de blanchiment en qualité de « broker », soit d'intermédiaire financier. Il récupérait notamment des liquidités issues d'opérations illicites et les fournissait à des tiers, lesquels, en échange d'une commission, créditaient en cryptoactifs des adresses qu'il utilisait.

Un des principaux créditeurs des adresses de cryptomonnaie utilisées par 3DORD/CEO-DARKBANK était le compte Binance 28677232 ouvert au nom d'Ekaterina JDANOVA, de nationalité russe. En exécution d'un mandat de recherche, celle-ci était interpellée à l'aéroport de Nice le 1er octobre 2023.

Le 5 octobre 2023, un réquisitoire introductif était pris par le procureur de la République près le Tribunal judiciaire de Paris, pour les chefs de blanchiment d'importation de stupéfiants en bande organisée, blanchiment de trafic de stupéfiants, blanchiment en bande organisée de tout crime ou délit, complicité d'accès et maintien frauduleux dans un système de traitement automatisé de données, complicité d'introduction frauduleuse de données dans un système de traitement automatisé de données, complicité d'extraction frauduleuse de données dans un système de traitement automatisé de données, complicité d'entrave au fonctionnement d'un système de traitement automatisé de données, extorsion en bande organisée et association de malfaiteurs en vue de la préparation des crimes et délits susvisés, lequel permettait l'ouverture d'une instruction et la poursuite des actes d'investigation par un juge d'instruction.

Ekaterina JDANOVA était mise en examen et placée en détention provisoire. Les investigations ultérieures, incluant des auditions de Ekaterina JDANOVA et l'exploitation de son téléphone, permettaient d'identifier les membres du réseau sur lequel elle s'appuyait dans le cadre de la réalisation des collectes de

conforme à l'original

SBU - LEGAL

fonds, dont plusieurs agissaient en France notamment. Ces individus étaient interpellés et auditionnés, de même que le domicile de deux d'entre eux était perquisitionné.

En outre, au vu des messages échangés par le SKY PIN 3DOR3D « CEO/DARKBANK » et de l'utilisation de ce système de communication, les investigations permettaient d'identifier l'utilisateur de celui-ci sous l'identité de Hufeza Hafiz ISMAIL, né ▉▉▉ 1983, de nationalité américaine, résidant à Dubaï depuis le 4 janvier 2017.

### V / La prescription

Les faits pour lesquels l'extradition de Huzefa Hafiz ISMAIL, né ▉▉▉ 983, visé par la présente, est réclamée, ne sont pas couverts par la prescription de l'action publique en droit français.

Les faits ont été commis jusqu'au 1er octobre 2023. Le délai de prescription en droit français pour les infractions visées de 06 ans selon l'article 8 du code de procédure pénale, à l'exception de l'infraction de blanchiment des biens et revenus provenant de l'importation illicite de stupéfiants en bande organisée pour laquelle un délai de 30 ans est prévu selon les dispositions de l'article 7 du code de procédure pénale et de l'infraction d'extorsion en bande organisée pour laquelle un délai de 20 ans est prévu en application des mêmes dispositions ? La présente demande d'arrestation provisoire est un acte d'interruption de l'action publique au sens de l'article 9-2 du code de procédure pénale.

*Les articles susmentionnés sont reproduits en annexe de la présente demande d'extradition.*

*La demande d'extradition de Monsieur Huzefa Hafiz ISMAIL est sollicitée sur le fondement du traité bilatéral franco-américain du 23 avril 1996, de l'accord entre l'Union Européenne et les Etats-Unis d'Amérique en date du 25 juin 2003, de la Convention sur la cybercriminalité du Conseil de l'Europe en date du 23 novembre 2001, entré en vigueur le 1er janvier 2007, de la Convention unique des Nations-Unie sur les stupéfiants, faite à New-York le 30 mars 1961, de la Convention des Nations-Unies contre le trafic illicite de stupéfiants et de substances psychotropes, adoptée à Vienne le 19 décembre 1988 et de la Convention des Nations Unies contre la criminalité transnationale organisée adoptée à New York le 15 novembre 2000.*

Je vous prie de bien vouloir trouver en annexe de ce pli :

- Copie certifiée conforme du mandat d'arrêt décerné par Monsieur Julien GAU, vice-président chargé de l'instruction près le Tribunal judiciaire de Paris le 30 juillet 2024 à l'encontre de Monsieur Huzefa Haziz ISMAIL, portant photographie de ce dernier ;
- Copie certifiée conforme du mandat d'arrêt européen, décerné par Madame Natacha RATEAU, premier vice-procureur de la République près le Tribunal judiciaire de Paris le 30 juillet 2024 à l'encontre de Monsieur Huzefa Hafiz ISMAIL ;
- Les textes de définition et de répression des infractions, ainsi que de prescription de la peine et de la compétence des juridictions françaises.

Copie certifiée
conforme à l'original



P/ Madame la procureure de la République

Philippe TOCCANIER
Procureur adjoint



SBU - LEGAL

COUR D'APPEL DE PARIS
## TRIBUNAL JUDICIAIRE DE PARIS

**Cabinet de Julien Gau**
vice-président chargé de l'instruction

N° Parquet :          21064000646
N° Instruction :      JIJI83123000001
Identifiant justice :  2100697077P
Procédure :           criminelle



## MANDAT D'ARRÊT

### REPUBLIQUE FRANCAISE - AU NOM DU PEUPLE FRANCAIS

Le 30 juillet 2024,

Nous, Julien GAU, vice-président chargé de l'instruction près le Tribunal judiciaire de Paris,

Vu les articles 122, 123, 124, 131, 133, 134, 141-2 du code de procédure pénale ;

Vu l'ordonnance de soit communiqué en date du 12 juillet 2024 ;

Vu les réquisitions du procureur de la République en date du 12 juillet 2024 ;

Vu la procédure suivie contre :

**Huzefa Hafiz ISMAIL**
né le ▮▮▮▮ 983
demeurant : à DUBAI
Susceptible de se rendre : notamment aux ETATS UNIS d'AMERIQUE, à DUBAI
Sexe : M
Nationalité : Américaine

Mis en cause pour les faits suivants :

- BLANCHIMENT: AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'IMPORTATION NON AUTORISEE DE STUPEFIANTS EN BANDE ORGANISEE faits commis du 6 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux USA, en Belgique, en Allemagne, en Italie et au Royaume Uni,
faits prévus par ART.222-38, ART.222-36 AL.2, AL.1, ART.222-41, ART.132-71 C.PENAL. ART.L.5132-7, ART.L.5132-8 AL.1, ART.R.5132-74, ART.R.5132-77, ART.R.5132-78 C.SANTE.PUB. ART.1 ARR.MINIST DU 22/02/1990. et réprimés par ART.222-38, ART.222-36 AL.2, ART.222-44 §I, .ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50, ART.222-51, ART.131-26-2 C.PENAL.

- BLANCHIMENT: AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'UN DELIT DE TRAFIC DE STUPEFIANTS faits commis du 6 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux USA, en Belgique, en Allemagne, en Italie et au Royaume Uni,
faits prévus par ART.222-38 AL.1, ART.222-36 AL.1, ART.222-37 C.PENAL. ART.L.5132-7 C.SANTE.PUB. ART.1 ARR.MINIST DU 22/02/1990. et réprimés par ART.222-38, ART.222-44, ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50 C.PENAL.

- BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVERSION DU PRODUIT D'UN DELIT faits commis du 6 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux USA, en Belgique, en Allemagne, en Italie et au Royaume Uni,

Copie certifiée
conforme à l'original

N° Parquet : 21064000646 - N° de dossier : JIJI83123000001
MANDAT D'ARRÊT de Huzefa Hafiz ISMAIL

Page 1/5

SBU - LEGAL

EX-ISMAIL-000136

faits prévus par ART.324-2 2°, ART.324-1 AL.2, ART.324-1-1, ART.132-71 C.PENAL. et réprimés par ART.324-2 AL.1, ART.324-3, ART.324-7, ART.324-8 C.PENAL.

- EXTORSION EN BANDE ORGANISEE faits commis du 6 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux USA, en Belgique, en Allemagne, en Italie et au Royaume Uni,
faits prévus par ART.312-6 AL.1, ART.312-1 AL.1, ART.132-71 C.PENAL. et réprimés par ART.312-6 AL.1, ART.312-13, ART.312-14, ART.131-26-2 C.PENAL.

- ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES faits commis du 6 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux USA, en Belgique, en Allemagne, en Italie et au Royaume Uni,
faits prévus par ART.323-1 AL.1 C.PENAL. et réprimés par ART.323-1 AL.1, ART.323-5 C.PENAL.

- MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES faits commis du 6 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux USA, en Belgique, en Allemagne, en Italie et au Royaume Uni,
faits prévus par ART.323-1 AL.1 C.PENAL. et réprimés par ART.323-1 AL.1, ART.323-5 C.PENAL.

- ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES faits commis du 6 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux USA, en Belgique, en Allemagne, en Italie et au Royaume Uni,
faits prévus par ART.323-2 AL.1 C.PENAL. et réprimés par ART.323-2 AL.1, ART.323-5 C.PENAL.

- INTRODUCTION FRAUDULÉUSE DE DONNEES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE faits commis du 6 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux USA, en Belgique, en Allemagne, en Italie et au Royaume Uni,
faits prévus par ART.323-3 AL.1 C.PENAL. et réprimés par ART.323-3 AL.1, ART.323-5 C.PENAL.

- EXTRACTION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE faits commis du 6 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux USA, en Belgique, en Allemagne, en Italie et au Royaume Uni,
faits prévus par ART.323-3 AL.1 C.PENAL. et réprimés par ART.323-3 AL.1, ART.323-5 C.PENAL.

- PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME faits commis du 6 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux USA, en Belgique, en Allemagne, en Italie et au Royaume Uni,
faits prévus par ART.450-1 AL.1, AL.2 C.PENAL. et réprimés par ART.450-1 AL.2, ART.450-3, ART.450-5 C.PENAL.

- PARTICIPATION A ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI DE 10 ANS D'EMPRISONNEMENT faits commis du 6 juin 2019 au 1er octobre 2023 à Paris, sur le territoire national et de manière indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux USA, en Belgique, en Allemagne, en Italie et au Royaume Uni,
faits prévus par ART.450-1 AL.1, AL.2 C.PENAL. et réprimés par ART.450-1 AL.2, ART.450-3, ART.450-5 C.PENAL.

- PARTICIPATION A ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI D'AU MOINS 5 ANS D'EMPRISONNEMENT faits commis du 6 juin 2019 au 1er octobre 2023 à Paris sur le territoire national et de manières indivisible en Turquie, à Dubaï, en Espagne, aux Pays-Bas, à Monaco, en Suisse, aux USA, en Belgique, en Allemagne, en Italie et au Royaume Uni,
faits prévus par ART.450-1 AL.1, AL.3 C.PENAL. et réprimés par ART.450-1 AL.3, ART.450-3 C.PENAL.

