IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA,            )    **Case No. 4:24-mj-00656-BP**
                                     )
          Plaintiff,                 )
                                     )    Fort Worth, Texas
v.                                   )    April 1, 2025
                                     )    9:00 a.m.
HUZEFA HAFIZ ISMAIL,                 )
                                     )    EXTRADITION HEARING
          Defendant.                 )
_____)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE HAL R. RAY, JR.,
UNITED STATES MAGISTRATE JUDGE.

APPEARANCES:

For the Government:         Matthew Robert Weybrecht
                            UNITED STATES ATTORNEY'S OFFICE
                            801 Cherry Street
                            Burnett Plaza, Suite 1700, Unit 4
                            Fort Worth, TX  76102-6882
                            (817) 252-5200

For the Defendant:          Richard B. Roper, III
                            Javan Porter
                            HOLLAND & KNIGHT, LLP
                            1722 Routh Street, Suite 1500
                            Dallas, TX  75201
                            (214) 964-9500

Court Recorder:             Elsherie Moore
                            UNITED STATES DISTRICT COURT
                            510 W. 10th Street
                            Fort Worth, TX  76102
                            (817) 850-6664

Transcription Service:      Kathy Rehling
                            311 Paradise Cove
                            Shady Shores, TX  76208
                            (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

```
 1              FORT WORTH, TEXAS - APRIL 1, 2025 - 9:00 A.M.

 2         THE CLERK:  All rise.

 3         THE COURT:  Good morning.  Thank you.  Please be

 4    seated.

 5      The Court calls Cause No. 4:24-mj-656-BP-1 in the matter

 6    of the extradition request regarding Huzefa Hafiz Ismail.  Mr.

 7    Ismail is here this morning with his attorney, Mr. Richard

 8    Roper and Mr. Javan Porter.  Are you ready to proceed, Mr.

 9    Roper?

10         MR. ROPER:  Yes, Your Honor.

11         THE COURT:  Present on behalf of the United States is

12    Assistant United States Attorney Matthew Weybrecht.  Mr.

13    Weybrecht, are you ready to proceed?

14         MR. WEYBRECHT:  Yes, Your Honor.

15         THE COURT:  Mr. Weybrecht, you may do so.

16         MR. WEYBRECHT:  Thank you, Your Honor.  The United

17    States Code -- 18 United States Code 3184 lays out

18    requirements for extradition.  There are five:  the Court is

19    authorized to conduct extradition proceedings; the Court has

20    jurisdiction over the Fugitive; the treaty is in full force

21    and effect; the offenses for which the Fugitive's extradition

22    is sought are covered by the treaty; and there is probable

23    cause to believe that the Fugitive committed the charged

24    offense.

25      The Government has supplied briefing on all of these, and
```

1    it appears that the Fugitive contests only the probable cause

2    determination.  And so, unless the Court wishes to hear

3    additional arguments, I think it probably makes sense to skip

4    ahead to the probable cause and talk through that piece.

5         So, extradition, at a high level, --

6             THE COURT:  Wait just a second.

7             MR. WEYBRECHT:  Yes, Your Honor.

8             THE COURT:  Let's clear that matter up.  Mr. Roper,

9    are we talking about anything today --

10            MR. ROPER:  I'm --

11            THE COURT:  -- here other than probable cause?

12            MR. ROPER:  I'm not conceding any elements.  But I

13   think we're only going to argue those.

14        I notice from the pleadings filed by the Government, if

15   you look at the packet, the extradition packet that the

16   Government submitted, they have a bunch of offenses, the

17   French asked for a bunch of offenses.  I don't know, like 20

18   offenses.  Like, 20, 30, I mean, there's just an outrageous

19   number of offenses.

20        Now, they're only asking for extradition on the conspiracy

21   and the money laundering charge.  Okay?  But, you know, I --

22   the packet is 135-something pages, and I don't think I'm in a

23   position to concede anything.

24            THE COURT:  Okay.

25            MR. ROPER:  I'm not going to argue --

1          THE COURT:  Well, that's fine.

2          MR. ROPER:  -- anything about that.

3          THE COURT:  That's fine.  All right.

4          MR. WEYBRECHT:  All right.

5          THE COURT:  Well, then so you're going to have to go

6    through each of those five elements, Mr. Weybrecht, --

7          MR. WEYBRECHT:  Yes, sir.

8          THE COURT:  -- just for the record.

9          MR. WEYBRECHT:  So, before we get started on that,

10   I'll just answer very briefly.  I mean, the fact that the

11   Government hasn't chosen to go forward on all of the crimes

12   that France has charged, I don't see how that's particularly

13   relevant to whether the crimes charged that the Government is

14   intending to go forward on are covered by the treaty.  And so

15   we'll start with that premise.

16       So, again, at a high level, an extradition proceeding is

17   not a court proceeding.  So the Government is not required to

18   offer live testimony.  We are entitled to rely on the

19   submissions from the Government of France.

20       In addition, the ability for the Defendant to contest or

21   to provide evidence is extremely limited.  And so, to that

22   end, you know, we would again point the Court to our initial

23   brief in this case.

24       The first requirement is that the Court is authorized to

25   conduct extradition proceedings.  I think that one is well-

established, that any justice or judge of the United States or

any magistrate judge authorized to do so by a court, or any

judge of a court of record or general jurisdiction of any

state.  This Court clearly is a magistrate court of the United

States and is authorized under this district to conduct

extradition proceedings.

Second, the Court has jurisdiction.  Mr. Ismail was

arrested here in the Northern District of Texas, at DFW

Airport, and therefore the Court has jurisdiction over him.

He's currently -- he's present here today in the Northern

District as well.

Third, the treaty is in full force and effect.  So, again,

the submissions by the Government, the certification by the

State Department that's provided in the extradition packet,

would establish that the treaty between the United States and

the Government of France, along with the treaty with the EU

that amends in certain ways that treaty between the United

States and France, is in full force and effect, and we would

rely on the State Department's certification as to that.