**RESUME DES FAITS :**

Copie certifiée
conforme à l'original

N° Parquet : 21064000646 - N° de dossier JIJI80123000001
MANDAT D'ARRÊT de Huzefa Hafiz ISMAIL

Jane KOCHANSKI
Anglais

SBU - LEGAL

L'exploitation des conversations chiffrées issues du lac de données de SKYECC conduisait les enquêteurs de l'Office Central de Lutte contre la Criminalité liée aux Technologies de l'Information et de la Communication (OCLCTIC) à isoler une communication entre les utilisateurs des SKY ID 3DOR3D (pseudonyme : CEO-DARKBANK) et ED8988 paraissant relative à un money pickup à Paris, portant sur "900K".

L'exploitation des communications de "3DOR3D / CEO-DARKBANK" tendait à laisser comprendre que d'autres money pickups avaient été programmés à Paris, et qu'un money pickup d'une valeur de 800.000 euros avait effectivement eu lieu entre le 26 novembre et le 27 novembre 2020 à PARIS, ainsi qu'à attribuer au même individu les SKY PIN 3TFFI7 (pseudonymes successifs CEO", "CEO add new SKY RARK9J » et « CEO BOX TT », actif du 24 novembre 2019 au 29 avril 2020) RARK9J (pseudonymes successifs « CEO », « NEW CEO »", "CILO » et « CEO. Ciphr CCF16355 », actif du 1er mai 2020 au 25 août 2020) puis 3DOR3D (pseudonyme « CEO / DARK BANK », actif du 11 juin 2020 au 8 mars 2021 – fin de fonctionnement de SKY ECC).

Cette exploitation tendait également à mettre en évidence un rôle de blanchiment et d'intermédiation, notamment dans le cadre de transactions de stupéfiants internationales, et à identifier, au vu des seules captures d'écran réalisées, 26 millions d'euros de dépôts en 2 mois (2 janvier - 27 février 2021) via 15 adresses, ayant pour leur part, du 16 août 2019 jusqu'au 28 février 2021, réceptionné la somme de 998.760.384 USDT *[stable coin Tether]* et en ayant renvoyés 996.487.465.

Parmi les adresses identifiées comme utilisées par "3DOR3D / CEO-DARKBANK" , il était constaté que l'adresse 0x3a3bafad999c705fcc36818a1f60764445af3281 (adresse active du 20 juin 2020 au 5 avril 2021 donnant lieu à un volume total de transactions entrantes et sortantes de près de 285.3000.000 de dollars américains) comptait parmi ses principaux créditeurs le compte Binance 28677232 ouvert au nom d'Ekaterina JDANOVA.

Il apparaissait ainsi :
- qu'entre le 4 octobre 2020 et le 1er mai 2021, ce compte BINANCE avait crédité l'adresse af3281 à hauteur de 13.791.341 USDT et 0,74 ETH ;
- que les 30 novembre et 20 décembre 2020, ce compte BINANCE avait alimenté l'adresse 1DiTUAEK9VC229fU7bBd74qgzyxbNrDq49      [pendant      en      bitcoins      de      l'adresse 0x3a3bafad999c705fcc36818a1f60764445af3281] à hauteur de 166,83 BTC [représentant en valeur 3.665.092 USD] ;
- que ce compte BINANCE avait, en outre, effectué des transactions avec d'autres adresses en lien financier avec l'adresse 0x3a3bafad999c705fcc36818a1f60764445af3281.

Les exploitations des communications de "3DOR3D" / "CEO-DARKBANK" et de son principal correspondant "BA69AQ" / "QUARTERBACK", corrélées aux flux financiers précités, tendaient en outre à attribuer à Ekaterina JDANOVA l'usage d'un SKY ID, "HYPG9I", pseudonyme "KATYA", au contact direct de "3DOR3D / CEO-DARK BANK" et de  "BA69AQ / QUARTERBACK".

Enfin, les autorités américaines faisaient connaître que le compte BINANCE attribué à Ekaterina JDANOVA avait réceptionné 40 BTC provenant d'une extorsion commise dans le cadre de la demande de rançon résultant d'une action du ransomware BitPaymer.

Ekaterina JDANOVA, de nationalité russe, résidant à DUBAI, était interpellée à l'aéroport de NICE, en exécution d'un mandat de recherches le 1er octobre 2023 alors qu'elle se rendait en France.

Par réquisitoire introductif en date du 5 octobre 2023 une information judiciaire était ouverte des chefs de :
- Blanchiment d'importation de stupéfiants en bande organisée, faits prévus et réprimés par les articles 222-38, 222-36 AL.2, 222-44, 222-45, 222-47, 222-48, 222-49, 222-50, 222-51, 131-26-2 du code pénal ;
- Blanchiment de trafic de stupéfiants, faits prévus et réprimés par les articles 222-38, 222-44, 222-45, 222-47, 222-48, 222-49,4. 222-50 du code pénale ;
- Blanchiment en bande organisée de tout crime ou délit, faits prévus et réprimés par les articles 324-2 ALI, 324-3, 324-7, 324-8 du code pénal ;
Complicité d'accès et maintien frauduleux dans un système de traitement automatisé de données, faits prévus et réprimés par les articles 323-1, 323-5 du code pénal ;
- Complicité d'introduction frauduleuse de données dans un système de traitement automatisé de données, faits prévus et réprimés par les articles 323-3, 323-5 C.PENAL du code pénal ;
- Complicité d'extraction frauduleuse de données dans un système de traitement automatisé de données, faits prévus et réprimés par les articles 323-3, 323-5 du code pénal ;

N° Parquet : 21064000646 - N° de dossier : JIJI83123000001
MANDAT D'ARRÊT de Huzefa Hafiz ISMAIL

Copie certifiée
conforme à l'original

Jane KOCHANSKI
Anglais

SBU - LEGAL

- Complicité d'entrave au fonctionnement d'un système de traitement automatisé de données, faits prévus et réprimés par les articles 323-2, 323-5 du code pénal ;
- Extorsion en bande organisée, faits prévus et réprimés par les articles 312-6, 312-13, 312-14, 131-26-2 du code pénal ;
- Association de malfaiteurs en vue de la préparation des crimes et délits susvisés, faits prévus et réprimés par les articles 4501, 450-3, 450-5 du code pénal.

Ekaterina JDANOVA était mise en examen et placée en détention provisoire.

L'exploitation du téléphone découvert en possession d'Ekaterina JDANOVA mettait en évidence sa participation à tout le moins à deux groupes de discussion (« ACTIVITY - BADCOM BDC » et « ACTIVITY - KATYA KDT »), groupes sur lesquels des collectes ou des remises étaient proposées contre rémunération, auxquels participaient dix individus, dont notamment les individus utilisant les pseudonymes de « CEO » et « THE Q8 ».

L'exploitation des messages du groupe SIGNAL « ACTIVITY - KATYA KTD », actif durant le premier semestre 2023, conduisait à mettre en évidence de nombreuses collectes ou remises de fonds sur le territoire européen, notamment en France, en Italie, en Belgique, pour un montant total de plus de 20.000.000 d'euros, donnant lieu à compensation en cryptomonnaie.

Parallèlement, l'exploitation des conversation SKY ECC du seul SKY PIN 3DOR3D « CEO / DARKBANK » conduisait à mettre en évidence, entre novembre 2020 et février 2021 (cessation du fonctionnement du système en mars 2021), des collectes ou remises d'espèces là encore sur l'ensemble du territoire européen (France, Belgique, Pays-Bas, Italie, Royaume-Uni). faisant intervenir "3DOR3D / CEO-DARKBANK" et d'autres utilisateurs de cette solution, dans le cadre d'opérations de compensation, ce à tout le moins pour une somme dépassant les 50.000.000 euros - s'agissant des collectes/remises de fonds susceptibles d'être liées à Ekaterina JDANOVA.

Au vu des messages échangés par le SKY PIN 3DOR3D « CEO /DARKBANK » et de l'utilisation de ce système de communication, les investigations ont conduit à identifier cet individu comme étant :



Huzefa Hafiz ISMAIL,
né le ░░░░ 1983,
de nationalité américaine ,
titulaire notamment d'un passeport ░░░░7428
établi à DUBAI depuis le 4 janvier 2017,
ayant obtenu un golden visa ░░░░037
et ayant pour EMIRATE UNIFED NUMBER le ░░░░097.

En effet il apparaissait des messages échangés que l'utilisateur du SKY PIN "3DOR3D / CEO-DARKBANK", également utilisateurs des SKY PIN RARK9J et 3TFFI7 :
- exposait avoir une ex-compagne de nationalité russe, ce qui est le cas d' Huzefa Hafiz ISMAIL ;
- avait séjourné en TURQUIE du 14 au 22 février 2021, empruntant des vols DUBAI-ISTANBUL / ISTANBUL-DUBAI sur lesquels figurait Huzefa Hafiz ISMAIL ;

Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000139

- annonçait à un de ses ██████████ants son indisponibilité en raison de la naissance d'un nouvel enfant entre le ████████ et le ██████ 2021, ce alors que Huzefa Hafiz ISMAIL se trouve père de ██████ ██ée le ██████ 2021.

Attendu que l'intéressé réside hors du territoire de la République,

Qu'au vu de la nature des faits elle-même, de leur ampleur, mais aussi des éléments mis en évidence par les investigations, la délivrance du présent mandat apparaît nécessaire et proportionnée à la localisation et à l'interpellation de l'intéressé ;

**EN CONSEQUENCE :**

Mandons et ordonnons à tous officiers ou agents de police judiciaire et à tous agents de la force publique, en se conformant à la loi, de rechercher et de conduire devant Nous la personne susvisée ;

Enjoignons au directeur de la maison d'arrêt du lieu d'arrestation de la recevoir et de la détenir en état de mandat d'arrêt jusqu'à ce qu'il en soit autrement ordonné ;

Requérons tout dépositaire de la force publique auquel le présent mandat sera exhibé de prêter main-forte pour son exécution en cas de besoin ;

En cas de découverte il conviendra d'en informer immédiatement le magistrat instructeur de permanence (06.74.78.04.28)

En foi de quoi le présent mandat a été signé par Nous et scellé de notre sceau.

Le vice-président chargé de l'instruction,



N° Parquet : 21064000848 - N° de dossier : JUI83128000001
MANDAT D'ARRÊT de Huzefa Hafiz ISMAIL

Jane KOCHANSKI
Anglais
08/08/2024

Page 5/9

pie certifiée
conforme à l'original

SBU - LEGAL

**MINISTRY OF JUSTICE**
Liberty-Equality-Fraternity

**PARIS COURT OF APPEAL**
**PARIS *TRIBUNAL JUDICIAIRE* (civil court)**

---

**EUROPEAN ARREST WARRANT**

[A030] This arrest warrant has been issued by a competent judicial authority. I request that the person mentioned below be arrested and handed over to the judicial authorities for the purposes of criminal prosecution or the enforcement of a penalty or a custodial measure.