The fourth is that the offenses for which the Fugitive's

extradition is sought are covered by the treaty.  Again, the

State Department and the Government's submissions in the

extradition packet cover this.  Money laundering, serious

money laundering, and criminal conspiracy are the three

charges that France submitted that the United States

1  Government has agreed to move forward on in terms of

2  extradition.  And the Government would point again to its

3  filings as to each one of those particular offenses related to

4  the Defendant's charged crimes in France.

5      So, for instance, the State Department declaration

6  provides that the offenses related to money laundering and

7  criminal conspiracy for which extradition is sought are

8  covered under Article II of the treaty.

9      Second, that the French money laundering and criminal

10 conspiracy offenses are punishable in France by terms of

11 imprisonment exceeding one year.

12     And third, that the conduct underlying France's charge

13 would be sufficiently punishable had it been committed in the

14 United States.  So, again, money laundering under 18 United

15 States Code § 1956; money laundering or use of proceeds of

16 specified unlawful activity under 18 United States Code §

17 1957; and then criminal conspiracy under 18 United States Code

18 § 371 would all be the equivalent.

19     And then, finally, that the extradition request is within

20 the statute of limitations in France on the charged crimes.

21     So, again, based on the State Department's certification

22 and the Government of France's submission, all four of those

23 requirements are satisfied.

24     So, with that said, moving on to the question of probable

25 cause, the Government here would rely largely on the

submissions of the packet that was submitted by France.
Again, the Government has not and is not offering any
additional evidence today.  We don't have any witnesses.  We
don't have any additional documents.  We're relying entirely
on the evidence previously submitted by the Government of
France.

So, as to the existence of the fact that this user of
3DOR3D, CEO-DARKNET was engaged in money laundering related to
drug proceeds, related to ransomware and other cyberattacks,
is well-established and supported by the records submitted by
the Government of France.

Again, I know Mr. Roper isn't conceding anything.
However, in his reply, he doesn't seem to be contesting the
fact that those crimes occurred or the evidence supporting the
occurrence of those crimes, but rather contesting the
attribution of Mr. Ismail as 3DOR3D moniker or the CEO-DARKNET
or DARKBANK moniker.

And so the Government will focus on the specific
attribution in order to answer and respond to the Fugitive's
submission, which, of course, you know, the Government would
note was filed Sunday night, prior to this.  And so, you know,
while the Government would have liked to have had more time
with this, we did find it slightly amusing that Mr. Roper
pointed to the fact that France submitted its filing towards
the end of the deadline as evidence that was somehow weak in a

1    filing that he filed Sunday night before an extradition

2    proceeding.

3         So, all that to say, again, we'll start with the premise

4    of extradition.  This is very important because it goes to the

5    fact that a fugitive facing extradition does not have the

6    right to challenge credibility of the witnesses of the foreign

7    government.  And so the premise at a high level is that the

8    Executive, with the advice and consent of the Senate, before

9    entering in a treaty, has the sole discretion to determine

10   that the courts of the foreign country with which it's

11   entering into its treaty is protective of the accused's rights

12   and provides sufficient due process.  That determination has

13   been made by entering into the treaty here with the Government

14   of France.

15        And so the Court's role here is limited, and the case law

16   that's cited in the Government's brief is supportive of the

17   fact that the Court here is not really exercising judicial

18   power at all, because the judicial power is being exercised by

19   the foreign government.  The foreign government has found that

20   there is probable cause that a crime has been committed and

21   that Mr. Ismail is the person who committed that crime.  And

22   so with that finding of the foreign court, this Court's role

23   is really a statutory role of an independent set of eyes to

24   review and ensure that probable cause exists.

25        So, again, there will be a trial.  If the Court finds that

1  there's probable cause, there will be a trial in the foreign

2  country that affords adequate due process, as determined by

3  the Executive, and that decision is entitled to deference in

4  the same way that a country that sends their individuals to

5  the United States pursuant to an extradition treaty, the

6  courts in that country are not entitled to question the

7  Court's determinations and the Court's due process here.

8      So, at this hearing, Your Honor, the Court's role is to

9  consider the evidence presented on behalf of the requesting

10  country and determine whether the legal requirements for

11  certification are met.  Again, the Fugitive's guilt or

12  innocence is not determined today.  It's, rather, determined

13  by the foreign court through -- and I'll quote here from a

14  Supreme Court case -- a trial according to the modes

15  established in the country where the crime was committed.

16  Again, Executive's determination that the foreign court's

17  modes established are sufficient and protective of due process

18  is given great weight.

19      Facts in this case.  The Government of France's submission

20  establishes probable cause to believe that Ismail committed

21  the crimes alleged in the extradition packet.  So, again, the

22  Government would focus on specifically the attribution piece

23  in this hearing.  Again, the Fugitive's right to introduce

24  evidence is limited to testimony which explains rather than

25  contradicts the demanding country's proof.  And that includes

1    the credibility of witnesses.

2        So a lot of the evidence in the packet refers to police

3    cooperation.  And Mr. Ismail contests that.  He's trying to

4    contest the credibility.  He's saying, well, there's no

5    evidence of the bias of that, of who that is, what the

6    cooperators' interests are in this.  That's not for this Court

7    to decide and that's not before the Court.  It's not a

8    consideration that this Court can consider.

9        And I would just point out, this is quite common in the

10   probable cause setting in the United States alone.  When an

11   agent comes and applies for a search warrant, they regularly

12   say an agent whom -- or, a cooperator whom the agent has

13   deemed to be credible or whom the FBI has deemed to be

14   credible.  That credibility determination is the same thing

15   that's happening here in that the foreign government is saying

16   this police cooperation is credible, and the Defendant is not

17   entitled -- the Fugitive here is not entitled to contest that.

18       And there's good reason for that, because the foreign

19   government doesn't want to make that source available or out

20   that source before trial, in the same way that the Government

21   here doesn't want to out cooperators or sources before it

22   absolutely must.

23       So let's talk specifically about the facts in this case.

24   So, there are several connections between 3DOR3D and Mr.

25   Ismail, and we'll just walk through each one.  So, Ismail's

1    child, the birthdate of his child.  Ismail's girlfriend.