---

a) **Information relating to the individual's identity**:

[A006] Surname: **ISMAIL**

[A007] First name(s): **Huzefa Hafiz**

[A008] Maiden name, if applicable:

[A011] Alias, if applicable:

[A012] Gender: **Masculine**

[A013] Nationality: **American**

**Holder of passport** ▮7428

**Holder of golden visa:** ▮▮37 and **EMIRATE UNIFED NUMBER:** ▮▮97

[A009] Date of birth: ▮1983

[A010] Place of birth: **Unknown**

[A061] Identified residence and/or address: **without any known domicile in France**

**Established in DUBAI since January 4, 2017**

[M083] The language(s) that the wanted individual understands (if known): **unknown**

[A058] Distinctive signs/description of the wanted individual: **unknown**

[A059 and A060] Photo and fingerprints of the wanted individual, if they are available and if it is possible to communicate them, or the contact details of the person to contact in order to obtain such information or a D.N.A. profile (if this data may be communicated, but has not been included): **A photograph**

1

Vu ne varietur
Traduction conforme à l'original en langue française
4° 1847

Expert Traducteur près la Cour
07/03/2024.
Jane KOCHANSKI
Anglais
06 80 83 ▮ 35

Copie certifiée
conforme à l'original

b) **Decision on which the European arrest warrant is based**:

**[A031 and A032]** Arrest warrant or judicial decision with the same effect: **Arrest warrant issued on July 30, 2024**

**[A033]** Type: **Arrest warrant issued by Julien GAU, Vice President in charge of the investigation at the Paris *Tribunal judiciaire* (Art. 131 Code of Criminal Procedure)**

**[A035 and A036]** Enforceable judgment: **Nil**

**[A037]** Reference: **21064000646**

c) **Indications concerning the duration of the penalty**:

1 **[A034]** Maximum duration of the penalty or custodial sentence which may be pronounced for the offense/offenses committed:

**Thirty years' imprisonment**

2 **[A038]** Duration of the penalty or custodial sentence:

**[A039]** Penalty remaining to be served:

Vu ne varietur
Traduction conforme à l'original en langue française
A·18L7

Jane KOCHANSKY
Anglais

07/08/2024

**[M083] d) Indicate whether** the wanted individual attended the process in question:

1. ☐ Yes, the wanted individual attended the process in question.

2. ☐ No, the wanted individual did not attend the process in question.

3. If you have ticked the box in point 2, please confirm whether:

☐ 3.1. a) the wanted individual was notified in person on…(day/month/year) and was duly informed of the date and placed scheduled for the process in question, and if he was informed that a decision could be rendered in the event of non-attendance;

OR

☐ 3.1. b) the wanted individual was not notified in person, but was informed officially and effectively by other means of the date and place scheduled for the process which resulted in the decision, and, accordingly, it was unequivocally established that the wanted individual had been informed of the scheduled process, and was informed that a decision could be rendered in the event of non-attendance;

OR

Copie certifiée
conforme à l'original

2

SBU - LEGAL

☐ 3.2 having been informed of the process scheduled, the wanted individual had granted arrest warrant to a legal counsel who was designated either by the wanted individual or by the State, to defend him during the process, and was effectively defended by this counsel during the process;

OR

☐ 3.3 the wanted individual was notified the decision on … (day/month/year) and was expressly informed of his right to a new judgment or an appeal procedure, to which the wanted individual has the right to participate and which enables the matter to be reexamined on the merits, taking into account the new elements of evidence, and which may result in a reversal of the initial decision, and

☐ the wanted individual expressly indicated that he did not contest the decision;

OR

☐ the wanted individual did not request a new judgment or appeal procedure within the due time period;

OR



☐ 3.4. the wanted individual did not receive the notification of the decision in person, but

- that he shall personally receive such notification upon issuance, and

- once he has received it, he shall be expressly informed of his right to a new judgment and appeal procedure, to which the wanted individual is authorized to participate and which enables a reexamination of the matter on the merits, taking into consideration new elements of evidence, and may result in a reversal of the initial decision, and

- he shall be informed of the period in which he must request a new judgment or appeal procedure, i.e., 10 days.

4. If you have ticked the box in point 3.1 b), 3.2 or 3.3 above, please indicate the means of accomplishment of the relevant condition:

### e) Offense(s):

**[M083]** THIS ARREST WARRANT RELATES IN TOTAL TO **TWELVE OFFENSES.**

**[A042, A043, A044 and A045]** Description of circumstances in which the offense(s) were committed, including the moment (date and time), the place and the level of participation of the wanted individual in the offense or offenses:

Copie certifiée
conforme à l'original

3

SBU - LEGAL

EX-ISMAIL-000143

Case 4:24-mj-00656-BP    Document 27-1    Filed 01/16/25    Page 145 of 169    PageID 358

Offender of the offenses committed from June 6, 2019 to October 1, 2023 in Paris, on national territory and indivisibly in Turkey, Dubai, Spain, the Netherlands, Monaco, Switzerland, the United States, in Belgium, Germany, Italy, the United Kingdom, and since not time-barred.

The exploitation of the encrypted conversations resulting from SKYECC enabled the investigators to identify an individual using an encrypted pseudonym in order to launder funds resulting from drug trafficking. In view of the sole screen shots taken, 26 million euros appear to have been deposited in 2 months (2nd January to 27th February 2021) via 15 addresses.

Amongst the addresses identified, one of them was creditor of a bank account Binance opened in the name of Ekaterina JDANOVA, a Russian citizen residing in DUBAI. She was arrested on October 1, 2023, indicted and placed under pre-trial custody.

The exploitation of Ekaterina JDANOVA's telephone evidenced her participation in two discussion groups in which collections or receipts of funds were proposed in return for remuneration.

One of the participants used the pseudonym "CEO". The investigations enabled the identification of this individual as being: **Huzefa Hafiz ISMAIL.**

Numerous collections and issuances of funds were identified on European territory (France, Italy, Belgium) for a total amount of more than 20,000,000 euros, resulting in compensation in cryptocurrency. The individual indicted had collected between November 2020 and February 2021 funds for an amount exceeding 50,000,000 euros.

Vu ne varietur
Traduction conforme à l'original en langue française
n° 1347.

[A040 and A041] Legal type and classification of the offense(s) and applicable statutory provisions:

- **MONEY LAUNDERING: ASSISTANCE WITH THE MISLEADING JUSTIFICATION OF THE ORIGIN OF ASSETS AND INCOME OF THE PERPETRATOR OF THE UNAUTHORIZED IMPORTATION OF DRUGS AS PART OF AN ORGANIZED GANG**

Defined under ART.222-38, ART.222-36, paragraph 2, paragraph 1, ART. 222-41, ART. 132-71 of the Criminal Code, ART. L.5132-7, ART.L.5132-8 paragraph 1, ART.R.5132-74, ART.R.5132-77, ART.R.5132-78 of the Public Health Code, Art 1 of the ministerial order dated 22/02/1990.

Copie certifiée
conforme à l'original

Jane KOCHANSKI
Anglais

4

SBU - LEGAL

EX-ISMAIL-000144

Sanctioned under ART.222-38, ART.222-36, paragraph 2, ART.222-44 paragraph 1, ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50, ART.222-51, ART.131-26-2 of the Criminal Code.

## MONEY LAUNDERING: ASSISTANCE WITH THE MISLEADING JUSTIFICATION OF THE ORIGIN OF ASSETS AND INCOME OF THE PERPETRATOR OF A DRUG TRAFFICKING OFFENSE

Defined by ART. 222-38 paragraph 1, ART.222-36 paragraph 1, ART.222-37 of the Criminal Code, ART. L.5132-7 of the Public Health Code, ART.1 of the ministerial order dated 22/02/1990.

Sanctioned under ART. 222-38, ART.222-44, ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50 of the Criminal Code.

## SERIOUS MONEY LAUNDERING: PARTICIPATION AS PART OF AN ORGANIZED GANG IN AN INVESTMENT, CONCEALMENT OPERATION OR THE CONVERSION OF THE PROCEEDS OF AN OFFENSE

Defined under ART. 324-2 2°, ART.324-1 paragraph 2, ART.324-1-1, ART.132-71 of the Criminal Code.

Sanctioned under ART.324-2 paragraph 1, ART.324-3, ART.324-7, ART.324-8 of the Criminal Code.

Vu ne varietur
Traduction conforme à l'original en langue française

## EXTORTION AS PART OF AN ORGANIZED GANG

Defined under ART.312-6 paragraph 1, ART.312-1 paragraph 1, ART.132-71 of the Criminal Code.

Sanctioned under ART.312-6 paragraph 1, ART.312-13, ART.312-14, ART.131-26-2 of the Criminal Code.

## FRAUDULENT ACCESS IN AN AUTOMATED DATA PROCESSING SYSTEM

Defined under ART.323-1 paragraph 1 of the Criminal Code.

Sanctioned under ART.323-1 paragraph 1, ART.323-5 of the Criminal Code.

## FRAUDULENT RETENTION IN AN AUTOMATED DATA PROCESSING SYSTEM

Defined under ART.323-1 paragraph 1 of the Criminal Code.

Sanctioned under ART.323-1 paragraph 1, ART. 323-5 of the Criminal Code.

Copie certifiée
conforme à l'original

SBU - LEGAL

**IMPEDIMENT OF THE FUNCTIONING OF AN AUTOMATED DATA PROCESSING SYSTEM**

Defined under ART.323-2 paragraph 1 of the Criminal Code.

Sanctioned under ART.323-2 paragraph 1, ART. 323-5 of the Criminal Code.

**FRAUDULENT INTRODUCTION OF DATA IN AN AUTOMATED DATA PROCESSING SYSTEM**

Defined under ART.323-3 paragraph 1 of the Criminal Code.

Sanctioned under ART.323-3 paragraph 1, ART.323-5 of the Criminal Code.

**FRAUDULENT EXTRACTION OF DATA CONTAINED IN AN AUTOMATED DATA PROCESSING SYSTEM**

Defined under ART.323-3 paragraph 1 of the Criminal Code.

Sanctioned under ART.323-3 paragraph 1, ART.323-5 of the Criminal Code.

**PARTICIPATION IN A CRIMINAL CONSPIRACY WITH THE VIEW TO THE PREPARATION OF A CRIME**

Defined under ART.450-1 paragraph 1, paragraph 2 of the Criminal Code.

Sanctioned under ART.450-1 paragraph 2, ART.450-3, ART.450-5 of the Criminal Code.

**PARTICIPATION IN A CRIMINAL CONSPIRACY WITH THE VIEW TO THE PREPARATION OF AN OFFENSE SANCTIONED BY 10 YEARS' IMPRISONMENT**

Defined under ART.450-1 paragraph 1, paragraph 2 of the Criminal Code.

Sanctioned under ART.450-1 paragraph 2, ART.450-3, ART.450-5 of the Criminal Code.

**PARTICIPATION IN A CRIMINAL CONSPIRACY WITH THE VIEW TO THE PREPARATION OF AN OFFENSE SANCTIONED BY AT LEAST 5 YEARS' IMPRISONMENT**

Defined under ART.450-1 paragraph 1, paragraph 3 of the Criminal Code.

Sanctioned under ART.450-1 paragraph 3, ART.450-3 of the Criminal Code.

Vu ne varietur
Traduction conforme à l'original en langue française
N° 1847.