2    Ismail's car.  Ismail's travel.  And so we'll focus on those.

3        So, first, Ismail's baby.  The text messages in 3DOR3D

4    establish that the person who's communicating using that

5    moniker says, I'm in the hospital with my wife, on January 11,

6    2021.  The next day he says, Sorry, bro.  Something to the

7    effect of, Sorry, bro, I was having a baby.  Or, just had a

8    little one, something to that effect, and establishing that

9    the person who was 3DOR3D had a baby that was born on or

10   around January 11, 2021.

11       Looking then at the travel records that the Government of

12   France submitted, Mr. Ismail has a baby that was born on that

13   exact same day, January 11, 2021.  Odds of a baby being born

14   on the same day, again, I'm not a statistical guru, but 365

15   days a year, one out of 365 is roughly .3 percent, less than

16   .3 percent.  Extremely unlikely that that person would have a

17   baby who happened to be born on the same day.  And that's not

18   even taking into account the year, that it would be the same

19   day on the same year, which, again, is extremely unlikely.

20       So, again, just probable cause on that alone is way above

21   the standard for probable cause.

22       Second, the person who's using 3DOR3D, the cooperator

23   stated that that person has a particular car, a Mercedes G 63.

24   Again, that cooperator's credibility, the credibility of that

25   has to be taken as true.  The fact that that happened has to

1    be deemed correct by this Court.

2         And then there's pictures, again, from -- I'm sorry.

3    Excuse me.  Let me back up.  The cooperator said that Mr.

4    Ismail had the Mercedes.  And then there are pictures from

5    3DOR3D, CEO-DARKBANK, that moniker, that show that car.  What

6    is very distinct about the car is the person who's using

7    3DOR3D is driving that car at the time.  It's actually taken

8    from the front seat, looking out the window, and then taken

9    looking at a phone down into the interior.

10        And, again, pictures of these comparisons are in the

11   extradition packet for the Court's review.

12        Again, the idea of the Russian girlfriend or Russian wife,

13   a brick is not a wall, it's not in and of itself necessarily

14   conclusive.  But the cooperation, the police cooperators'

15   evidence or police cooperators' statement is not entitled to

16   be questioned in terms of the credibility.  And so that is

17   another piece of evidence that stacks onto this.

18        And then, finally, the travel from Dubai to Turkey.  Now,

19   I know my colleague here, Mr. Roper, is going to talk about

20   all the different flights from Turkey to Dubai and how it

21   could have been a different flight or a different city or this

22   or that.  I think that kind of sails over the point here.  The

23   point is that 3DOR3D traveled from Dubai to Turkey at the same

24   time frame as the records show that Mr. Ismail traveled from

25   there.

1    And so while it's possible that two separate people, that

2    3DOR3D could have been on the exact same flights, could have

3    been on the flight from Turkey to -- or, from Ankara, Turkey

4    to Dubai, instead of from Istanbul to Dubai, those are

5    possible.  But I guess I would flip it around and say, given

6    all of the flights in the world and all of the people in the

7    world who do not go on flights, the odds of those two people

8    being on those same flights in that same time frame, even if

9    they're not the same flights, are extremely small.

10    So, again, Your Honor, this is circumstantial.  The

11    evidence here is circumstantial.  But taken as a whole, this

12    would more than satisfy the standards for probable cause.  And

13    so, for that reason, we believe that all of the elements of

14    extradition have been met and the Court should certify

15    extradition in this case.

16        THE COURT:  Let me ask you, Mr. Weybrecht.  Does the

17    Government offer any evidence, just for the record, for

18    purposes of this hearing?  Am I supposed to take judicial

19    notice of the extradition packet, or evidentiary-wise, do you

20    offer that packet and then the supplement, the supplemental

21    filing?

22        MR. WEYBRECHT:  Yes, Your Honor.  I mean, we can --

23    again, I -- formally, I'm not sure if we need to officially

24    offer it.  We filed it on the record.  But if not, the

25    Government would offer into evidence the filing, both the

1 supplemental filing and the full extradition packet that the

2 Government filed on the record in this case.

3          THE COURT:  And that would be, in this matter, it

4 would be ECF 27-1 for the extradition packet itself, and then

5 ECF No. 33, or 33 dash -- I guess 33 is the Government's

6 notice of supplementary filing, and then 33-1 is the amending

7 instrument.  Is that right?

8          MR. WEYBRECHT:  I think those are right, Your Honor.

9 I don't have it in front of me right now.  Can I check while

10 my colleague goes and then --

11          THE COURT:  Yes.

12          MR. WEYBRECHT:  -- and then answer?

13          THE COURT:  We can take that up after a while.

14          MR. WEYBRECHT:  Okay.

15          THE COURT:  Okay.  Mr. Roper?

16          MR. ROPER:  Good morning, Your Honor.

17          THE COURT:  Good morning.

18          MR. ROPER:  So, I want to take issue with what the

19 prosecutor said, that we can't contest the credibility.  I

20 cite cases, and there's a case from San Antonio, a magistrate

21 judge decision that's -- I would ask you to look at.  And it

22 says you can explain probable cause.

23          THE COURT:  Mr. Roper, would you push that microphone

24 over in front of you?

25          MR. ROPER:  Oh.

1          THE COURT:  Just so that we have you on the record.

2    Go ahead.

3          MR. ROPER:  So, the -- I take issue with it.  I don't

4    think the cases support that.  Probable cause deter... we have

5    a right to offer evidence.  We're going to -- we did in our

6    packet, and we have a couple of exhibits we want to offer.  We

7    have all right to explain probable cause.  Now, we can't say

8    -- for instance, if this were a murder case, we can't get up

9    there and say our client has a self-defense claim.  But we can

10   clear explain the probable cause.  And explaining probable

11   cause goes to the whole heart, is there probable cause?  And

12   there's a reliability determination to be made by the Court.

13   And that involves like something you do every day of the week

14   when you look at search warrants.  You know, was the police in

15   a position to see what -- you know, say it's an informant.

16   Was the informant credible?  Did he -- was he -- did he have

17   some kind of reliability to make that decision?  Was he in a

18   position to see, see where the drugs were?

19       Those are the -- probable cause determinations always

20   involve some kind of credibility and reliability standard, and

21   the whole thing is you want to make sure you have it right.