Copie certifiée
conforme à l'original

6

SBU - LEGAL

**[M083] I. Tick, as the case maybe, if it concerns one of the following offense(s) sanctioned in France by a penalty of a duration equal or greater than 3 years as defined by French law:**

☒ **Participation in a criminal organisation**

☐ Terrorism

☐ Trafficking in human beings

☐ Sexual exploitation of children and child pornography

☐ Illicit trafficking in narcotic drugs and psychotropic substances

☐ Illicit trafficking in weapons, munitions and explosives

☐ Corruption

☐ Fraud, including that affecting the financial interests of the European Union within the meaning of the Convention of 26 July 1995 on the protection of the European Communities' financial interests

☒ **Laundering of the proceeds of crime**

☐ Counterfeiting currency, including of the euro

☒ **Cybercrime**

☐ Environmental crime, including illicit trafficking in endangered animal species and in endangered plant species and varieties

☐ Facilitation of unauthorized entry and residence

☐ Murder, grievous bodily injury

☐ Illicit trade in human organs and tissue

☐ Kidnapping, illegal restraint and hostage-taking

☐ Racism and xenophobia

☐ Organized or armed robbery

☐ Illicit trafficking in cultural goods, including antiques and works of art

☐ Fraud

☒ **Extortion**

☐ Counterfeiting and piracy of products

☐ Forgery of administrative documents and trafficking

☐ Forgery of means of payment

☐ Illicit trafficking in hormonal substances and other growth promoters

☐ Illicit trafficking in nuclear or radioactive materials

☐ Trafficking in stolen vehicles

☐ Rape

☐ Arson

☐ Crimes within the jurisdiction of International Criminal Court

☐ Unlawful seizure of aircraft/ships

☐ Sabotage

7

EX-ISMAIL-000147

II. **[A044] Full description of the offense or offenses which are not included under the cases referred to in point I above:**

f) **[M083] Other relevant circumstances to the case (optional information)**:

*(NB: it is possible to include the comments on extra-territoriality, the acts suspending the statute of limitations and other consequences of the offense).*

g) **[M083] This arrest warrant is also related to the seizure and issuance of items which may be used as incriminating evidence**

This arrest warrant also relates to the seizure and issuance of the items required by the wanted individual due to the offense:

description of the items (and their location) (if known):

h) **[M083] ☐ The offense or offenses for which this arrest warrant has been issued is sanctioned by a penalty or custodial measure, a life sentence or with the effect of such penalty or measure:**

The legal system of the issuing member state provides for a revision of the penalty inflicted – upon request or at the latest after 20 years – with a view to the non-performance of this penalty or measure.

AND/OR

The French legal system provides for the application of clemency measures which may be claimed under the legislation with a view to the non-performance of this penalty.

i) **[A030] Judicial authority which issued the arrest warrant**:

**Official designation of the Court authority**: Public Prosecutor at the Paris *tribunal judiciaire*

Name of its representative: **Mrs. Natacha RATEAU**

Position (title): **Senior Deputy Public Prosecutor**

File reference: **21064000646**

Address: **Parvis du Tribunal de Paris – 75859 CEDEX 17**

Public prosecution department operator number:

Telephone no.: +33 1 70 60 80 60

Fax no.: + 33 1 44 32 78 77

Email: mandats.a2.tj-paris@justice.fr

**CONTACT DETAILS OF THE PERSON TO BE CONTACTED IN ORDER TO TAKE THE PRACTICAL MEASURES NECESSARY FOR THE INDIVIDUAL'S EXTRADITON:**

**Mrs. Natacha RATEAU, civil court magistrate**

**Telephone number (operator): +33 1 70 60 80 60**

**Fax: +33 1 44 32 78 77**

**Email: mandats.a2.tj-paris@justice.fr**

and **the national transfer department** (DAP) and Mrs. Rohra GHOLEM, head of department, Head of SNT at the following numbers:

8

Copie certifiée
conforme à l'original

Vu ne varietur
Traduction conforme à l'original en langue française

SBU - LEGAL

Mobile telephone number (operator): 00 33 681 49 77 99

Telephone number: 00 33 188 28 60 28

Email: snt.dap-ems@justice.gouv.fr

Signature of the issuing court authority (Attorney General or Public Prosecutor) or his representative:
Name: **Mrs. Natacha RATEAU**
Position (title): **Senior Deputy Public Prosecutor**
Date: **July 30, 2024**
Official stamp (if available)

Pour traduction certifiée conforme à l'original en langue française *visé ne variatur* sub numéro 1847 ; Ce jour, le 07/08/2024. Jane Kochanski







9

## ANNEXE

## TEXTES DE DEFINITION ET DE REPRESSION DES INFRACTIONS

**BLANCHIMENT: AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'IMPORTATION NON AUTORISEE DE STUPEFIANTS EN BANDE ORGANISEE**
Définie par ART.222-38, ART.222-36 AL.2, AL.1, ART.222-41, ART.132-71 C.PENAL. ART.L.5132-7, ART.L.5132-8 AL.1, ART.R.5132-74, ART.R.5132-77, ART.R.5132-78 C.SANTE.PUB. ART.1 ARR.MINIST DU 22/02/1990.
Réprimée par ART.222-38, ART.222-36 AL.2, ART.222-44 §I, ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50, ART.222-51, ART.131-26-2 C.PENAL.

**BLANCHIMENT: AIDE A LA JUSTIFICATION MENSONGERE DE L'ORIGINE DES BIENS ET REVENUS DE L'AUTEUR D'UN DELIT DE TRAFIC DE STUPEFIANTS**
Définie par ART.222-38 AL.1, ART.222-36 AL.1, ART.222-37 C.PENAL. ART.L.5132-7 C.SANTE.PUB. ART.1 ARR.MINIST DU 22/02/1990.
Réprimée par ART.222-38, ART.222-44, ART.222-45, ART.222-47, ART.222-48, ART.222-49, ART.222-50 C.PENAL.

Article 222-36 du code pénal
L'importation ou l'exportation illicites de stupéfiants sont punies de dix ans d'emprisonnement et de 7 500 000 euros d'amende.

Ces faits sont punis de trente ans de réclusion criminelle et de 7 500 000 euros d'amende lorsqu'ils sont commis en bande organisée.

Les deux premiers alinéas de l'article 132-23 relatif à la période de sûreté sont applicables aux infractions prévues par le présent article.

Les personnes physiques ou morales coupables du délit prévu à la présente section encourent également la peine complémentaire suivante : interdiction de l'activité de prestataire de formation professionnelle continue au sens de l'article L. 6313-1 du code du travail pour une durée de cinq ans.

Article 222-37 du code pénal
Le transport, la détention, l'offre, la cession, l'acquisition ou l'emploi illicites de stupéfiants sont punis de dix ans d'emprisonnement et de 7 500 000 euros d'amende.

Est puni des mêmes peines le fait de faciliter, par quelque moyen que ce soit, l'usage illicite de stupéfiants, de se faire délivrer des stupéfiants au moyen d'ordonnances fictives ou de complaisance, ou de délivrer des stupéfiants sur la présentation de telles ordonnances en connaissant leur caractère fictif ou complaisant.

Les deux premiers alinéas de l'article 132-23 relatif à la période de sûreté sont applicables aux infractions prévues par le présent article.

Article 222-38 du code pénal
Est puni de dix ans d'emprisonnement et de 750 000 euros d'amende le fait de faciliter, par tout moyen, la justification mensongère de l'origine des biens ou des revenus de

Copie certifiée
conforme à l'original

SBU - LEGAL

19/08/2024

N° 1359

l'auteur de l'une des infractions mentionnées aux articles 222-34 à 222-37 ou d'apporter son concours à une opération de placement, de dissimulation ou de conversion du produit de l'une de ces infractions. La peine d'amende peut être élevée jusqu'à la moitié de la valeur des biens ou des fonds sur lesquels ont porté les opérations de blanchiment.

Lorsque l'infraction a porté sur des biens ou des fonds provenant de l'un des crimes mentionnés aux articles 222-34, 222-35 et 222-36, deuxième alinéa, son auteur est puni des peines prévues pour les crimes dont il a eu connaissance.
Les deux premiers alinéas de l'article 132-23 relatifs à la période de sûreté sont applicables aux infractions prévues par le présent article.

Article 222-41 du code pénal
Constituent des stupéfiants au sens des dispositions de la présente section les substances ou plantes classées comme stupéfiants en application de l'article L. 5132-7 du code de la santé publique.

Article 132-71 du code pénal
Constitue une bande organisée au sens de la loi tout groupement formé ou toute entente établie en vue de la préparation, caractérisée par un ou plusieurs faits matériels, d'une ou de plusieurs infractions.

Article L.5132-7 du code de santé publique
Les plantes, substances ou préparations vénéneuses sont classées comme stupéfiants ou comme psychotropes ou sont inscrites sur les listes I et II par décision du directeur général de l'Agence nationale de sécurité du médicament et des produits de santé, sans préjudice des dispositions réglementaires applicables aux plantes, substances ou préparations vénéneuses inscrites sur les listes I et II mentionnées au 4° de l'article L. 5132-1 contenues dans des produits autres que les médicaments à usage humain.

Article L.5132-8 du code de santé publique
La production, la fabrication, le transport, l'importation, l'exportation, la détention, l'offre, la cession, l'acquisition et l'emploi de plantes, de substances ou de préparations classées comme vénéneuses sont soumises à des conditions définies par décrets en Conseil d'Etat.
Ces décrets peuvent prohiber toute opération relative à ces plantes et substances ; ils peuvent notamment, après avis des Académies nationales de médecine et de pharmacie, interdire la prescription et l'incorporation dans des préparations de certaines de ces plantes et substances ou des spécialités qui en contiennent.
Les conditions de prescription et de délivrance de telles préparations sont fixées après avis des conseils nationaux de l'ordre des médecins et de l'ordre des pharmaciens.

R.5132-74 du code pénal
Sont interdits, à moins d'autorisation expresse, la production, la fabrication, le transport, l'importation, l'exportation, la détention, l'offre, la cession, l'acquisition ou l'emploi et, d'une manière générale, les opérations agricoles, artisanales, commerciales et industrielles relatifs aux substances ou préparations et plantes ou parties de plantes classées comme stupéfiantes, sur proposition du directeur général de l'Agence nationale de sécurité du médicament et des produits de santé, après avis de la Commission nationale des stupéfiants et des psychotropes, par arrêté du ministre chargé de la santé.

copie certifiée
conforme à l'original

Jane KOCH
Anglais

19/08/2024
SBU - LEGAL

n°1859

EX-ISMAIL-000151

Lorsque ces substances ou préparations et ces plantes ou parties de plantes sont utilisées en médecine vétérinaire, le directeur général de l'Agence nationale de sécurité du médicament et des produits de santé sollicite, préalablement à sa proposition, l'avis du directeur général de l'Agence nationale de sécurité sanitaire de l'alimentation, de l'environnement et du travail.