22   Looking up these pictures, I started as an AUSA before Judge

23   Tolle, Judge Sanderson, Judge McGlinchey, Judge Bleil, Judge

24   Boyle, Judge Ramirez, Judge Toliver.  Those are the folks I

25   presented warrants to my whole career as a federal prosecutor.

1   And I can tell you, they had high standards, just like I'm

2   sure you and Judge Cureton have.  And those high standards for

3   probable cause exist for a reason, because you want to ensure

4   it's reliable.

5       I'll tell you the standard, much as I lost hair preparing

6   for Judge McGlinchey, he made me a better lawyer.  And he

7   raises the standard up, so when those agents come out and

8   there's a search warrant signed, you know that there's a high

9   standard there of reliability.  And that's -- that high

10  standard applies to a determination of probable cause in this

11  case.  It's the same deal.  You have a standard to keep, and

12  it involves the determination.

13      Now, I'm telling you, this, in my opinion, it didn't

14  happen here in this case.  I don't know who it was, a young

15  Millennium Internet-bound French agent.  It's kind of junior

16  Inspector Clouseau who had prepared this submission packet,

17  and I don't think it meets that standard.  I honestly don't.

18  If you go through and look at it, first off, you know, I think

19  the Government -- I know he's not going to say this; he pretty

20  well conceded it -- there's a bunch, I don't know how many

21  offenses, 20 offenses, that they asked for permission to

22  extradite.  And most of them, they're just down to a couple,

23  really.

24      So I wanted to go through this, because the probable cause

25  determination is the key factor in this case.  And I explain

 1    it in my brief.  And I'm sorry if I go through it a little

 2    bit, because it is a complicated deal.  It's not an easy thing

 3    to go through.  And I hope you bear with me.  But I think it's

 4    important to explain the lack of probable cause.

 5        All right.  So let's talk -- and I want to -- first off, I

 6    do want to offer -- let me get up there -- B and C.  I don't

 7    think the Government has any objections to B and C.  We need

 8    to make sure they have a copy.  And Javan?

 9            MR. PORTER:  May I approach, Your Honor?

10            THE COURT:  You may.

11            MR. ROPER:  We have flight records from Dubai to

12    Istanbul and other, Ankara.  They're two of the cities.  You

13    know, there's actually 11 airports that -- international

14    airports in Dubai to Istanbul, and I'll explain the relevance

15    of it.  So we'd offer those.  And I'd want to argue about

16    those.

17            THE COURT:  Any objection, Mr. Weybrecht?

18            MR. WEYBRECHT:  No, Your Honor.

19            THE COURT:  Then Defendant's Exhibits B and C are

20    admitted.

21        (Defendant's Exhibits B and C are admitted.)

22            MR. ROPER:  Okay.  So let's go through.  So what

23    happened is, best I can tell from looking at this incredibly

24    long submission, 135 pages, single-typed, is that there was a

25    spy, a Soviet -- I mean, I say so, but Russian spy -- that was

1    arrested in Nice.  And this -- when running, looking through

2    their phone, they find this reference to this CEO-DARKBANK or,

3    you know, the username, and so they're off to the races,

4    trying to connect him to him.

5        There's really very little -- that's one of the reasons

6    I'm not going to contest it, contest it, there's rarely --

7    rarely any venue in France for this.  Certainly, there's no

8    evidence that my client ever went to France in his life.  And

9    so the -- they try to go through and figure out who this CEO

10   guy is that's doing this.  And how they got to Mr. Ismail, who

11   is -- though he was born in Orange County -- I mean, born in

12   -- I mean, raised in Orange County, a U.S. citizen in a real

13   estate business in the United States and in Dubai, somehow

14   they figured out that he -- they think he's the guy.

15       Well, they look at -- the first factor they look at is the

16   flights.  And in the submission, the French say that -- they

17   pull some texts out and they say that this CEO guy traveled --

18   one of -- he's responding to a text, and this guy says, you in

19   France -- you in Turkey?  Babes, deal done from when you were

20   in -- gone to Turkey.  Need the prior ones to your Turkey

21   trip.

22       Now, you don't know a lot from that, when it was.  You can

23   suggest it was on that day, but you don't really know for

24   sure.  That's the only evidence, really, to show that he went

25   to Turkey.  We don't know where he came from.  There's no

1    evidence of that.

2        Now, the French try to say, before this text, and this

3    would be on Page 65 of the submission, that -- they're saying

4    that CEO-DARKBANK flew from Dubai to Istanbul on February

5    14th, returning February 22nd.  Now, I've looked at that

6    packet a thousand times, and my position is that there is no

7    evidence that this CEO guy flew on those flights.  There's

8    nothing to say that.  They're guessing.

9        What it does say is that sometime he flew -- obviously,

10   before the text was done on the 24th.  But we don't know for

11   sure.  Now, they're saying it is, but there's no evidence.

12   And I can understand why they're suggesting that, because the

13   dates don't actually -- don't actually meet up.  What they do

14   do is they do it after the fact.  They look and find out that

15   Mr. Ismail did fly from Dubai to Turkey on a particular day.

16   Okay.  But there is -- but they're guessing if they match it.

17   So there's not a complete match.  Obviously, Mr. Ismail did

18   fly from Dubai to Turkey on that day back in 2021.  Okay.

19   That was what happened.

20       So they -- and they suggest it was Istanbul.  It didn't

21   say that.  And that just is another important feature of this,

22   is it only says Turkey.  Well, there are 11 airports.  I put

23   that Wiki page, the only thing I could do to find that.

24   There's 11 airports.  And it's essentially like flying from

25   Texas down to Mexico.  I mean, there's a bunch of airports.

1   And we looked at, in the submissions we submitted, we picked

2   two airports out of the eleven.  Okay.  Two airports.  And

3   there's about fift... and anyhow, Dubai is kind of the

4   economic center of that area of the country, and you can

5   imagine there's a lot of flights.  And I'll talk about Dubai a

6   little bit in this and the United Arab Emirates.  And there's

7   52 flights that go through there.  There's a lot of flights.

8   So -- I'm sorry.

9      (Off-the-record discussion.)