### R.5132-77 du code de la santé publique

L'autorisation mentionnée à l'article R. 5132-74 ne peut être accordée qu'à une personne physique. Dans les entreprises mentionnées aux articles L. 5124-2 et L. 5142-1, l'autorisation peut être demandée pour le pharmacien responsable, le pharmacien responsable intérimaire, les pharmaciens délégués et les pharmaciens adjoints ainsi que pour le vétérinaire responsable, le vétérinaire responsable intérimaire, les vétérinaires délégués et les vétérinaires adjoints. En cas d'absence des titulaires de l'autorisation pour une durée n'excédant pas quinze jours, l'autorisation bénéficie dans les mêmes conditions à ceux qui les remplacent, dûment inscrits en cette qualité au tableau de l'ordre national des pharmaciens ou au tableau de l'ordre des vétérinaires. L'autorisation indique les substances ou préparations et les plantes ou parties de plantes dont la production, la fabrication, le transport, l'importation, l'exportation, la détention, l'offre, la cession, l'acquisition ou l'emploi est autorisé.

Elle peut être assortie de conditions particulières en ce qui concerne la détention des substances ou préparations, des plantes ou parties de plantes classées comme stupéfiants et le contrôle de leur extraction, de leur fabrication et de leur transformation.

Elle fixe la quantité de stupéfiants qui peut être cédée ou remise lorsqu'elle est accordée à des fins de recherche ou d'enseignement. Toutefois aucune quantité n'est fixée pour les programmes gouvernementaux de collecte de stupéfiants à des fins de recherche en santé publique.

Elle ne peut être accordée et elle est retirée d'office à une personne condamnée pour infraction aux dispositions de la présente section ou pour usage illicite de stupéfiants.

Lorsque la substance ou la préparation est une matière première à usage pharmaceutique, l'autorisation ne peut être accordée que si l'établissement a été autorisé dans les conditions prévues à l'article L. 5138-1.

### R.5132-78 du code de la santé publique

En dehors des cas de transit ou d'emprunt du territoire douanier, il est interdit d'importer ou d'exporter des stupéfiants sans autorisation spéciale délivrée pour chaque opération par le directeur général de l'Agence nationale de sécurité du médicament et des produits de santé. Cette autorisation est délivrée dans les conditions prévues à l'article R. 5132-75. L'autorisation mentionne la dénomination et la quantité du produit faisant l'objet de l'opération, la nature et la quantité de substance stupéfiante qu'il renferme, le nom et l'adresse de l'expéditeur et du destinataire, le mode de transport, le bureau de douane.

En cas de transit ou d'emprunt du territoire douanier, la marchandise est accompagnée de l'autorisation d'exportation délivrée par l'autorité administrative compétente de l'Etat exportateur.

Les documents attestant des autorisations délivrées en application du présent article sont conservés par les titulaires de ces autorisations pendant trois ans à compter de la date de leur délivrance pour être présentés à toute réquisition des autorités de contrôle.

Par dérogation au premier alinéa, pour les établissements dont l'autorisation délivrée en application de l'article R. 5132-74 le prévoit, une autorisation peut être délivrée pour une série d'opérations par le directeur général de l'Agence nationale de sécurité du

Copie certifiée conforme à l'original

SBU - LEGAL

EX-ISMAIL-000152

médicament et des produits de santé pour les importations et les exportations des étalons de référence contenant des stupéfiants utilisés exclusivement à des fins scientifiques.

Art. ler de l'arrêté ministériel du 22 février 1990

Les conditions dans lesquelles les médicaments destinés à la médecine humaine et les produits mentionnés à l'article L. 658-11 du code de la santé publique renfermant des substances vénéneuses à des doses ou concentrations trop faibles pour être soumis aux dispositions des articles R. 5190 à R. 5219 du code de la santé publique sont celles en vigueur à la date de publication du présent arrêté.

Article 222-44 du code pénal

I.- Les personnes physiques coupables des infractions prévues aux sections 1 à 4 du présent chapitre encourent également les peines complémentaires suivantes :

1° L'interdiction, suivant les modalités prévues par l'article 131-27, soit d'exercer une fonction publique ou d'exercer l'activité professionnelle ou sociale dans l'exercice ou à l'occasion de l'exercice de laquelle l'infraction a été commise, soit, pour les infractions prévues par les articles 222-1 à 222-6,222-7,222-8,222-10, les 1° et 2° de l'article 222-14, les 1° à 3° de l'article 222-14-1, les articles 222-15,222-23 à 222-26,222-34,222-35,222-36,222-37,222-38 et 222-39, d'exercer une profession commerciale ou industrielle, de diriger, d'administrer, de gérer ou de contrôler à un titre quelconque, directement ou indirectement, pour son propre compte ou pour le compte d'autrui, une entreprise commerciale ou industrielle ou une société commerciale. Ces interdictions d'exercice peuvent être prononcées cumulativement ;

2° L'interdiction de détenir ou de porter, pour une durée de cinq ans au plus, une arme soumise à autorisation ;

3° La suspension, pour une durée de cinq ans au plus, du permis de conduire, cette suspension pouvant être limitée à la conduite en dehors de l'activité professionnelle ; dans les cas prévus par les articles 222-19-1 et 222-20-1, la suspension ne peut pas être assortie du sursis, même partiellement, et ne peut pas être limitée à la conduite en dehors de l'activité professionnelle ; dans les cas prévus par les 1° à 6° et le dernier alinéa des articles 222-19-1 et 222-20-1, la durée de cette suspension est de dix ans au plus ;

4° L'annulation du permis de conduire avec interdiction de solliciter la délivrance d'un nouveau permis pendant cinq ans au plus ;

5° La confiscation d'un ou plusieurs véhicules appartenant au condamné ;

6° La confiscation d'une ou plusieurs armes dont le condamné est propriétaire ou dont il a la libre disposition ;

7° La confiscation de la chose qui a servi ou était destinée à commettre l'infraction ou de la chose qui en est le produit ;

8° Dans les cas prévus par les articles 222-19-1 et 222-20-1, l'interdiction de conduire certains véhicules terrestres à moteur, y compris ceux pour la conduite desquels le permis de conduire n'est pas exigé, pour une durée de cinq ans au plus ;

Copie certifiée
conforme à l'original

SBU - LEGAL 19/02/2024

Jane KOCHANSKI
Anglais

9° (Abrogé) ;

9° bis (Abrogé) ;

10° Dans les cas prévus par les articles 222-19-1 et 222-20-1, l'immobilisation, pendant une durée d'un an au plus, du véhicule dont le condamné s'est servi pour commettre l'infraction, s'il en est le propriétaire ;

11° La confiscation de l'animal ayant été utilisé pour commettre l'infraction ;

12° L'interdiction, à titre définitif ou temporaire, de détenir un animal ;

13° Dans les cas prévus par les articles 222-19-1 et 222-20-1, la confiscation du véhicule dont le condamné s'est servi pour commettre l'infraction, s'il en est le propriétaire. La confiscation du véhicule est obligatoire dans les cas prévus par les 4° et dernier alinéa de ces articles ainsi que, dans les cas prévus par les 2°, 3° et 5° des mêmes articles, en cas de récidive ou si la personne a déjà été définitivement condamnée pour un des délits prévus par les articles L. 221-2, L. 224-16, L. 234-1, L. 234-8, L. 235-1, L. 235-3, L. 413-1 du code de la route ou pour la contravention mentionnée à ce même article L. 413-1. La juridiction peut toutefois ne pas prononcer cette peine, par une décision spécialement motivée ;

14° Dans les cas prévus par les 2° et dernier alinéa des articles 222-19-1 et 222-20-1 du présent code, l'interdiction, pendant une durée de cinq ans au plus, de conduire un véhicule qui ne soit pas équipé par un professionnel agréé ou par construction d'un dispositif d'anti-démarrage par éthylotest électronique, homologué dans les conditions prévues à l'article L. 234-17 du code de la route. Lorsque cette interdiction est prononcée en même temps que la peine d'annulation ou de suspension du permis de conduire, elle s'applique, pour la durée fixée par la juridiction, à l'issue de l'exécution de cette peine ;

15° (Abrogé) ;

Toute condamnation pour les délits prévus par les 1° à 6° et le dernier alinéa de l'article 222-19-1 donne lieu de plein droit à l'annulation du permis de conduire avec interdiction de solliciter un nouveau permis pendant dix ans au plus.

II.- En cas de condamnation pour les crimes ou pour les délits commis avec une arme prévus aux sections 1,3,3 ter et 4 du présent chapitre, le prononcé des peines complémentaires prévues aux 2° et 6° du I est obligatoire. La durée de la peine prévue au 2° du I est portée à quinze ans au plus.

Toutefois, la juridiction peut, par une décision spécialement motivée lorsque la condamnation est prononcée par une juridiction correctionnelle, décider de ne pas prononcer ces peines, en considération des circonstances de l'infraction et de la personnalité de son auteur.

Article 222-45 du code pénal
Les personnes physiques coupables des infractions prévues par les sections 1, 3 bis, 3 et 4 encourent également les peines suivantes :

SBU - LEGAL

1° L'interdiction, suivant les modalités prévues par l'article 131-26, des droits civiques, civils et de famille ;

2° L'interdiction, suivant les modalités prévues par l'article 131-27, d'exercer une fonction publique ;

3° L'interdiction d'exercer, soit à titre définitif, soit pour une durée de dix ans au plus, une activité professionnelle ou bénévole impliquant un contact habituel avec des mineurs.

Article 222-47 du code pénal
Dans les cas prévus par les articles 222-1 à 222-15,222-23 à 222-30 et 222-34 à 222-40, peut être prononcée à titre de peine complémentaire l'interdiction de séjour, suivant les modalités prévues par l'article 131-31.
Dans les cas prévus aux articles 222-7 à 222-13 et 222-14-2, lorsque les faits sont commis lors du déroulement de manifestations sur la voie publique, peut être prononcée la peine complémentaire d'interdiction de participer à des manifestations sur la voie publique, dans les conditions prévues à l'article 131-32-1.
Dans les cas prévus par les articles 222-23 à 222-30, lorsqu'ils sont commis sur des mineurs, par le 6° bis des articles 222-3,222-8,222-10,222-12 et 222-13, par l'article 222-14-4 et par les articles 222-34 à 222-40, peut être également prononcée l'interdiction, pour une durée de cinq ans au plus, de quitter le territoire de la République.

Article 222-48 du code pénal
L'interdiction du territoire français peut être prononcée dans les conditions prévues par l'article 131-30, soit à titre définitif, soit pour une durée de dix ans au plus, à l'encontre de tout étranger coupable de l'une des infractions définies aux articles 222-1 à 222-12,222-14,222-14-1,222-14-4,222-15,222-15-1,222-23 à 222-31 et 222-34 à 222-40.

Article 222-49 du code pénal
Dans les cas prévus par les articles 222-34 à 222-40, doit être prononcée la confiscation des installations, matériels et de tout bien ayant servi, directement ou indirectement, à la commission de l'infraction, ainsi que tout produit provenant de celle-ci, à quelque personne qu'ils appartiennent et en quelque lieu qu'ils se trouvent, dès lors que leur propriétaire ne pouvait en ignorer l'origine ou l'utilisation frauduleuse.
Dans les cas prévus par les articles 222-34, 222-35, 222-36, 222-37 et 222-38, peut également être prononcée la confiscation de tout ou partie des biens du condamné ou, sous réserve des droits du propriétaire de bonne foi, dont il a la libre disposition, quelle qu'en soit la nature, meubles ou immeubles, divis ou indivis.