10      MR. ROPER:  Yeah.  That's only two airports.  Okay.

11   So there's other airports we didn't look at.  But my point is,

12   there's a lot of airports that go there.

13     And so to say that, from one flight, you can -- you can

14   make an inference that this guy was CEO-DARKBANK, certainly,

15   it's a possibility.  I'm not saying that.  But the question is

16   we're dealing with probabilities, not possibilities.  And I

17   don't believe, from the information they submit as to the

18   conduct of CEO, that is not enough to establish that he's the

19   same person.

20     Now, they do point out, they pull records from a flight

21   where Mr. Ismail and his family traveled to -- from Dubai to

22   Mumbai, which you can tell from the deal, it says -- has the

23   code for Bombay.  That's the old code.  And so they pull that

24   and they say, hmm, look at that, he had a child born around

25   the same time of that flight.

1    Now, he says it was the same day.  No, it was on the --

2    one day before.  Okay.  It wasn't the same day.  Okay.  So the

3    baby was born the 11th.  12.  But, you know, people coming

4    from Dubai, that many flights, I don't think it's that unusual

5    for a guy to have a baby born during that time period.  Now,

6    certainly, it's possible, and I'm not saying it's not

7    possible, but I don't think it's sufficiently probable to show

8    that.

9    So you've got the baby and the flight that doesn't really

10    match up.  And I submit that's all they have.  And I want to

11    go through what else they do just to try to establish it.

12    (Off-the-record discussion.)

13    MR. ROPER:  He wants me to mention again that it was

14    the day -- date of birth is the day before.  They don't match

15    up.  It's not the exact day.

16    Okay.  So let's go to this car.  So they -- so they pull

17    off from a selected text.  Of course, we don't have all the

18    texts.  We don't know how many there are, what else do they

19    say.  But the text, there is about four pictures.  Three of

20    them are this CEO guy in his car taking screenshots in the

21    front of the car.  And then there's one where he's checking

22    his phone, and you can see just a tiny bit of the interior of

23    the car.  And so, from that, they conclude that CEO was

24    driving a Brabus, which a Brabus is -- I can tell you, I

25    definitely don't have a Brabus -- the Brabus, I've learned, is

1    like the Shelby Cobra aftermarket for some high-end cars.  If

2    you go on their website, there's a bunch of Brabus upgrades

3    you can get where they aftermarketly kind of  -- I'd actually

4    say pimp out a car.  But that's what they do.  Okay.  So a

5    Brabus can be a Porsche, it can be a Mercedes, it can be some

6    other of these high-end cars that they put an aftermarket spin

7    on a car.

8         Just a second.

9         (Off-the-record discussion.)

10         MR. ROPER:  So the Brabus, they say that CEO-DARKBANK

11    was definitely driving a Brabus.  Now, they don't say it's a

12    G 63.  Now, it's possible a Brabus can be converted -- can --

13    they can take a G 63 and upgrade it to a Brabus.  But they

14    don't really say a Brabus -- a G 63.

15         Okay.  Now, why is that important?  So, the --

16         (Off-the-record discussion.)

17         MR. ROPER:  In the submission, he -- the French

18    categorize it, after looking at those photographs, they say

19    this, Your Honor.  They say, from CEO revealed -- the texts

20    there -- revealed that this user was using the same vehicle,

21    possibly a G 63 Brabus, given the vehicle's visible -- certain

22    of the characteristics.  Okay.

23         Now, it's interesting.  Why did they use the word

24    possible?  That's not my word.  That's their word.  They say

25    possibly.  And when you look at possibly, I take it to their

1    word what they mean, that it is possible that it was a Brabus.

2    How much probative value?  Just take that one comment at face

3    value.  How much probative value is a case like that?  And I

4    agree.  You can look at those pictures.  It could be a Brabus.

5    But the question is, is it any more than that?

6        And then it's compounded by the fact that to show --

7    there's the screenshots from this guy.  And then they go back

8    and try to prove it's Ismail.  Okay.  So how do they do that?

9    Do they get Motor Vehicle records normally like you do?  It

10   would take those French five minutes to call the Dubai folks

11   and get the records.  We got the records.  Now, albeit it was,

12   you know, we just got them recently.  We can't go back and --

13   we were not able to go back and find them in 2021.  Now, maybe

14   the police do it, but we couldn't.  But it didn't take much to

15   get the records.  So do they do that?  Nope.  They don't do

16   that.

17       So they say they had, from an analysis of the messages,

18   and they go back even before that, all the way back to a prior

19   version of this encrypted messaging app, you know, they had

20   the Sky ECC encrypted messaging app, and then they go back to

21   a prior version of that.  And they say it reveals that the

22   user of the vehicle that could -- again, not my words; their

23   words -- could correspond to a G 63 Mercedes.  They don't say

24   Brabus.  Now they're just saying G 63.  Could correspond to a

25   G 63.  I don't think could establishes probable cause.  While

1   police cooperation revealed that Ismail was the owner of

2   several luxury vehicles, including a G 63.  Now, they don't

3   say it was a Brabus aftermarket version.  I think that's

4   incredible.  But police cooperation.

5       Now, the prosecutor tried to put a spin on it.  Police

6   cooperation.  That's good enough.  I submit it's not.  We

7   don't know what -- what does police cooperation mean?  I don't

8   think you've ever seen a search warrant -- I venture you

9   haven't -- where a federal agent gets to go -- swears to

10  something where he says, oh, police cooperation showed that

11  this guy had 10 kilograms of cocaine in his house.  No federal

12  agent is going to do that.  And I'm sure Mr. Weybrecht, the

13  quality of the prosecutor he is, he wouldn't submit anything

14  like that to you.

15      Police cooperation doesn't really tell you anything.  Is

16  it another law enforcement agency cooperating?  We don't know

17  that.  Is it an informant?  Okay.  Say it's an informant.  How

18  do we know, is that informant reliable?  Has he seen that

19  information before?  Has he -- what's his past track record?