Article 222-50 du code pénal
Les personnes physiques ou morales coupables de l'une des infractions prévues par les articles 222-34 à 222-40 encourent également les peines complémentaires suivantes :
1° Le retrait définitif de la licence de débit de boissons ou de restaurant ;
2° La fermeture, à titre définitif ou pour une durée de cinq ans au plus, de tout établissement ouvert au public ou utilisé par le public dans lequel ont été commises, par l'exploitant ou avec la complicité de celui-ci, les infractions définies par ces articles."
Article 222-51 du code pénal

Copie certifiée
conforme à l'original

Jane KOCHANSKI
Traducteur Anglais

SBU - LEGAL

La fermeture temporaire prévue par l'article 222-50 emporte suspension de la licence de débit de boissons ou de restaurant pour la même durée. Le délai de péremption de celle-ci est suspendu pendant la durée de la fermeture.

La fermeture définitive prévue par l'article 222-50 emporte retrait définitif de la licence de débit de boissons ou de restaurant.

Article 131-26-2 du code pénal

I. – Le prononcé de la peine complémentaire d'inéligibilité mentionnée au 2° de l'article 131-26 et à l'article 131-26-1 est obligatoire à l'encontre de toute personne coupable d'un délit mentionné au II du présent article ou d'un crime.

Cette condamnation est mentionnée au bulletin n° 2 du casier judiciaire prévu à l'article 775 du code de procédure pénale pendant toute la durée de l'inéligibilité.

II. – Les délits pour lesquels l'inéligibilité est obligatoirement prononcée sont les suivants :

1° Les délits prévus aux articles 222-9,222-11,222-12,222-14,222-14-1,222-14-4,222-14-5,222-15,222-15-1 et 222-27 à 222-33-2-2 du présent code ;

2° Les délits prévus aux articles 225-1 à 225-2 ;

3° Les délits prévus aux articles 313-1,313-2 et 314-1 à 314-3, ainsi que leur recel ou leur blanchiment ;

4° Les délits prévus au chapitre Ier du titre II du livre IV ;

5° Les délits prévus aux articles 432-10 à 432-15,433-1 et 433-2,434-9,434-9-1,434-43-1,435-1 à 435-10 et 445-1 à 445-2-1, ainsi que leur recel ou leur blanchiment ;

6° Les délits prévus aux articles 441-2 à 441-6, ainsi que leur recel ou leur blanchiment ;

7° Les délits prévus aux articles L. 86 à L. 88-1, L. 91 à L. 104, L. 106 à L. 109, L. 111, L. 113 et L. 116 du code électoral ;

8° Les délits prévus aux articles 1741 et 1743 du code général des impôts, lorsqu'ils sont commis en bande organisée ou lorsqu'ils résultent de l'un des comportements mentionnés aux 1° à 5° du II de l'article L. 228 du livre des procédures fiscales, ainsi que leur recel ou leur blanchiment ;

9° Les délits prévus aux articles L. 465-1 à L. 465-3-3 du code monétaire et financier, ainsi que leur recel ou leur blanchiment ;

10° Les délits prévus aux articles L. 241-3 et L. 242-6 du code de commerce, ainsi que leur recel ou leur blanchiment ;

11° Les délits prévus à l'article L. 113-1 du code électoral et à l'article 11-5 de la loi n° 88-227 du 11 mars 1988 relative à la transparence financière de la vie politique ;

12° Les délits prévus au I de l'article LO 135-1 du code électoral et à l'article 26 de la loi n° 2013-907 du 11 octobre 2013 relative à la transparence de la vie publique ;

14° Le délit de participation à une association de malfaiteurs prévu à l'article 450-1 du présent code, lorsqu'il a pour objet un crime ou un délit mentionné aux 1° à 13° du présent II.

III. – Toutefois, la juridiction peut, par une décision spécialement motivée, décider de ne pas prononcer la peine prévue par le présent article, en considération des circonstances de l'infraction et de la personnalité de son auteur.

Copie certifiée conforme à l'original

n° 1859

19/08/2024

SBU - LEGAL

**BLANCHIMENT AGGRAVE : CONCOURS EN BANDE ORGANISEE A UNE OPERATION DE PLACEMENT, DISSIMULATION OU CONVERSION DU PRODUIT D'UN DELIT**

Définie par ART.324-2 2°, ART.324-1 AL.2, ART.324-1-1, ART.132-71 C.PENAL.
Réprimée par ART.324-2 AL.1, ART.324-3, ART.324-7, ART.324-8 C.PENAL.

Article 324-1 du code pénal

Le blanchiment est le fait de faciliter, par tout moyen, la justification mensongère de l'origine des biens ou des revenus de l'auteur d'un crime ou d'un délit ayant procuré à celui-ci un profit direct ou indirect.

Constitue également un blanchiment le fait d'apporter un concours à une opération de placement, de dissimulation ou de conversion du produit direct ou indirect d'un crime ou d'un délit.

Le blanchiment est puni de cinq ans d'emprisonnement et de 375 000 euros d'amende.

Article 324-1-1 du code pénal

Pour l'application de l'article 324-1, les biens ou les revenus sont présumés être le produit direct ou indirect d'un crime ou d'un délit dès lors que les conditions matérielles, juridiques ou financières de l'opération de placement, de dissimulation ou de conversion ne peuvent avoir d'autre justification que de dissimuler l'origine ou le bénéficiaire effectif de ces biens ou revenus.

Article 324-2 du code pénal

Le blanchiment est puni de dix ans d'emprisonnement et de 750 000 euros d'amende :
1° Lorsqu'il est commis de façon habituelle ou en utilisant les facilités que procure l'exercice d'une activité professionnelle ;
2° Lorsqu'il est commis en bande organisée.

Article 132-71 du code pénal
*Cf. ci-avant cité.*

Article 324-3 du code pénal

Les peines d'amende mentionnées aux articles 324-1 et 324-2 peuvent être élevées jusqu'à la moitié de la valeur des biens ou des fonds sur lesquels ont porté les opérations de blanchiment.

Article 324-7 du code pénal

Les personnes physiques coupables des infractions définies aux articles 324-1 et 324-2 encourent également les peines complémentaires suivantes :

1° L'interdiction, suivant les modalités prévues par l'article 131-27, soit d'exercer une fonction publique ou d'exercer l'activité professionnelle ou sociale dans l'exercice ou à l'occasion de l'exercice de laquelle l'infraction a été commise, cette interdiction étant définitive ou provisoire dans le cas prévu à l'article 324-2 et pour une durée de cinq ans au plus dans le cas prévu à l'article 324-1, soit d'exercer une profession commerciale ou industrielle, de diriger, d'administrer, de gérer ou de contrôler à un titre quelconque, directement ou indirectement, pour son propre compte ou pour le compte d'autrui, une entreprise commerciale ou industrielle ou une société commerciale. Ces interdictions d'exercice peuvent être prononcées cumulativement ;

2° L'interdiction de détenir ou de porter, pour une durée de cinq ans au plus, une arme soumise à autorisation ;

Copie certifiée
conforme à l'original

Jane KOCHANSKI
Anglais                              15/08/2024

n°1859

SBU - LEGAL

3° L'interdiction, pour une durée de cinq ans au plus, d'émettre des chèques autres que ceux qui permettent le retrait de fonds par le tireur auprès du tiré ou ceux qui sont certifiés et d'utiliser les cartes de paiement ;

4° La suspension, pour une durée de cinq ans au plus, du permis de conduire, cette suspension pouvant être limitée à la conduite en dehors de l'activité professionnelle ;

5° L'annulation du permis de conduire avec l'interdiction de solliciter la délivrance d'un nouveau permis pendant cinq ans au plus ;

6° La confiscation d'un ou plusieurs véhicules appartenant au condamné

7° La confiscation d'une ou plusieurs armes dont le condamné est le propriétaire ou dont il a la libre disposition ;

8° La confiscation de la chose qui a servi ou était destinée à commettre l'infraction ou de la chose qui en est le produit, à l'exception des objets susceptibles de restitution ;

9° L'interdiction, suivant les modalités prévues aux articles 131-26 et 131-26-1, des droits civiques, civils et de famille ;

10° L'interdiction de séjour suivant les modalités prévues par l'article 131-31 ;

11° L'interdiction, pour une durée de cinq ans au plus, de quitter le territoire de la République

12° La confiscation de tout ou partie des biens du condamné ou, sous réserve des droits du propriétaire de bonne foi, dont il a la libre disposition, quelle qu'en soit la nature, meubles ou immeubles, divis ou indivis.

Article 324-8 du Code pénal
L'interdiction du territoire français peut être prononcée dans les conditions prévues par l'article 131-30, soit à titre définitif, soit pour une durée de dix ans au plus, à l'encontre de tout étranger coupable de l'une des infractions définies aux articles 324-1 et 324-2.

**EXTORSION EN BANDE ORGANISEE**
Définie par ART.312-6 AL.1, ART.312-1 AL.1, ART.132-71 C.PENAL.
Réprimée par ART.312-6 AL.1, ART.312-13, ART.312-14, ART.131-26-2 C.PENAL.

Article 312-1 du code pénal
L'extorsion est le fait d'obtenir par violence, menace de violences ou contrainte soit une signature, un engagement ou une renonciation, soit la révélation d'un secret, soit la remise de fonds, de valeurs ou d'un bien quelconque.

L'extorsion est punie de sept ans d'emprisonnement et de 100 000 euros d'amende.

Article 312-6 du code pénal
L'extorsion en bande organisée est punie de vingt ans de réclusion criminelle et de 150 000 euros d'amende.

Elle est punie de trente ans de réclusion criminelle et de 150 000 euros d'amende lorsqu'elle est précédée, accompagnée ou suivie de violences sur autrui ayant entraîné une mutilation ou une infirmité permanente.

Elle est punie de la réclusion criminelle à perpétuité lorsqu'elle est commise soit avec usage ou menace d'une arme, soit par une personne porteuse d'une arme soumise à autorisation ou dont le port est prohibé.

Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000158

Les deux premiers alinéas de l'article 132-23 relatif à la période de sûreté sont applicables aux infractions prévues par le présent article.

Article 132-71 du code pénal
*Cf. ci-avant mentionné*

Article 312-13 du code pénal
I. – Les personnes physiques coupables de l'une des infractions prévues au présent chapitre encourent également les peines complémentaires suivantes :

1° L'interdiction des droits civiques, civils et de famille, suivant les modalités prévues par l'article 131-26 ;

2° L'interdiction, suivant les modalités prévues par l'article 131-27, soit d'exercer une fonction publique ou d'exercer l'activité professionnelle ou sociale dans l'exercice ou à l'occasion de l'exercice de laquelle l'infraction a été commise, cette interdiction étant définitive ou provisoire dans les cas prévus aux articles 312-3 à 312-7 et pour une durée de cinq ans au plus dans les cas prévus aux articles 312-1, 312-2 et 312-10, soit d'exercer une profession commerciale ou industrielle, de diriger, d'administrer, de gérer ou de contrôler à un titre quelconque, directement ou indirectement, pour son propre compte ou pour le compte d'autrui, une entreprise commerciale ou industrielle ou une société commerciale. Ces interdictions d'exercice peuvent être prononcées cumulativement ;

3° (Abrogé) ;

4° La confiscation de la chose qui a servi ou était destinée à commettre l'infraction ou de la chose qui en est le produit, à l'exception des objets susceptibles de restitution ;

5° L'interdiction de séjour suivant les modalités prévues par l'article 131-31.