20  Has he given information before?

21      So you're left to guess as to -- and maybe that's good

22  enough to go for French.  I don't think so, but my point is

23  it's not probable that he even owns a Brabus.  I haven't seen

24  any evidence of it.  They don't even say that.  And, you know,

25  even if he were to own the G 63, that doesn't mean it's the

upgraded version.

So I submit to you that the evidence of the -- this Brabus that Ismail and CEO own, you know, is like a direct match, it's not even there.  It's a possibility, but we deal with probabilities.  Okay.

And, again, I got the records pretty quickly.  It doesn't show he owns a G 63.  And if it's that easy, then does that really set the standard?

Now, let's go through this allegation -- and I don't know if you see, Your Honor, the -- Mr. Ismail's wife is here. Please stand up for me.  And then his brother and his mother and his grandmother are here in court.  Okay.  But they talk about a Russian girlfriend or something, and so let's talk about the evidence about that.

They say -- and here we go -- you would think, well, you know, they have an informant again and they hung out with this guy, he's talking about a Russian girlfriend, Ismail is, and they've got photos or something.  No.  They have this one statement:  Intelligence gathered through police cooperation revealed that Ismail, Huzefa, had two girlfriends, one of Indian nationality, with whom he would have one of -- with whom he would have one of Russian nationality.  You know, the translation may be a little stupid, but, you know, look, it's the French's translation, not ours.  And I think the Government is bound by that translation.  Police coop... there

1    we go, the same word, police cooperation.  Okay.  Now, who is,

2    again, who -- is it the police?  Who are the police that

3    cooperated?  How do they know this?  What's the basis of their

4    information?  Is it another informant?  Okay.  Well, is that

5    informant reliable?  Have they provided information in the

6    past?

7         There's just no ability, Your Honor, for you to get and

8    try and make a probable cause determination to be able to draw

9    any inferences from that.  It's just too vague.

10        So I don't think the Russian -- you know, the idea is,

11   man, we got a match.  We got CEO here and right next to him is

12   that Russian girlfriend he has.  He's good to go.  It doesn't

13   say that.

14        Now, they do -- then they -- then they go in, and the

15   prosecutor didn't mention this, but they try to connect him,

16   because there's these 12 nicknames that are attributed to him.

17   Some of them have nothing to do with Ismail.  One of them is,

18   like, Mexicans.  Like, the guy's not from Mexico.  There's no

19   evidence he had anything to do with Mexico.  I think that's

20   key.

21        But then they focus in on one that says he has a watch

22   company.  And then they include the URL for this -- which is a

23   legitimate website that Mr. Ismail and his brothers have for

24   their real estate business.  And you go back and look at,

25   there's not one -- it talks about real estate.  It doesn't

1    talk about watches.  And they try to establish that.

2        And look, let's just be frank.  I know why they're doing

3    it.  They know they don't really have any evidence, so they're

4    trying to set up a bunch of disparate facts to try to show a

5    connection.  Nothing I've seen that any -- besides this vague

6    police cooperation has anything to do with Ismail.

7        Now, then they go, oh, man, we've got him here.  One of

8    the nick -- one of the 12 nicknames is CEO Huzaif.  H-U-Z-A-I-

9    F.  Okay.  So I looked that word up.  That is a bona fide

10   word.  Never heard it before.  And -- but it's not the same as

11   Huzefa.  That's a completely separate word.  So that's no

12   connection.  It's like, in English, talking about Fred is the

13   same as Frank.

14           MR. WEYBRECHT:  Your Honor, I think I have to object

15   at this point.  I mean, this is far outside the scope of this

16   hearing.  And there is no linguist here that can be

17   translating.  Mr. Roper is not an Arabic linguist.  He's not

18   qualified to say this.  We're getting into details of evidence

19   that is appropriate at a trial, not at an extradition hearing.

20           MR. ROPER:  I disagree, Your Honor.

21           THE COURT:  I'm going to overrule the objection.

22   I'll --

23           MR. ROPER:  The -- I mean, there's a long -- and,

24   look, the prosecutor says, even in his brief, he says, well,

25   apparently -- and he used the word apparently -- they're the

1   same.  They're not the same.  I don't know how they get it.

2   It's kind of -- it's like Fred and Frank.  It's (inaudible).

3   There's no evidence to support it.  And, of course, they have

4   the burden, the French do.  It's a completely separate name.

5       Then they say, well, his nickname is AMRK.  Means

6   American.  Okay.  I guess that's possible.  They don't have

7   anything in the affidavit saying that's Internet slang for

8   American.  I looked it up.  I didn't find anything.  Of

9   course, that doesn't mean anything.  Maybe I'm wrong.  But

10  they don't prove anything to say he's an American.

11      And so, again, maybe it's possible.  But, again, that one

12  goes to the -- by the wayside, too.  I don't think that shows

13  anything.

14      Then they have some other ones, nicknames.  CEO

15  PrivateBank.  No connection there.  H20.  Have no idea.  HAJL.

16  I have no idea what that means.  No connection there.  Kucho

17  ind.  And I didn't even know what kucho is.  Apparently, it's

18  an Indian food, okay.  So there you go.  Did he have a

19  restaurant or something?  Shoku Luis Transf.  TimeZone.  Token

20  CEO VIP.  Zuckerberg.  I don't know how -- what connection

21  there is.  But of all those -- if all those nicknames are

22  supposed to go back to this CEO guy and it has  -- it doesn't

23  have a thing to do with Mr. Ismail.  Okay?

24      Now, they do mention that there's a Dubai deal and

25  MoneyMan.  That could be him.  But you've got to remember:

1    Just in Dubai alone, there are over three million people who

2    live there.  And most of the population there, about 88

3    percent of them, are foreigners.  Now, if you look at the full

4    country of UAE, there's 10 million people there.  So I don't

5    know what connection that has.

6         And so, really, what we're left with is just this flight

7    information to try to establish that it's Ismail.  And by the

8    way, when they talk about -- I want to make sure the Court

9    understands.  They garnered from flight records not -- the

10   kids -- Ismail's -- wasn't flying with his children to Dubai

11   or Istanbul.  They garner that, the date of birth for the

12   child, from a flight for Mr. Ismail and his family, travel

13   from Dubai to see their, you know, relatives that live in

14   India.  They traveled from Dubai to India, and that was the

15   trip.  It has no connection.