II. – En cas de condamnation pour les infractions prévues au présent chapitre, le prononcé de la peine complémentaire d'interdiction de détenir ou de porter, pour une durée de cinq ans au plus, une arme soumise à autorisation est obligatoire.

Toutefois, la juridiction peut, par une décision spécialement motivée lorsque la condamnation est prononcée par une juridiction correctionnelle, décider de ne pas prononcer cette peine, en considération des circonstances de l'infraction et de la personnalité de son auteur.

Article 312-14 du code pénal
L'interdiction du territoire français peut être prononcée dans les conditions prévues par l'article 131-30, soit à titre définitif, soit pour une durée de dix ans au plus, à l'encontre de tout étranger coupable de l'une des infractions définies à la section 1 du présent chapitre.

Article 131-26-2 du code pénal
*Cf. ci-avant mentionné*

Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000159

**ACCES FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-1 AL.1 C.PENAL.
Réprimée par ART.323-1 AL.1, ART.323-5 C.PENAL.

**MAINTIEN FRAUDULEUX DANS UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES**
Définie par ART.323-1 AL.1 C.PENAL.
Réprimée par ART.323-1 AL.1, ART.323-5 C.PENAL.

Article 323-1 du code pénal
Le fait d'accéder ou de se maintenir, frauduleusement, dans tout ou partie d'un système de traitement automatisé de données est puni de trois ans d'emprisonnement et de 100 000 € d'amende.

Lorsqu'il en est résulté soit la suppression ou la modification de données contenues dans le système, soit une altération du fonctionnement de ce système, la peine est de cinq ans d'emprisonnement et de 150 000 € d'amende.

Lorsque les infractions prévues aux deux premiers alinéas ont été commises à l'encontre d'un système de traitement automatisé de données à caractère personnel mis en œuvre par l'Etat, la peine est portée à sept ans d'emprisonnement et à 300 000 € d'amende.

Article 323-5 du code pénal
Les personnes physiques coupables des délits prévus au présent chapitre encourent également les peines complémentaires suivantes :

1° L'interdiction, pour une durée de cinq ans au plus, des droits civiques, civils et de famille, suivant les modalités de l'article 131-26 ;

2° L'interdiction, pour une durée de cinq ans au plus, d'exercer une fonction publique ou d'exercer l'activité professionnelle ou sociale dans l'exercice de laquelle ou à l'occasion de laquelle l'infraction a été commise ;

3° La confiscation de la chose qui a servi ou était destinée à commettre l'infraction ou de la chose qui en est le produit, à l'exception des objets susceptibles de restitution ;

4° La fermeture, pour une durée de cinq ans au plus, des établissements ou de l'un ou de plusieurs des établissements de l'entreprise ayant servi à commettre les faits incriminés ;

5° L'exclusion, pour une durée de cinq ans au plus, des marchés publics ;

6° L'interdiction, pour une durée de cinq ans au plus, d'émettre des chèques autres que ceux qui permettent le retrait de fonds par le tireur auprès du tiré ou ceux qui sont certifiés ;

7° L'affichage ou la diffusion de la décision prononcée dans les conditions prévues par l'article 131-35.

SBU - LEGAL

## ENTRAVE AU FONCTIONNEMENT D'UN SYSTEME DE TRAITEMENT AUTOMATISE DE DONNEES
Définie par ART.323-2 AL.1 C.PENAL.
Réprimée par ART.323-2 AL.1, ART.323-5 C.PENAL.

Article 323-2 du code pénal
Le fait d'entraver ou de fausser le fonctionnement d'un système de traitement automatisé de données est puni de cinq ans d'emprisonnement et de 150 000 € d'amende.

Lorsque cette infraction a été commise à l'encontre d'un système de traitement automatisé de données à caractère personnel mis en œuvre par l'Etat, la peine est portée à sept ans d'emprisonnement et à 300 000 € d'amende.

Article 323-5 du code pénal
*Cf. ci-avant mentionné.*

## EXTRACTION FRAUDULEUSE DE DONNEES CONTENUES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE
Définie par ART.323-3 AL.1 C.PENAL.
Réprimée par ART.323-3 AL.1, ART.323-5 C.PENAL.

## INTRODUCTION FRAUDULEUSE DE DONNEES DANS UN SYSTEME DE TRAITEMENT AUTOMATISE
Définie par ART.323-3 AL.1 C.PENAL.
Réprimée par ART.323-3 AL.1, ART.323-5 C.PENAL.

Article 323-3 du code pénal
Le fait d'introduire frauduleusement des données dans un système de traitement automatisé, d'extraire, de détenir, de reproduire, de transmettre, de supprimer ou de modifier frauduleusement les données qu'il contient est puni de cinq ans d'emprisonnement et de 150 000 € d'amende.

Lorsque cette infraction a été commise à l'encontre d'un système de traitement automatisé de données à caractère personnel mis en œuvre par l'Etat, la peine est portée à sept ans d'emprisonnement et à 300 000 € d'amende.

Article 323-5 du code pénal
*Cf. ci-avant mentionné.*

## PARTICIPATION A UNE ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN CRIME
Définie par ART.450-1 AL.1, AL.2 C.PENAL.
Réprimée par ART.450-1 AL.2, ART.450-3, ART.450-5 C.PENAL.

## PARTICIPATION A ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI DE 10 ANS D'EMPRISONNEMENT
Définie par ART.450-1 AL.1, AL.2 C.PENAL.

Copie certifiée conforme à l'original

EX-ISMAIL-000161

Réprimée par ART.450-1 AL.2, ART.450-3, ART.450-5 C.PENAL.

## PARTICIPATION A ASSOCIATION DE MALFAITEURS EN VUE DE LA PREPARATION D'UN DELIT PUNI D'AU MOINS 5 ANS D'EMPRISONNEMENT

Définie par ART.450-1 AL.1, AL.3 C.PENAL.
Réprimée par ART.450-1 AL.3, ART.450-3 C.PENAL.

Article 450-1 du code pénal
Constitue une association de malfaiteurs tout groupement formé ou entente établie en vue de la préparation, caractérisée par un ou plusieurs faits matériels, d'un ou plusieurs crimes ou d'un ou plusieurs délits punis d'au moins cinq ans d'emprisonnement.

Lorsque les infractions préparées sont des crimes ou des délits punis de dix ans d'emprisonnement, la participation à une association de malfaiteurs est punie de dix ans d'emprisonnement et de 150 000 euros d'amende.

Lorsque les infractions préparées sont des délits punis d'au moins cinq ans d'emprisonnement, la participation à une association de malfaiteurs est punie de cinq ans d'emprisonnement et de 75 000 euros d'amende.

Article 450-3 du code pénal
Les personnes physiques coupables de l'infraction prévue par l'article 450-1 encourent également les peines complémentaires suivantes :

1° L'interdiction des droits civiques, civils et de famille, suivant les modalités prévues par l'article 131-26 ;

2° L'interdiction, suivant les modalités prévues par l'article 131-27, soit d'exercer une fonction publique ou d'exercer l'activité professionnelle ou sociale dans l'exercice ou à l'occasion de l'exercice de laquelle l'infraction a été commise, soit d'exercer une profession commerciale ou industrielle, de diriger, d'administrer, de gérer ou de contrôler à un titre quelconque, directement ou indirectement, pour son propre compte ou pour le compte d'autrui, une entreprise commerciale ou industrielle ou une société commerciale. Ces interdictions d'exercice peuvent être prononcées cumulativement ;

3° L'interdiction de séjour, suivant les modalités prévues par l'article 131-31.

Peuvent être également prononcées à l'encontre de ces personnes les autres peines complémentaires encourues pour les crimes et les délits que le groupement ou l'entente avait pour objet de préparer.

Article 450-5 du code pénal
Les personnes physiques et morales reconnues coupables des infractions prévues au deuxième alinéa de l'article 450-1 et à l'article 321-6-1 encourent également la peine complémentaire de confiscation de tout ou partie des biens leur appartenant ou, sous réserve des droits du propriétaire de bonne foi, dont elles ont la libre disposition, quelle qu'en soit la nature, meubles ou immeubles, divis ou indivis



Copie certifiée
conforme à l'original

**ANNEXE**

## TEXTES DE PRESCRIPTION ET DE COMPETENCE JURIDICTIONNELLE INTERNATIONALE

- **SUR LA PRESCRIPTION DE L'ACTION PUBLIQUE**

Article 7 du code de procédure pénale
**L'action publique des crimes se prescrit par vingt années** révolues à compter du jour où l'infraction a été commise.

**L'action publique des crimes mentionnés aux articles** 706-16,**706-26** et 706-167 du présent code, aux articles 214-1 à 214-4 et 221-12 du code pénal et au livre IV bis du même code **se prescrit par trente années révolues à compter du jour où l'infraction a été commise.**

L'action publique des crimes mentionnés à l'article 706-47 du présent code, lorsqu'ils sont commis sur des mineurs, se prescrit par trente années révolues à compter de la majorité de ces derniers ; toutefois, s'il s'agit d'un viol, en cas de commission sur un autre mineur par la même personne, avant l'expiration de ce délai, d'un nouveau viol, d'une agression sexuelle ou d'une atteinte sexuelle, le délai de prescription de ce viol est prolongé, le cas échéant, jusqu'à la date de prescription de la nouvelle infraction.

L'action publique des crimes mentionnés aux articles 211-1 à 212-3 du code pénal est imprescriptible.

Article 8 du code de procédure pénale
**L'action publique des délits se prescrit par six années révolues** à compter du jour où l'infraction a été commise.

L'action publique des délits mentionnés à l'article 706-47 du présent code, lorsqu'ils sont commis sur des mineurs, à l'exception de ceux mentionnés aux articles 222-29-1 et 227-26 du code pénal, se prescrit par dix années révolues à compter de la majorité de ces derniers.

L'action publique des délits mentionnés aux articles 222-12,222-29-1 et 227-26 du même code, lorsqu'ils sont commis sur des mineurs, se prescrit par vingt années révolues à compter de la majorité de ces derniers.

Toutefois, s'il s'agit d'une agression sexuelle ou d'une atteinte sexuelle commise sur un mineur, en cas de commission sur un autre mineur par la même personne, avant l'expiration des délais prévus aux deuxième et troisième alinéas du présent article, d'une agression sexuelle ou d'une atteinte sexuelle, le délai de prescription de la première infraction est prolongé, le cas échéant, jusqu'à la date de prescription de la nouvelle infraction.