16        So, look, what we're left with is you have, you know, the

17   -- what the prosecutor wants to do is dumb down this probable

18   cause standard to essentially nothing and doesn't allow us to

19   present any evidence to support the fact there's not probable

20   cause.  I think it's 180 degrees different from any kind of

21   warrant that would have been presented by an FBI agent or Mr.

22   Weybrecht, who's a very talented prosecutor, to present, and

23   it's something you would never see.  And when they say police

24   cooperation, where they speculate about whether he's got a

25   Brabus, it just isn't there.

1      And I ask you, Your Honor, to -- you know, there's a

2  reliability and credibility determination you're called on to

3  make.  And, look, the statute is -- this isn't the first time

4  I've raised this with the prosecutor -- the French have an

5  ability.  They can go back and redo a packet and arrest him

6  next week if they want to, if they thought about it.  And if

7  he's the big -- big dog that they say he is, it should be

8  easier for them to do than one stupid flight four years ago in

9  a -- over a five-year investigation.  If he's the big dog that

10  they think he is, they should be able to come up with some

11  evidence.  But I think here in the United States, we have high

12  standards.  And I ask you respectfully to maintain, maintain

13  that standard.

14          THE COURT:  Thank you, Mr. Roper.

15    Reply, Mr. Weybrecht?

16         MR. WEYBRECHT:  Yes, Your Honor.  First, I would

17  point out probable cause is not a high standard.  It's

18  actually quite a low standard, as the Court knows, and this

19  evidence more than meets that threshold of probable cause.

20    I would like to point out a few things, specifics.  So,

21  defense counsel -- or, excuse me, Fugitive's attorney talked

22  about the birth date and said, actually, it was the day

23  before.  That's not correct.  If you look at the actual text,

24  January 11th, 2021, 3DOR3D:  No, bro, I'm in the hospital with

25  my missus.  Busy today.  And then the following day he says:

1    Sorry.  Been busy with doctor.  Just had a little new one.

2        The idea that that's conclusively saying that he was born

3    -- the child was born on January 12th instead of January 11th,

4    the context there is more than sufficient.  I can tell you

5    from personal experience I was in the hospital the next day

6    after my wife had a baby.  We were still there.  And I said,

7    My wife just had a baby.  The idea that that somehow is like

8    some gotcha moment, that, oh, it was actually the day before,

9    I think is a little bit preposterous.

10        You know, going to the car registration, first of all,

11    again, a brick is not a wall.  The fact that there's a -- what

12    is in pictures of 3DOR3D the same type of car as what the

13    cooperator said that Ismail has, the idea that the Government

14    of France has to provide car registrations and proof and it --

15    there are many reasons.  Number one, Mr. Roper didn't have car

16    registrations going back to 2021.  So it very well could be

17    that he was -- had that car registered.  It could be he didn't

18    have the car registered.  It could be the car was registered

19    in a different name.  It could be all of these things.  But

20    that's not the standard.  We're not at trial here.  We're not

21    proving beyond a reasonable doubt.  We're saying there are

22    similarities here.  There's 3DOR3D and Mr. Ismail.  This car

23    looks like it's the same.  Let's look at the other evidence.

24    And then you start stacking the bricks, and the bricks build

25    into a wall that goes over probable cause.

1    It's the same thing.  And, again, I know Mr. Roper may not

2    like it, but the law is clear that credibility determinations

3    are not to be made at this proceeding.  I'll just cite two

4    cases.  You know, sometimes in the Fifth Circuit we say "even

5    the Ninth Circuit."  *Santos v. Thomas* -- and this was cited in

6    our brief -- 830 F.3d 987.  And then I'll cite another one.

7    *Eain v. Wilkes*, and this is a Seventh Circuit case, 641 F.2d

8    504.  There's other cases as well.  This is a common issue

9    that comes up in extradition proceedings, and courts

10    consistently hold that credibility determinations are not to

11    be made.  The Court is to take what is being presented as

12    true, and the Defendant is not allowed to offer evidence to

13    contradict that.  And that's, again, because we're not here at

14    trial.  We're not weighing credibility of witnesses.  And so

15    Mr. Roper may not like it, but that's the law.

16    The websites.  The nicknames.  He went to a website in

17    2025 and says now that website doesn't have any watches on it.

18    That's -- that doesn't mean anything.  In 2020, when the

19    website -- 2021, when the website was recited and reviewed by

20    the French, they said that that website has watches on it.

21    Again, that statement, that that website was a watch website,

22    is entitled to deference by this Court.  The fact that it now

23    doesn't have watches on it four or five years later has no

24    probative value whatsoever as to the French's statement.

25    The flights.  Okay.  Mr. Roper reads the statement too

1  narrowly.  And I'm looking at the page at the bottom with X

2  Ismail with number ending in 65.  If you look at the middle,

3  right before those text messages, the investigators first

4  established from CEO-DARKBANK exchanges via his Sky PIN, and

5  then it lists several of them, including Roarke 91 (phonetic),

6  3TFF17, and then it says, with other correspondence, PINS,

7  BA69AQ, 8A0ARG, and 3C3VNC, that he had spent time in Turkey

8  and had flown from Dubai to Istanbul on these particular

9  dates.

10     They then list an exemplary text string, which you'll note

11  does not include Roarke 91, does not include 3TFF17, does not

12  include PINS, does not include 8A0ARG, does not include

13  3C3VNC.  And so while Mr. Roper reads those text messages as

14  exhaustive, that's not the case.  The French government is

15  saying in this that they have reviewed text messages, other

16  strings.  That they are including one of those strings, which

17  includes only 3DOR3D, BA69AQ, and 8A0ARG, not any of the other

18  ones.  So this is just an example.

19     And, again, the French's statement about reviewing these

20  other texts is to be taken as credible by this Court.  The

21  fact that they don't include all of their evidence, all of the

22  specific chats, is not a question -- or, is not something that

23  raises into doubt the specific evidence that's offered here.

24     And then, lastly, regarding the flight and the birth date

25  and probabilities, again, we're talking probable cause here.