L'action publique du délit mentionné à l'article 434-3 du code pénal se prescrit, lorsque le défaut d'information concerne une agression ou un atteinte sexuelle commise sur un mineur, par dix années révolues à compter de la majorité de la victime et, lorsque le défaut d'information concerne un viol commis sur un mineur, par vingt années révolues à compter de la majorité de la victime.

Copie certifiée
conforme à l'original

Jane KOCHANSKI
Anglais
06 60
N' 1855
15/08/2024

SBU - LEGAL

EX-ISMAIL-000163

**L'action publique des délits mentionnés** à l'article 706-167 du présent code, lorsqu'ils sont punis de dix ans d'emprisonnement, ainsi que celle des délits mentionnés aux articles 706-16 du présent code, à l'exclusion de ceux définis aux articles 421-2-5 à 421-2-5-2 du code pénal, et **706-26 du présent code** et au livre IV bis du code pénal **se prescrivent par vingt années révolues à compter du jour où l'infraction a été commise.**

Article 706-26 du code de procédure pénale
Les infractions prévues par les articles 222-34 à 222-40 du code pénal, ainsi que le délit de participation à une association de malfaiteurs prévu par l'article 450-1 du même code lorsqu'il a pour objet de préparer l'une de ces infractions, sont poursuivies, instruites et jugées selon les règles du présent code, sous réserve des dispositions du présent titre.

Article 9-2 du code de procédure pénale
Le délai de prescription de l'action publique est interrompu par :

1° Tout acte, émanant du ministère public ou de la partie civile, tendant à la mise en mouvement de l'action publique, prévu aux articles 80, 82, 87, 88, 388, 531 et 532 du présent code et à l'article 65 de la loi du 29 juillet 1881 sur la liberté de la presse ;

2° Tout acte d'enquête émanant du ministère public, tout procès-verbal dressé par un officier de police judiciaire ou un agent habilité exerçant des pouvoirs de police judiciaire tendant effectivement à la recherche et à la poursuite des auteurs d'une infraction ;

3° Tout acte d'instruction prévu aux articles 79 à 230 du présent code, accompli par un juge d'instruction, une chambre de l'instruction ou des magistrats et officiers de police judiciaire par eux délégués, tendant effectivement à la recherche et à la poursuite des auteurs d'une infraction ;

4° Tout jugement ou arrêt, même non définitif, s'il n'est pas entaché de nullité.

Tout acte, jugement ou arrêt mentionné aux 1° à 4° fait courir un délai de prescription d'une durée égale au délai initial.

Le présent article est applicable aux infractions connexes ainsi qu'aux auteurs ou complices non visés par l'un de ces mêmes acte, jugement ou arrêt.

- **SUR LA COMPETENCE JURIDICTIONNELLE FRANCAISE**

Article 689 du code de procédure pénale
Les auteurs ou complices d'infractions commises hors du territoire de la République peuvent être poursuivis et jugés par les juridictions françaises soit lorsque, conformément aux dispositions du livre Ier du code pénal ou d'un autre texte législatif, la loi française est applicable, soit lorsqu'une convention internationale ou un acte pris en application du traité instituant les Communautés européennes donne compétence aux juridictions françaises pour connaître de l'infraction.

Article 113-2 du code pénal
La loi pénale française est applicable aux infractions commises sur le territoire de la République.

Copie certifiée
conforme à l'original

SBU - LEGAL

EX-ISMAIL-000164

L'infraction est réputée commise sur le territoire de la République **dès lors qu'un de ses faits constitutifs a eu lieu sur ce territoire.**

Article 113-7 du code pénal

La loi pénale française est applicable à tout crime, ainsi qu'à tout délit puni d'emprisonnement, commis par un Français ou par un étranger hors du territoire de la République lorsque la victime est de nationalité française au moment de l'infraction.

Article 113-8 du code pénal

Dans les cas prévus aux articles 113-6 et 113-7, la poursuite des délits ne peut être exercée qu'à la requête du ministère public. Elle doit être précédée d'une plainte de la victime ou de ses ayants droit ou d'une dénonciation officielle par l'autorité du pays où le fait a été commis.

Article 113-8-1 du code pénal

La plainte ou la dénonciation mentionnées à l'article 113-8 ne sont pas nécessaires lorsque la poursuite est exercée devant une juridiction pénale disposant, en application des dispositions du code de procédure pénale, d'une compétence territoriale concurrente et spécialisée s'étendant sur le ressort de plusieurs tribunaux judiciaires ou sur l'ensemble du territoire.

Copie certifiée
conforme à l'original

SBU - LEGAL

## ANNEXE

## TEXTES DE PRESCRIPTION ET DE COMPETENCE JURIDICTIONNELLE INTERNATIONALE

- **SUR LA PRESCRIPTION DE L'ACTION PUBLIQUE**

Article 7 du code de procédure pénale

**L'action publique des crimes se prescrit par vingt années** révolues à compter du jour où l'infraction a été commise.

**L'action publique des crimes mentionnés aux articles** 706-16,**706-26** et 706-167 du présent code, aux articles 214-1 à 214-4 et 221-12 du code pénal et au livre IV bis du même code **se prescrit par trente années révolues à compter du jour où l'infraction a été commise.**

L'action publique des crimes mentionnés à l'article 706-47 du présent code, lorsqu'ils sont commis sur des mineurs, se prescrit par trente années révolues à compter de la majorité de ces derniers ; toutefois, s'il s'agit d'un viol, en cas de commission sur un autre mineur par la même personne, avant l'expiration de ce délai, d'un nouveau viol, d'une agression sexuelle ou d'une atteinte sexuelle, le délai de prescription de ce viol est prolongé, le cas échéant, jusqu'à la date de prescription de la nouvelle infraction.

L'action publique des crimes mentionnés aux articles 211-1 à 212-3 du code pénal est imprescriptible.

Article 8 du code de procédure pénale

**L'action publique des délits se prescrit par six années révolues** à compter du jour où l'infraction a été commise.

L'action publique des délits mentionnés à l'article 706-47 du présent code, lorsqu'ils sont commis sur des mineurs, à l'exception de ceux mentionnés aux articles 222-29-1 et 227-26 du code pénal, se prescrit par dix années révolues à compter de la majorité de ces derniers.

L'action publique des délits mentionnés aux articles 222-12,222-29-1 et 227-26 du même code, lorsqu'ils sont commis sur des mineurs, se prescrit par vingt années révolues à compter de la majorité de ces derniers.

Toutefois, s'il s'agit d'une agression sexuelle ou d'une atteinte sexuelle commise sur un mineur, en cas de commission sur un autre mineur par la même personne, avant l'expiration des délais prévus aux deuxième et troisième alinéas du présent article, d'une agression sexuelle ou d'une atteinte sexuelle, le délai de prescription de la première infraction est prolongé, le cas échéant, jusqu'à la date de prescription de la nouvelle infraction.

L'action publique du délit mentionné à l'article 434-3 du code pénal se prescrit, lorsque le défaut d'information concerne une agression ou un atteinte sexuelle commise sur un mineur, par dix années révolues à compter de la majorité de la victime et, lorsque le défaut d'information concerne un viol commis sur un mineur, par vingt années révolues à compter de la majorité de la victime.

Copie certifiée conforme à l'original

15

Jane KOCHANSKI
Anglais
06 60 83 25 35
N°1859

19/08/2024
SBU - LEGAL

EX-ISMAIL-000166

**L'action publique des délits mentionnés** à l'article 706-167 du présent code, lorsqu'ils sont punis de dix ans d'emprisonnement, ainsi que celle des délits mentionnés aux articles 706-16 du présent code, à l'exclusion de ceux définis aux articles 421-2-5 à 421-2-5-2 du code pénal, et **706-26 du présent code** et au livre IV bis du code pénal **se prescrivent par vingt années révolues à compter du jour où l'infraction a été commise.**

Article 706-26 du code de procédure pénale
Les infractions prévues par les articles 222-34 à 222-40 du code pénal, ainsi que le délit de participation à une association de malfaiteurs prévu par l'article 450-1 du même code lorsqu'il a pour objet de préparer l'une de ces infractions, sont poursuivies, instruites et jugées selon les règles du présent code, sous réserve des dispositions du présent titre.

Article 9-2 du code de procédure pénale
Le délai de prescription de l'action publique est interrompu par :

1° Tout acte, émanant du ministère public ou de la partie civile, tendant à la mise en mouvement de l'action publique, prévu aux articles 80, 82, 87, 88, 388, 531 et 532 du présent code et à l'article 65 de la loi du 29 juillet 1881 sur la liberté de la presse ;

2° Tout acte d'enquête émanant du ministère public, tout procès-verbal dressé par un officier de police judiciaire ou un agent habilité exerçant des pouvoirs de police judiciaire tendant effectivement à la recherche et à la poursuite des auteurs d'une infraction ;

3° Tout acte d'instruction prévu aux articles 79 à 230 du présent code, accompli par un juge d'instruction, une chambre de l'instruction ou des magistrats et officiers de police judiciaire par eux délégués, tendant effectivement à la recherche et à la poursuite des auteurs d'une infraction ;

4° Tout jugement ou arrêt, même non définitif, s'il n'est pas entaché de nullité.

Tout acte, jugement ou arrêt mentionné aux 1° à 4° fait courir un délai de prescription d'une durée égale au délai initial.

Le présent article est applicable aux infractions connexes ainsi qu'aux auteurs ou complices non visés par l'un de ces mêmes acte, jugement ou arrêt.

- **SUR LA COMPETENCE JURIDICTIONNELLE FRANCAISE**

Article 689 du code de procédure pénale
Les auteurs ou complices d'infractions commises hors du territoire de la République peuvent être poursuivis et jugés par les juridictions françaises soit lorsque, conformément aux dispositions du livre Ier du code pénal ou d'un autre texte législatif, la loi française est applicable, soit lorsqu'une convention internationale ou un acte pris en application du traité instituant les Communautés européennes donne compétence aux juridictions françaises pour connaître de l'infraction.

Article 113-2 du code pénal
La loi pénale française est applicable aux infractions commises sur le territoire de la République.

16

Copie certifiée
conforme à l'original

SBU - LEGAL

L'infraction est réputée commise sur le territoire de la République **dès lors qu'un de ses faits constitutifs a eu lieu sur ce territoire.**

Article 113-7 du code pénal
*La loi pénale française est applicable à tout crime, ainsi qu'à tout délit puni d'emprisonnement, commis par un Français ou par un étranger hors du territoire de la République lorsque la victime est de nationalité française au moment de l'infraction.*

Article 113-8 du code pénal

*Dans les cas prévus aux articles 113-6 et 113-7, la poursuite des délits ne peut être exercée qu'à la requête du ministère public. Elle doit être précédée d'une plainte de la victime ou de ses ayants droit ou d'une dénonciation officielle par l'autorité du pays où le fait a été commis.*

Article 113-8-1 du code pénal

*La plainte ou la dénonciation mentionnées à l'article 113-8 ne sont pas nécessaires lorsque la poursuite est exercée devant une juridiction pénale disposant, en application des dispositions du code de procédure pénale, d'une compétence territoriale concurrente et spécialisée s'étendant sur le ressort de plusieurs tribunaux judiciaires ou sur l'ensemble du territoire.*



17

SBU - LEGAL