1  Again, it could have been that 3DOR3D and Mr. Ismail were on

2  the same flight, roundtrip, on February 14th and February

3  22nd.  They just happened to be on the same flight.  But,

4  again, combined with all the other evidence, the odds of that

5  are exceptionally unlikely.  The odds are far beyond probable

6  cause that 3DOR3D and Ismail are the same person.

7       And so for these reasons, Your Honor, again, the evidence

8  more than meets probable cause, and the Court should certify.

9            THE COURT:  Thank you, Mr. Weybrecht.

10      The Court turns to the requirements that must exist here

11  for it to consider the Government of France's request for

12  extradition.

13      First, can the Court conduct the extradition proceeding?

14  It can.  I think the law is clear under 18 U.S.C. Section 3184

15  that a magistrate judge can conduct an extradition proceeding.

16  That's also permitted under the Local Rules of our Court.

17      The Court has jurisdiction.  I don't think there's any

18  dispute that Mr. Ismail was found at the DFW Airport, which is

19  located within this district.

20      There was an extradition treaty in full force and effect,

21  and there currently is, between the Government of France and

22  the Government of the United States, as reflected by the

23  extradition packet and also by the text of the treaty itself

24  and the amendments to that.

25      Mr. Weybrecht, do you offer those exhibits into evidence?

 1          MR. WEYBRECHT:  Yes, Your Honor.  The Government

 2    would offer Exhibits Docket No. 27-1 and Docket No. 33-1.

 3          THE COURT:  Any objections?

 4          MR. ROPER:  Just the objection we raised as to the --

 5    whether they're reliable enough to be considered.  But other

 6    than that, we don't have any.

 7          THE COURT:  All right.  I'll overrule the objections

 8    and the evidence of the text of the treaty between France and

 9    the United States, ECF Nos. 27-1 and 33-1, are admitted.  For

10    purposes of the record, ECF 27-1 will be Government Exhibit 2

11    and 33-1 will be Government Exhibit 3.  Well, actually, let's

12    say, 27-1 is the whole packet, so it'll be GX-1.  33-1 will be

13    GX-2.  And the text of the treaty on extradition between

14    France and the United States is contained within the

15    extradition packet that's Document ECF No. 27-1.

16          (Government's Exhibits 1 and 2 are admitted.)

17          THE COURT:  The offenses for which the Government is

18    moving for extradition on behalf of the Government of France

19    -- money laundering, serious money laundering, and conspiracy

20    -- are covered by the treaty.  There certainly are analog

21    offenses within the United States Code.  18 U.S.C. Sections

22    1956, 1957, and 371 are all equivalent.

23          The offenses proffered by the Government of France are

24    brought within the applicable statute of limitations in

25    France.

1    And then that falls to the question of probable cause.  I

2  do find probable cause here.

3    I certainly agree with Mr. Roper that the individual

4  pieces of evidence offered in the extradition packet could be

5  worded better, stronger.  The Court is left with the

6  impression that the question of what goes to trial in France

7  is somewhat different from what goes to trial in the United

8  States.  Discussions of possibilities, not probabilities.  I

9  can certainly see that argument.

10    However, the issue on probable cause here has to take into

11  account each of these individual pieces of evidence.  The

12  plane trips.  The new baby.  The Brabus.  The Russian

13  girlfriend.  And nicknames.  I think individually they're not

14  very impressive to the Court in terms of probable cause, but

15  the point here is what does the totality of the evidence

16  indicate, and I just can't say that there's nothing there that

17  the Government of France could prosecute Mr. Ismail on.

18    Now, can they succeed?  I don't know.  I've never had any

19  involvement with a French prosecution, or a French civil case,

20  for that matter.  I don't know.  But the issue here is

21  probable cause to hold over for trial, and I think, given the

22  case law and the limitations on the evidence that can be

23  argued and offered and disposed of in front of a U.S. judge on

24  an extradition application is such that it's just a matter of

25  whether I certify to the Secretary of State in terms of

1    whether there is probable cause, and I'm going to certify to

2    him that there is.

3        I'll therefore order that Mr. Ismail be retained in a

4    proper jail pending action by the Secretary of State on the

5    French application for extradition of Mr. Ismail in this

6    matter.

7        Now, is there anything else that we need to take up here?

8    Is there any other evidence that either side wants to put in

9    the record?

10           MR. WEYBRECHT:  Not from the Government, Your Honor.

11           MR. ROPER:  I just, look, I think, as you -- I've

12   argued, I think he's wrong about this credibility

13   determination issue.  And it goes to the whole standard of

14   whether it's conclusory, too.  There's so many conclusory

15   statements.  And I cite a string of cases that say that.  So I

16   just take issue with that.  I think you can determine

17   credibility as it relates to probable cause.  So, that's my

18   only position.  I don't have any other evidence at all.

19           THE COURT:  Okay.  And I understand that, Mr. Roper,

20   and I appreciate your argument.  I just think the law goes the

21   other way.  I think you can -- you can challenge whether

22   there's probable cause here, and I think you've done that

23   ably.  But I just think that the standard here to be met is

24   met, and that will be the Court's ruling.

25       So, anything else, then?

1          MR. WEYBRECHT:  No, Your Honor.

2          MR. ROPER:  No, Your Honor.

3          THE COURT:  All right.  Very well.  Mr. Ismail, I

4   remand you back to the custody of the United States Marshal

5   pending direction from the Secretary of State.

6      (Proceedings concluded at 10:05 a.m.)

7                        --oOo--

8

9

10

11

12

13

14

15

16

17

18

19                      CERTIFICATE

20      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21  above-entitled matter.

22  **/s/ Kathy Rehling**                              **04/03/2025**

23

24  _____          _____
    Kathy Rehling, CETD-444                        Date
25  Certified Electronic Court Transcriber

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                                    INDEX

PROCEEDINGS                                                      3

WITNESSES

-none-

EXHIBITS

Defendant's Exhibit B                          Received  17
Defendant's Exhibit C                          Received  17

Government's Exhibit 1                          Received  35
Government's Exhibit 2                          Received  35

RULINGS                                                          34

END OF PROCEEDINGS                                               38

INDEX                                                            39